KARA HENDRICKS, ESQ.
Nevada Bar No. 07743
KYLE A. EWING, ESQ.
Nevada Bar No. 14051
MADELEINE COLES, ESQ.
Nevada Bar No. 16216
**GREENBERG TRAURIG, LLP**
10845 Griffith Peak Drive Suite 600
Las Vegas, Nevada 89135
Telephone: (702) 792-3773
Facsimile: (702) 792-9002
Email: hendricksk@gtlaw.com
ewingk@gtlaw.com
madeleine.coles@gtlaw.com

*Attorneys for Plaintiff Geoff Winkler, in his Capacity as a Court-Appointed Receiver*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| GEOFF WINKLER, as court-appointed receiver for J&J CONSULTING SERVICES INC., et al.,<br><br>Plaintiff,<br><br>v.<br><br>DAVID RISKE, an individual;, an individual; MICK LOPEZ, an individual; JULIE MAYER, an individual; MICHAEL BARNEY, an individual; BRAD BERRETT, an individual; JARED BONNELL, an individual; CAREN IGERT, an individual; ROBERT ZOBRIST, an individual; ZANE HADFIELD, an individual; GARY JUDD, an individual; JONATHAN F. KINNEY, an individual; CESAR MAURTUA, an individual; PETER B. MURRAY, an individual; EMILY NEWBERRY an individual; DONALD B. ROWLAND, an individual; JOHN SIEGRIST, an individual; ROBERT SEIK, an individual; and RICH MARINO, an individual,<br><br>Defendants. | CASE NO.<br><br>**COMPLAINT FOR FRAUDULENT TRANSFER** |

/ / /

/ / /



GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive Suite 600 , Las Vegas, Nevada 89135
Telephone: (702) 938- 6856

Plaintiff Geoff Winkler (the "***Receiver***"), in his capacity as the court-appointed receiver for nonparties J&J Consulting Services, Inc., an Alaska corporation; J&J Consulting Services, Inc., a Nevada corporation; J and J Purchasing LLC; The Judd Irrevocable Trust; and BJ Holdings LLC (collectively, the "***Receivership Entities***" or the "***J&J Enterprise***"), together with their subsidiaries and affiliates, brings this action against Defendants to recover fraudulent transfers made by the Receivership Entities to Defendants, as further detailed below.

**PARTIES**

1. Plaintiff Geoff Winkler was appointed by the United States District Court for the District of Nevada in an enforcement action brought by the Securities and Exchange Commission (the "***SEC***") and captioned *SEC v. Matthew Wade Beasley, et al.*, bearing Case No. 22-cv-00612-CDS-EJY (the "***Receivership Action***") to serve as the Receiver for the J&J Enterprise.[1] Mr. Winkler is a citizen of Oregon and a resident of Marion County, Oregon. He brings this action solely in his capacity as the court-appointed Receiver, and not in his individual capacity.

2. At relevant times, the business and affairs of the J&J Enterprise were conducted through a Nevada corporation formed in 2005, J&J Consulting Services, Inc., and controlled by Receivership Defendant and nonparty Jeffrey Judd.

3. Prior to being placed into receivership, including at all times relevant here, the J&J Enterprise's principal place of business, including for each separate Receivership Entity, was in Las Vegas, Nevada.

4. On information and belief, David Riske is a citizen of Nevada.

5. On information and belief, Mick Lopez is a citizen of Nevada.

6. On information and belief, Julie Mayer is a citizen of Nevada.

7. On information and belief, Michael Barney is a citizen of Nevada.

[1] Mr. Winkler was also appointed Receiver over the Wells Fargo Interest on Lawyers' Trust Account ending in 5598 and held in the name of Beasley Law Group PC – through which the defendants to the Receivership Action funneled many of the funds alleged here to have been fraudulently transferred. He was also appointed Receiver over the personal assets of Matthew Wade Beasley; Jeffrey J. Judd; Christopher R. Humphries; Shane M. Jager; Jason M. Jongeward; Denny Seybert; and Roland Tanner (together with the Receivership Entities, the "***Receivership Defendants***"). Finally, Mr. Winkler was also appointed the Receiver over certain "relief" defendants in the Receivership Action.

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 938-6856

8. On information and belief, Brad Berrett is a citizen of Nevada.

9. On information and belief, Jared Bonnell is a citizen of Nevada.

10. On information and belief, Caren Igert is a citizen of Nevada.

11. On information and belief, Robert Zobrist is a citizen of California.

12. On information and belief, Zane Hadfield is a citizen of Nevada.

13. On information and belief, Gary Judd is a citizen of Nevada.

14. On information and belief, Jonathan F. Kinney is a citizen of Nevada.

15. On information and belief, Cesar Maurtua is a citizen of Nevada.

16. On information and belief, Peter B. Murray is a citizen of California.

17. On information and belief, Emily Newberry is a citizen of Nevada.

18. On information and belief, Donald B. Rowland is a citizen of Nevada.

19. On information and belief, John Siegrist is a citizen of Nevada.

20. On information and belief, Robert Seik is a citizen of Nevada.

21. On information and belief, Rich Marino is a citizen of Nevada.

## JURISDICTION, AND VENUE

22. The Court has jurisdiction over the parties and over this cause of action pursuant to 28 U.S.C. §§ 754 and 1367 in that this action, brought by the Receiver, arises from a common nucleus of operative facts as, and is substantially related to the original claims in, the Receivership Action, which is currently pending in this District (the "***Receivership Court***").

23. Pursuant to its June 3, 2022, Order Appointing Receiver (the "***Appointment Order***"), the Receivership Court took "exclusive jurisdiction and possession of the assets, of whatever kind and wherever situated" of the Receivership Defendants, as defined above, after finding that "appointment of a receiver in this action is necessary and appropriate for the purposes of marshaling and preserving all assets of the [Receivership D]efendants and those assets of certain Relief Defendants that … are attributable to funds derived from investors or clients of the [Receivership D]efendants …. [or] were fraudulently transferred by the [Receivership D]efendants …."

24. Put differently, the Receivership Court has exercised *in rem* jurisdiction over the

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive Suite 600 , Las Vegas, Nevada 89135
Telephone: (702) 938- 6856

object of this lawsuit.

25. The Court also has personal jurisdiction over those Defendants residing in Nevada, as alleged above.

26. Further, the Court has personal jurisdiction over all Defendants because Defendants purposefully availed themselves of the privileges of conducting activities within the State of Nevada by accepting what turned out to be illicit funds from a Nevada lawyer's trust account in Nevada, which funds were ostensibly the property of a Nevada corporation with a known principal place of business of Las Vegas, Nevada.

27. In some cases, J&J Enterprise investors also met and communicated with individuals associated with the J&J Enterprise in Nevada.

28. Venue in the District of Nevada is proper under 28 U.S.C. § 1391 because this action is an ancillary proceeding to the Receivership Action, which is pending in this District. Additionally, Defendants' actions, as described in this Complaint, emanated primarily to and from Clark County, Nevada.

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 938-6856

## BACKGROUND ALLEGATIONS

### SEC ACTION AND APPOINTMENT OF RECEIVER

29. The Receivership Action stems from a long-running Ponzi-scheme perpetrated by attorney Matthew Beasley; his law firm, the Beasley Law Group; Receivership Defendant Jeffrey Judd; Receivership Defendant Christopher Humphries; and the Receivership Entities, with substantial assistance from others, including, without limitation, the other defendants named in the Receivership Action.

30. In the Receivership Action, the SEC alleges that from at least 2017 and continuing through March 2022, the Receivership Entities offered investments in purported settlement contracts with tort plaintiffs called "purchase agreements," which the SEC alleges constitute securities under federal law.

31. According to the SEC's Complaint, promoters of the J&J Enterprise told investors they could invest in insurance tort settlements and that the funds would be used to make advance payments to Plaintiffs who had reached a settlement with insurance companies and were willing

to pay a premium to receive a portion of their settlement in advance.

32. The J&J promoters are alleged to have informed investors they would receive returns of at least 12.5% every 90 days, for an annualized return of 50% or more and that Beasley and the Beasley Law Group managed relationships with numerous personal injury attorneys around the country to maintain a supply of purchase agreements to the J&J Enterprise and its investors.

33. These purported "investments" were memorialized by "purchase agreements" between the Receivership Entities and various tort plaintiffs and their attorneys.

34. However, the purchase agreements upon which the Settlement Scheme were based were fictitious, and the funds provided by investors were, in fact, used to fund lavish lifestyles, including, among other things, luxury homes and properties, a private jet, ATVs, and boats.

35. The promoters of the J&J Enterprise recruited hundreds of investors into the scheme and received transaction-based compensation for bringing in additional investors.

36. As set forth in minute detail in the Receiver's Forensic Accounting Report, a true and correct copy of which is attached as **Exhibit 1**, the J&J Enterprise "operated by the sixteen individual defendants and their seventy-five entities … raised $519.9 million from 1,213 investors, promising them that their investment capital would fund personal injury settlement contracts that would generate revenue worth $1.39 billion." **Ex. 1**., Executive Summary.

37. Ultimately, the J&J Enterprise came crashing down on March 3, 2022, when agents from the FBI executed search warrants at the homes of Judd, Humphries, and Beasley.

38. When agents from the FBI attempted to execute their warrant at Beasley's residence, Beasley drew a weapon, ultimately resulting in his being shot twice, non-fatally, and a standoff ensued.

39. Following the hours-long standoff, Beasley was taken into custody, where he remains to date.

40. On April 12, 2022, the SEC filed a complaint in the Receivership Action.

41. On June 3, 2022, Plaintiff here was appointed as the permanent receiver for the J&J Enterprise, as well as specified assets of other entities and individuals holding Receivership

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive Suite 600 , Las Vegas, Nevada 89135
Telephone: (702) 938- 6856

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive Suite 600 , Las Vegas, Nevada 89135
Telephone: (702) 938-6856

Property, as set forth in detail in the Appointment Order.

**Fraudulent Transfers to Defendants from the Receivership Entities**

42. In connection with his investigation, the Receiver discovered that each of the Defendants was an "investor" in the J&J Enterprise.

43. In connection with his forensic accounting activities, the Receiver carefully reconstructed the books of the J&J Enterprise and, upon completion of the Forensic Accounting Report, concluded that these particular investors were what the courts refer to as "net winners" because they ultimately received more funds *from* the Receivership Entities than they paid *to* the Receivership Entities.[2]

44. Specifically, the J&J investments were structured like debt, and each Defendant here received more payments of interest and/or principal on their "contracts" than they had paid in principal to make the investment.

45. Additionally, many of the Defendants also received transfers of funds from the Receivership Defendants outside of payments of interest and/or principal without exchanging goods or services of reasonably equivalent value. These additional transfers appear to be gratuitous "gifts," informal "loans," unverified "asset purchases," or other transfers for no exchange of value initiated by the individual Receivership Defendants to illicitly divert fraudulently raised funds to their family, friends, or other associates in order to extract a further personal benefit from the Enterprise.

46. Put differently, on "net," the J&J Enterprise transferred more of its assets to each Defendant named here than that same Defendant transferred to the Enterprise, on what forensic accountants refer to as a straight "money in-money out" or "MIMO" basis.

52. The Receivership Entities fraudulently transferred a net total of $30,000.00 to Defendant Riske as the result of the following cash flow activity:

---

[2] *See, e.g.*, *Winkler v. McCloskey*, 83 F.4th 720, 727 (9th Cir. 2023) (citing *Donell v. Kowell*, 533 F.3d 762, 767 n.2 (9th Cir. 2008), and explaining that "net winner" investors are "creditors" under fraudulent transfer principles while the receivership entities are "debtors," availing a receiver or bankruptcy trustee of the ability to "claw back" or "avoid" the transfers *from* the Ponzi scheme to "winning" investors (net of the "principal" the investors had previously transferred *to* the Ponzi Scheme) via UFTA claims or similar claims available under state and/or federal law).

a. Beginning on August 16, 2021, Defendant Riske transferred a total of $100,000.00 to the Receivership Entities, purportedly as 'principal' investment(s);

b. As of a final transaction date of February 14, 2022, the Receivership Entities had transferred a total of $130,000.00 of Receivership Property to Defendant Riske.

53. The Receivership Entities fraudulently transferred a net total of $402,000.00 to Defendant Lopez as the result of the following cash flow activity:

a. Beginning on March 22, 2017, Defendant Lopez transferred a total of $460,000.00 to the Receivership Entities, purportedly as 'principal' investment(s);

b. As of a final transaction date of February 15, 2022, the Receivership Entities had transferred a total of $862,000.00 of Receivership Property to Defendant Lopez.

54. The Receivership Entities fraudulently transferred a net total of $144,223.00 to Defendant Mayer as the result of the following cash flow activity:

a. Beginning on March 20, 2018, Defendant Mayer transferred a total of $323,277.12 to the Receivership Entities, purportedly as 'principal' investment(s);

b. As of a final transaction date of February 15, 2022, the Receivership Entities had transferred a total of $467,500.00 of Receivership Property to Defendant Mayer.

55. The Receivership Entities fraudulently transferred a net total of $905,000.00 to Defendant Barney as the result of the following cash flow activity:

a. Beginning on May 30, 2019, Defendant Barney transferred a total of $2,650,000.00 to the Receivership Entities, purportedly as 'principal' investment(s);

b. As of a final transaction date of February 16, 2022, the Receivership Entities had transferred a total of $3,555,000.00 of Receivership Property to Defendant Barney.

56. The Receivership Entities fraudulently transferred a net total of $1,204,000.00 to Defendant Berrett as the result of the following cash flow activity:

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 938-6856

a. Beginning on January 22, 2019, Defendant Berrett transferred a total of $3,926,000.00 to the Receivership Entities, purportedly as 'principal' investment(s);

b. As of a final transaction date of February 22, 2022, the Receivership Entities had transferred a total of $5,130,000.00 of Receivership Property to Defendant Berrett.

57. The Receivership Entities fraudulently transferred a net total of $44,985.00 to Defendant Bonnell as the result of the following cash flow activity:

a. Beginning on May 28, 2019, Defendant Bonnell transferred a total of $300,015.00 to the Receivership Entities, purportedly as 'principal' investment(s);

b. As of a final transaction date of February 22, 2022, the Receivership Entities had transferred a total of $345,000.00 of Receivership Property to Defendant Bonnell.

58. The Receivership Entities fraudulently transferred a net total of $31,500.00 to Defendant Igert as the result of the following cash flow activity:

a. Beginning on July 23, 2019, Defendant Igert transferred a total of $235,000.00 to the Receivership Entities, purportedly as 'principal' investment(s);

b. As of a final transaction date of February 23, 2022, the Receivership Entities had transferred a total of $266,500.00 of Receivership Property to Defendant Igert.

59. The Receivership Entities fraudulently transferred a net total of $320,500.00 to Defendant Zobrist as the result of the following cash flow activity:

a. Beginning on June 12, 2018, Defendant Zobrist transferred a total of $200,000.00 to the Receivership Entities, purportedly as 'principal' investment(s);

b. As of a final transaction date of February 23, 2022, the Receivership Entities had transferred a total of $520,500.00 of Receivership Property to Defendant Zobrist.

60. The Receivership Entities fraudulently transferred a net total of $1,742,000.00 to Defendant Hadfield as the result of the following cash flow activity:

a. Beginning on April 23, 2019, Defendant Hadfield transferred a total of

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 938-6856

$1,445,000.00 to the Receivership Entities, purportedly as 'principal' investment(s);

b. As of a final transaction date of March 1, 2022, the Receivership Entities had transferred a total of $3,187,000.00 of Receivership Property to Defendant Hadfield.

61. The Receivership Entities fraudulently transferred a net total of $280,067.86 to Defendant Judd as the result of the following cash flow activity:

a. Beginning on June 14, 2017, Defendant Judd transferred a total of $113,850.00 to the Receivership Entities, purportedly as 'principal' investment(s);

b. As of a final transaction date of March 2, 2022, the Receivership Entities had transferred a total of $393,917.86 of Receivership Property to Defendant Judd.

62. The Receivership Entities fraudulently transferred a net total of $3,150,000.00 to Defendant Kinney as the result of the following cash flow activity:

a. Beginning on May 15, 2017, Defendant Kinney transferred a total of $1,870,000.00 to the Receivership Entities, purportedly as 'principal' investment(s);

b. As of a final transaction date of March 2, 2022, the Receivership Entities had transferred a total of $5,020,000.00 of Receivership Property to Defendant Kinney.

63. The Receivership Entities fraudulently transferred a net total of $721,655.40 to Defendant Maurtua as the result of the following cash flow activity:

a. Beginning on April 24, 2017, Defendant Maurtua transferred a total of $3,336,844.60 to the Receivership Entities, purportedly as 'principal' investment(s);

b. As of a final transaction date of March 2, 2022, the Receivership Entities had transferred a total of $4,058,500.00 of Receivership Property to Defendant Maurtua.

64. The Receivership Entities fraudulently transferred a net total of $228,000.00 to Defendant Murray as the result of the following cash flow activity:

a. Beginning on June 12, 2018, Defendant Murray transferred a total of $460,000.00 to the Receivership Entities, purportedly as 'principal' investment(s);

b. As of a final transaction date of March 2, 2022, the Receivership Entities had transferred a total of $688,000.00 of Receivership Property to Defendant Murray.

65. The Receivership Entities fraudulently transferred a net total of $164,000.00 to

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 938-6856

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive Suite 600 , Las Vegas, Nevada 89135
Telephone: (702) 938- 6856

Defendant Newberry as the result of the following cash flow activity:

a. Beginning on December 17, 2019, Defendant Newberry transferred a total of $805,000.00 to the Receivership Entities, purportedly as 'principal' investment(s);

b. As of a final transaction date of March 2, 2022, the Receivership Entities had transferred a total of $969,000.00 of Receivership Property to Defendant Newberry.

66. The Receivership Entities fraudulently transferred a net total of $1,313,500.00 to Defendant Rowland as the result of the following cash flow activity:

a. Beginning on January 11, 2018, Defendant Rowland transferred a total of $3,379,500.00 to the Receivership Entities, purportedly as 'principal' investment(s);

b. As of a final transaction date of March 2, 2022, the Receivership Entities had transferred a total of $4,693,000.00 of Receivership Property to Defendant Rowland.

67. The Receivership Entities fraudulently transferred a net total of $306,500.00 to Defendant Siegrist as the result of the following cash flow activity:

a. Beginning on September 4, 2020, Defendant Siegrist transferred a total of $430,000.00 to the Receivership Entities, purportedly as 'principal' investment(s);

b. As of a final transaction date of March 2, 2022, the Receivership Entities had transferred a total of $736,500.00 of Receivership Property to Defendant Siegrist.

68. The Receivership Entities fraudulently transferred a net total of $1,354,336.02 to Defendant Seik as the result of the following cash flow activity:

a. Beginning on October 14, 2016, Defendant Seik transferred a total of $2,114,193.98 to the Receivership Entities, purportedly as 'principal' investment(s);

b. As of a final transaction date of March 3, 2022, the Receivership Entities had transferred a total of $3,468,530.00 of Receivership Property to Defendant Seik.

69. The Receivership Entities fraudulently transferred a net total of $222,000.00 to Defendant Marino as the result of the following cash flow activity:

a. Beginning on May 5, 2020, Defendant Marino transferred a total of $2,726,750.00 to the Receivership Entities, purportedly as 'principal' investment(s);

b. As of a final transaction date of March 7, 2022, the Receivership Entities

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 938-6856

had transferred a total of $2,948,750.00 of Receivership Property to Defendant Marino.

70. The transfers to Defendants from the J&J Enterprise described above were made from the fruits of the fraudulent scheme; specifically, these transfers were made from principal "investment money" from new and/or existing investors' principal investment money.

71. These transfers were not comprised of earned revenues, interest, or returns on investments in connection with the settlement contracts the Receivership Entities purported to make or otherwise; indeed, the Receiver is not aware of a single non-fictitious settlement contract, a single dollar "loaned" to a settling plaintiff, or a single dollar of "interest" repaid from such a settling plaintiff. Put differently, never during the life of the J&J Enterprise were *any* revenues from the purchase or sale of settlement contracts earned, let alone revenue sufficient to meet the current or long-term debt obligations of the Enterprise that were being created—and accumulated—every time one of the Receivership Defendants or another promoter brought a new investor into the "fold."

72. The representations made by the Receivership Defendants and/or other promoters to Defendants and other similarly situated investors were untrue, and in fact (a) hundreds of millions of dollars were used for Ponzi payments and unauthorized personal and so-called business expenses; (b) any investor returns and "commissions" to Enterprise insiders were entirely fictitious and funded solely by the influx of new and additional investor money; (c) the J&J Enterprise was never profitable and consistently operated "in the red"; and (d) all of that being the case, the J&J Enterprise was never solvent—its liabilities were greater than its assets (and it was unable to pay its debts as they became due) from the moment it entered the first settlement purchase contract with an "investor." The Enterprise never had any revenue-generating assets and thus could not have produced income sufficient to service even one settlement contract.

73. In truth, the Receivership Entities derived their assets from investor principal investments, which the Receivership Defendants consistently commingled; nevertheless, the J&J Enterprise and those working for it represented to investors and potential investors that the J&J Enterprise was wildly profitable and that the investments were guaranteed because the settlements were already in hand and the funds to repay the settlement advances were supposedly to be

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive Suite 600 , Las Vegas, Nevada 89135
Telephone: (702) 938- 6856

provided from heavily regulated, institutional insurance companies.

74. J&J investors relied upon the fictitious interest and growth purportedly achieved via the (apparently endless) supply of settlement purchase contracts (and the supposedly guaranteed repayment of investors' principal) in making additional investments, and the Receivership Defendants pointed to "success stories"—like Defendants here—as part of their "pitch" to keep the scheme going by bringing in new investors.

75. These newer—and therefore ultimately "losing"—investors were not told that their "principal" would soon be funding supposed interest payments to older ("winning") investors as soon as the Receivership Defendants could convert the newly "invested" funds to payouts of supposed "interest" or purported "returns of capital" to the "winning" investors.

76. The principal investment money from new investors, the existing investors' principal investment money, and the existing investors' additional principal investment money should have been used for the J&J Enterprise's stated purpose, which was purportedly funding tort settlements.

77. Instead, the Receivership Defendants caused the J&J Enterprise to divert investor funds for numerous unauthorized and illicit uses, including fraudulent transfers to the Defendants here to "keep up the ruse" by satisfying older investors' debts with new investment money, allowing the Enterprise to hide the insolvency and fraudulent nature of the Enterprise to new prospective investors.

78. Regardless of whether the Defendants were aware that the J&J Enterprise was a Ponzi scheme, or was otherwise fraudulent, to allow Defendants to keep monies they received from the Receivership Entities would be inequitable and unjust, including to the "losing" J&J investors.

79. Indeed, there are hundreds of investors who never received a full return of capital and thus made a "net" transfer of funds *to* the J&J Enterprise; in fact, some of these investors never even saw a single dollar of their investment returned in the form of either interest or a return of capital.

80. In stark contrast, some of the "net winners" of the J&J Enterprise from whom the

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive Suite 600 , Las Vegas, Nevada 89135
Telephone: (702) 938- 6856

Receiver is now seeking recovery *made millions of dollars in profit* for returns on investment well in excess of 100% and/or received additional transfers of funds from the J&J Enterprise without exchanging goods or services of reasonably equivalent value.

**FIRST CLAIM FOR RELIEF**

(AVOIDANCE OF FRAUDULENT TRANSFERS UNDER NRS 112.180(1)(A))

81. The Receiver re-alleges each allegation set forth above.

82. The Receivership Entities, at all relevant times, were "debtors" to their "investors," as debtor is defined in NRS 112.150(6).

83. Because the individual Receivership Defendants intentionally and wrongfully caused the Receivership Entities to transfer investors' principal investment monies to Defendants as described above, the Receivership Entities, through the Receiver as creditor, have a right to repayment of the wrongfully transferred amounts on behalf of the J&J Enterprise's "losing" investors.

84. The transfers of monies that the individual Receivership Defendants caused the Receivership Entities to make to Defendants were inherently fraudulent and made with actual intent to hinder, delay, or defraud the Receivership Entities because the transfers were made as part of the individual Receivership Defendants' scheme, which here was a Ponzi scheme.

85. The fact that the J&J Enterprise never received any revenue from any "real" settlement purchase contract demonstrates that the Receivership Entities, as a practical matter, were persistently insolvent, as the individual Receivership Defendants must have known or should have known.

86. In addition, transfers to Defendants above and beyond their "principal" "investments" were made for less than reasonably equivalent value or fair consideration and at a time when the J&J Enterprise was (i) engaged or was about to engage in a business or a transaction for which the remaining assets of the Enterprise were unreasonably small in relation to the business or transaction and/or (ii) the Receivership Entities intended, believed, or should have believed they would incur debts beyond their ability to pay as they became due.

87. Further, the Receivership Entities were insolvent at the time of the transfer(s) or

became insolvent after the transfer(s) occurred.

*88.* The transfers are therefore avoidable pursuant to the Uniform Fraudulent Transfer Act, NRS 112.140 *et seq*.

89. The Receiver is entitled to exercise rights under NRS 112.210.

90. As it has now become necessary for the Receiver to engage the services of legal counsel to prosecute this action, and because the Defendants here are in contempt of the Receivership Court's Appointment Order, which requires the turnover of Receivership Property fraudulently transferred by the Receivership Entities to the Receiver by all Parties with actual notice of the Appointment Order, the Receiver is entitled to recover the attorney fees and costs he has incurred and continues to incur in this action.

**SECOND CLAIM FOR RELIEF**

(AVOIDANCE OF FRAUDULENT TRANSFERS UNDER NRS 112.180(1)(B))

91. The Receiver re-alleges each allegation set forth above.

92. The Receivership Entities, at all relevant times, were "debtors" to their "investors," as debtor is defined in NRS 112.150(6).

93. Because the individual Receivership Defendants intentionally and wrongfully caused the Receivership Entities to transfer investors' principal investment monies to Defendants as described above, the Receivership Entities, through the Receiver as creditor, have a right to repayment of the wrongfully transferred amounts on behalf of the J&J Enterprise's "losing" investors.

94. The transfers of monies that the individual Receivership Defendants caused the Receivership Entities to make to Defendants were inherently fraudulent and made with actual intent to hinder, delay, or defraud the Receivership Entities because the transfers were made as part of the individual Receivership Defendants' scheme, which here was a Ponzi scheme.

95. The fact that the J&J Enterprise never received any revenue from any "real" settlement purchase contract demonstrates that the Receivership Entities, as a practical matter, were persistently insolvent, as the individual Receivership Defendants must have known or should have known.

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive Suite 600 , Las Vegas, Nevada 89135
Telephone: (702) 938-6856

96. In addition, transfers to Defendants above and beyond their "principal" "investments" were made for less than reasonably equivalent value or fair consideration and at a time when the J&J Enterprise was (i) engaged or was about to engage in a business or a transaction for which the remaining assets of the Enterprise were unreasonably small in relation to the business or transaction and/or (ii) the Receivership Entities intended, believed, or should have believed they would incur debts beyond their ability to pay as they became due.

97. Further, the Receivership Entities were insolvent at the time of the transfer(s) or became insolvent after the transfer(s) occurred.

*98.* The transfers are therefore avoidable pursuant to the Uniform Fraudulent Transfer Act, NRS 112.140 *et seq.*

99. The Receiver is entitled to exercise rights under NRS 112.210.

100. As it has now become necessary for the Receiver to engage the services of legal counsel to prosecute this action, and because the Defendants here are in contempt of the Receivership Court's Appointment Order, which requires the turnover of Receivership Property fraudulently transferred by the Receivership Entities to the Receiver by all Parties with actual notice of the Appointment Order, the Receiver is entitled to recover the attorney fees and costs he has incurred and continues to incur in this action.

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive Suite 600 , Las Vegas, Nevada 89135
Telephone: (702) 938- 6856

## **<u>THIRD CLAIM FOR RELIEF</u>**

(AVOIDANCE OF FRAUDULENT TRANSFERS UNDER NRS 112.190)

101. The Receiver re-alleges each allegation set forth above.

102. The Receivership Entities, at all relevant times, were "debtors" to their "investors," as debtor is defined in NRS 112.150(6).

103. Because the individual Receivership Defendants intentionally and wrongfully caused the Receivership Entities to transfer investors' principal investment monies to Defendants as described above, the Receivership Entities, through the Receiver as creditor, have a right to repayment of the wrongfully transferred amounts on behalf of the J&J Enterprise's "losing" investors.

104. The transfers of monies that the individual Receivership Defendants caused the

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive Suite 600 , Las Vegas, Nevada 89135
Telephone: (702) 938- 6856

Receivership Entities to make to Defendants were inherently fraudulent and made with actual intent to hinder, delay, or defraud the Receivership Entities because the transfers were made as part of the individual Receivership Defendants' scheme, which here was a Ponzi scheme.

105. The fact that the J&J Enterprise never received any revenue from any "real" settlement purchase contract demonstrates that the Receivership Entities, as a practical matter, were persistently insolvent, as the individual Receivership Defendants must have known or should have known.

106. In addition, transfers to Defendants above and beyond their "principal" "investments" were made for less than reasonably equivalent value or fair consideration and at a time when the J&J Enterprise was (i) engaged or was about to engage in a business or a transaction for which the remaining assets of the Enterprise were unreasonably small in relation to the business or transaction and/or (ii) the Receivership Entities intended, believed, or should have believed they would incur debts beyond their ability to pay as they became due.

107. Further, the Receivership Entities were insolvent at the time of the transfer(s) or became insolvent after the transfer(s) occurred.

*108.* The transfers are therefore avoidable pursuant to the Uniform Fraudulent Transfer Act, NRS 112.140 *et seq.*

109. The Receiver is entitled to exercise rights under NRS 112.210.

110. As it has now become necessary for the Receiver to engage the services of legal counsel to prosecute this action, and because the Defendants here are in contempt of the Receivership Court's Appointment Order, which requires the turnover of Receivership Property fraudulently transferred by the Receivership Entities to the Receiver by all Parties with actual notice of the Appointment Order, the Receiver is entitled to recover the attorney fees and costs he has incurred and continues to incur in this action.

**FOURTH CLAIM FOR RELIEF**

(UNJUST ENRICHMENT)

111. The Receiver re-alleges each allegation set forth above.

112. Defendants received a benefit when, during the course of the scheme, the

individual Receivership Defendants caused the Receivership Entities to transfer money to them.

113. Defendants knowingly and voluntarily accepted and retained the transferred monies.

114. The circumstances alleged in this complaint render Defendants' retention of that benefit inequitable and unjust.

115. Pursuant to all applicable law and principles of equity, and to the extent any transfers to Defendants cannot be unwound and/or disgorged pursuant to the preceding claims for relief, the Receiver is entitled to a judgment against Defendants in the net amount of J&J Enterprise funds each received.

WHEREFORE, the Receiver asks this Court to:

1. Enter judgment against Defendants in the net amount of monies each defendant received from the J&J Enterprise, whether by way of a fraudulent transfer or as an unjust benefit;

2. Enter an award in the Receiver's favor for the reasonable attorneys' fees and costs the Receivership Estate incurred in bringing this action;

3. Enjoin any further dissipation by Defendants of the fraudulently transferred funds described above; and

4. Order any further relief that the Court under law or principles of equity deems just and proper under the law or under principles of equity.

DATED this 31st day of March, 2026.

GREENBERG TRAURIG, LLP

By: /s/ Kara B. Hendricks

KARA B. HENDRICKS, Bar No. 07743
KYLE A. EWING, Bar No. 014051
MADELEINE COLES, Bar No. 16216

***Attorneys for Plaintiff Geoff Winkler, in his Capacity as a Court-Appointed Receiver***

GREENBERG TRAURIG, LLP
10845 Griffith Peak Drive Suite 600, Las Vegas, Nevada 89135
Telephone: (702) 938-6856