# EXHIBIT 1

EXHIBIT 1

**FORENSIC ACCOUNTING REPORT**

EST. 2020
AMERICAN
FIDUCIARY
SERVICES

# FORENSIC ACCOUNTING REPORT ON THE RECONSTRUCTED BUSINESS ACTIVITIES OF SIXTEEN INDIVIDUALS AND SEVENTY-FIVE ENTITIES AND THEIR OPERATION OF THE J&J ENTERPRISE FROM OCTOBER 2016 THROUGH JUNE 2022

**Prepared by:**

**John B. Hall, MBA, CFE, CIRA, CDBV, CSAR**

**Accountant for Geoff Winkler, Receiver**

**March 31, 2025**

**CASE NO.:2-22-CV-00612-CDS-EJY:**

Securities and Exchange Commission v.

DEFENDANTS: Matt Beasley, Beasley Law Group PC, Jeff Judd, Chris Humphries, J&J Consulting Services, Inc (Alaska), J&J Consulting Services, Inc (Nevada), J and J Purchasing LLC, Shane Jager, Jason Jongeward, Denny Seybert, Roland Tanner, Larry Jeffery, Jason Jenne, Seth Johnson, Chris Madsen, Richard Madsen, Mark Murphy, Cameron Rohner, Warren Rosegreen; and

RELIEF DEFENDANTS: The Judd Irrevocable Trust, PAJ Consulting Inc, BJ Holdings Inc, Stirling Consulting LLC, CJ Investments LLC, JL2 Investments LLC, Rocking Horse Properties LLC, Triple Threat Basketball LLC, ACAC LLC, Anthony Michael Alberto Jr., and Monty Crew LLC; and

-ooo-

OTHER RELATED DEFENDANT ENTITIES: AAA Las Vegas Event Planner Inc, All American Builders, Inc #2, American Colocation Services LLC, American Investment Company LLC, Anderson Dairy Creamery, Anthem Assets LLC, Battle Born Funding LLC, BugRaiders Pest Control LLC, Business Center LLC, Business Investment LLC, C&C Group Holding LLC, Cameron Rohner LLC, Capital Core Financial, Inc., Chopin Investments, Inc, CR6 LLC, Desert Elevator Inc, Elite Pest Control, LLC, Expert Litigation Services Inc, Fajardo Properties LLC, FDC Consulting Corp, GDBH, LLC, HGD Brothers LLC, Hobbyhorse Associates, LLC, Hope Ranch, Inc., Infused LLC, J&D Consulting Firm Inc., Jager Family Trust, Jason Jongeward, Eco Battery, JCH Consulting LLC, Jongeward Construction & Development LLC, Judd Nevada Trust, KAJ Holdings LLC, LV Capital LLC, Mark A Murphy LTD DBA Steel Dust, Mark Murphy Foundation, Nevada Housing Solutions, LLC, Nevada Pro Pest Control INC, North Texas Properties LLC, ORC Holdings LLC, Pearl Squirrel Fund LLC, Precision Sanitation, LLC, Prestige Consulting, Pride Pest Control, LLC, PRJ Consulting Inc, Promenade Partners, Red Hills Investment Inc, RRM Consulting LLC, Ruger Investments, S.A. Johnson LLC, Tanner Capital Group, LLC, Tanner Family Trust, Tanner Legacy LLC, Target Marketing Insurance Services Inc, The Arjen S. Jager and Kelli Jager Living Trust Kelli Jager Trustee, The CJ Humphries Foundation, The D-Wayne Foundation, The Judd Family Foundation, Triangle Consultants LLC, Twenty17 Bayou City LLC, US Team Industries, LLC, and ZZYZX Capital LLC.

**TABLE OF CONTENTS**

PREAMBLE ..... 7
EXECUTIVE SUMMARY ..... 7
INTRODUCTION AND BACKGROUND ..... 8
Federal Bureau of Investigation ("FBI") Search Warrants ..... 9
The Hindenburg Research Article ..... 9
The SEC's Ex Parte Motion for Entry of Temporary Restraining Order and Asset Freeze ..... 10
Appointment of Receiver Geoff Winkler ..... 10
Information Ascertained from Investors and Promoters ..... 10
Summary of Defendants, Relief Defendants, and Poolers ..... 11
STATE OF THE RECORDS ON JUNE 3, 2022 ..... 12
THE PROCESS & METHODOLOGY TO RECONSTRUCT FINANCIAL RECORDS ..... 13
Sources of Financial Records ..... 13
Intake ..... 13
Receiving Documents ..... 13
Normalize Data ..... 14
Digitize Data ..... 14
Compile Data for Categorization ..... 14
Categorization ..... 14
Review ..... 16
Integration ..... 16
Relationship Database ..... 16
Personnel ..... 17
The Investor Management Tool ..... 17
THE PURPORTED OPERATIONS OF BEASLEY LAW GROUP AND J&J CONSULTING . 17
THE ACTUAL OPERATIONS OF THE J&J PONZI SCHEME ..... 19
VISUALIZATIONS OF THE J&J PONZI SCHEME CASH FLOWS ..... 21
THE ACTIVITIES IN THE PERSONAL AND ENTITY ACCOUNTS OF THE ASSOCIATED DEFENDANTS AND THEIR JOINT VENTURES ..... 30
Jeffrey "Jeff" J. Judd ..... 30
Jeff Judd's Entities ..... 30

Shane M. Jager ........ 34
Shane Jager's Entities ........ 35
Christopher "Chris" R. Humphries ........ 39
Chris Humphries Entities ........ 39
Jason M. Jongeward ........ 42
Jason Jongeward's Entities ........ 42
Matthew "Matt" W. Beasley ........ 43
Matt Beasley's Entities ........ 44
Christopher "Chris" M. Madsen ........ 46
Chris Madsen's Entities ........ 46
Roland S. Tanner ........ 49
Roland Tanner's Entities ........ 50
Mark A. Murphy ........ 52
Mark Murphy's Entities ........ 53
Warren D. Rosegreen ........ 56
Warren Rosegreen's Entity ........ 57
Richard "Rocco" Madsen ........ 58
Richard Madsen's Entities ........ 58
Anthony M. Alberto, Jr. ........ 60
Anthony Alberto's Entity ........ 61
Larry D. Jeffery ........ 61
Larry Jeffery's Entities ........ 61
Cameron T. Rohner ........ 63
Cameron Rohner's Entities ........ 63
Jason A. Jenne ........ 64
Jason Jenne's Entity ........ 65
Denny D. Seybert ........ 65
Denny Seybert's Entities ........ 66
Seth A. Johnson ........ 68
Seth Johnson's Entity ........ 69
Joint Ventures ........ 69
ASSETS RECOVERED, POTENTIALLY RECOVERABLE, CREDIT CARD PAYMENTS, PHYSICAL CURRENCY, AND DEFENDANTS' UNRECOVERABLE SPENDING ........ 72

Recovered Assets ..... 72
Potentially Recoverable Assets ..... 73
Credit Card Payments ..... 74
Balance of Cash and Equivalents on June 3, 2022 ..... 75
Defendant Unrecoverable Spending "Burn" ..... 75
THE PONZI-LIKE NATURE OF THE SCHEME ..... 76
What is a Ponzi Scheme? ..... 76
Key Indicia of a Ponzi Scheme ..... 77
Applicability to the J&J Scheme ..... 77
CONTRACT ANALYSES ..... 79
Example Purchase Agreement ..... 79
Analysis of the Contracts ..... 80
Errors in the Contracts ..... 81
Anomalies in the Contracts ..... 83
BENFORD'S LAW ANALYSIS ..... 85
Benford's Law Explained ..... 85
Benford's Law Datasets ..... 88
Applications of Benford's Law ..... 88
Limitations of Benford's Law ..... 88
Benford's Law Analysis of the J&J Ponzi Scheme ..... 88
VELOCITY OF FUNDS ANALYSES ..... 97
Beasley Law Group Wells Fargo IOLTA (a/e 5598) ..... 98
J&J Consulting US Bank (a/e 2073) ..... 98
J&J Consulting Wells Fargo (a/e 0153) ..... 99
Stirling Consulting Wells Fargo Bank (a/e 6558) ..... 100
Nevada Pro Pest Control Wells Fargo Bank (a/e 6540) ..... 100
Velocity of Funds Summary ..... 101
PURPORTED V. ACTUAL TERMINAL BALANCE SHEET AND NECESSARY RESTRUCTURING ADJUSTMENTS ..... 102
The Implied Balance Sheet Had Accounts Receivables of $419.5 Million ..... 102
Engaged Capital Forecast Based on Existing Contracts and Estimated New Capital Needed in the Next 90 Days to Cover Liabilities ..... 103

ON THE ECONOMIC DAMAGES OF MULTI-OPERATOR PONZI-LIKE ENTERPRISES AND THE ASSIGNMENT OF SUCH DAMAGES TO OPERATORS USING THE FRAUD PROXIMITY RATIO ........ 103

CONCLUSION ........ 110

EXHIBIT A ........ 113

**PREAMBLE**

The Enterprise that is the subject of this report is an ostensible partnership between Matt Beasley, the owner and operator of Beasley Law Group PC, and fourteen salespeople under the umbrella of Jeff Judd and J&J Consulting Services, Inc. The report further details how the Enterprise raised $519.9 million in investment capital from 1,213 people that purchased purported interests in settlement contracts and what the Enterprise did with those funds.

On June 3, 2022, the Enterprise had no recoverable centralized accounting system; it had no identifiable customer relationship management system; it had no discernible investor relationship system; it had no ascertainable vendor management system; and aside from a single attorney and fourteen salespeople, the Enterprise had no employees and had no business revenue.

Matt Beasley was consistently cooperative in the reconstruction and analysis of the Enterprise's activities, and cooperation from all other defendants ranged from cooperative to uncooperative, including with respect to their production of materials, which ranged from useless to helpful.

Preparing for a report that forensically analyzes the business activities, and human impacts, of this Enterprise on the one hand and adequately prepares receiver Geoff Winkler to execute his recovery and distribution responsibilities on the other, required an entire reconstruction and audit of those activities.

There were 179 bank and brokerage accounts from the sixteen individuals and their seventy-five entities who together operated this Enterprise that were determined to be of critical importance to the forensic accounting. Combined, the Receiver reviewed 163,164 transactions with a volume of $3.81 billion, all of which were digitized, reconciled, categorized, traced, and tied out to one another to analyze the Enterprise. There were a total of 545 bank and brokerage accounts and 171 personal and corporate credit card accounts that were reviewed for relevance in this endeavor.

Nineteen professionals from American Fiduciary Services, over the course of 34 months, collectively dedicated an average of 25 hours each workday to support the completion of this responsibility. Without whom the production of this report would be impossible.

**EXECUTIVE SUMMARY**

The Enterprise operated by the sixteen individual defendants and their seventy-five entities identified above (herein, the “Enterprise” or “J&J Ponzi Scheme”) raised $519.9 million from 1,213 investors, promising them that their investment capital would fund personal injury settlement contracts that would generate revenue worth $1.39 billion.

While supposed investment contracts were generated, we saw no evidence of the settling plaintiffs whose settlements purported to underlie the investments. However, during the course of the J&J Ponzi Scheme, $331.4 million was repaid to investors under the guise of successful investment interest and returns. However, the repayments were not the results of normal, profitable business activities. As reconciled, $273.4 million of these payments are correctly

reclassified as "return of investor capital" and $58.0 million was reconciled as unjust distributions and likely recoverable.

In total, 948 investors have $246.4 million in net cash losses to be repaid; there are 253 other investors that have $47.9 million in unjust transfers to recover; there are 83 third-party non-investors with $10.0 million in potential recoveries; and sixteen defendants have a further $105.6 million subject to recovery as of March 31, 2025.

Owing to the disparity between the losses suffered by those investors procured by an individual defendant and the unjust enrichment appropriated by that defendant, the use of the *Fraud Proximity Ratio*[1] is appropriate for comparing relative to actual damages in a multi-operator investment scheme.

The observations and analyses reflected in this report indicate that no legal and legitimate business operations took place, and that instead the defendants operated an unregistered securities offering and Ponzi-like scheme designed to bilk investors out of their investment capital.

## INTRODUCTION AND BACKGROUND

As alleged by the Securities and Exchange Commission ("SEC") in its Complaint, filed April 12, 2022 (ECF No. 1), and its Amended Complaint, filed June 29, 2022 (ECF No. 118) (referred to collectively herein as the "Complaint"), the Enterprise beginning in at least January 1, 2017, and continuing until March 2022, directly and through the named defendants and others, promoted and offered investments in purchase agreements involving purported personal injury settlement contracts. The Complaint alleges that Jeff Judd told investors that he had a litigation financing business with his attorney colleague, Matt Beasley, whereby Jeff Judd invested money in contracts with personal injury plaintiffs while Matt Beasley procured those contracts through his contacts with other attorneys around the country. Jeff Judd is alleged to have told investors that Matt Beasley and his law firm, Beasley Law Group PC, had relationships with personal injury attorneys whose clients had settlements with insurance companies, and who were willing to pay a premium to receive a portion of their settlement in advance rather than wait for payment from the insurance companies. Investors were also allegedly told that the J&J Entities entered into purchase agreements with the personal injury plaintiffs whereby the J&J Entities advanced to the personal injury plaintiffs a portion of their expected insurance settlement payment, and the personal injury plaintiffs repaid the J&J Entities plus interest and fees when their insurance payout arrived.

As alleged in the Complaint, Jeff Judd told investors that the purchase agreements came in amounts of $80,000 or $100,000, with a term of 90 days, although he also said he allowed investors to split contracts with him or other investors if they wanted to invest less than $80,000.

[1] Aa novel key performance indicator developed for use in multi-operator issues of misappropriation that quantifies the relationship between the funds an operator indirectly brought in and the funds an operator directly appropriated, in order to compare the operators with one another.

Jeff Judd allegedly told investors that they would receive returns, which varied slightly over time. Jeff Judd allegedly told some investors that they would make up to $22,000 within 90 days on an investment of $100,000. Jeff Judd allegedly told other investors they would receive 12.5% on their investments (50% on an annual basis), for a return of $12,500 within 90 days on an investment of $100,000 or $10,000 within 90 days on an investment of $80,000.

The pleadings on file further allege that Jeff Judd told investors that at the end of the 90-day period, the Enterprise could reinvest the principal in a new purchase agreement with a new tort plaintiff, and the investor could continue to receive his or her promised returns every 90 days. Jeff Judd allegedly told investors that they could get their principal back rather than reinvesting it at the end of the contract term if they chose.

Per the Complaint, Jeff Judd told investors that the tort plaintiffs who entered the purchase agreements paid an administrative fee of $5,000, half of which went to Matt Beasley and Beasley Law Group, and the other half of which went to the tort plaintiff's attorney. Jeff Judd allegedly also told investors that Matt Beasley and Beasley Law Group managed the relationships with the various personal injury attorneys and wrote the agreements with the personal injury plaintiffs, while Jeff Judd managed the investment side of the business with assistance from his son, Parker Judd.

The SEC also alleges that Jeff Judd told investors that the risk from investing in the purchase agreements was almost zero. Jeff Judd is alleged to have told some investors that he would make good on any investor loss, saying that Matt Beasley and he had a separate fund to make investors whole if a personal injury plaintiff failed to pay on a contract. He allegedly claimed he had "never had to use" this fund, because "we've never had one go bad."

***Federal Bureau of Investigation ("FBI") Search Warrants***

On March 3, 2022, the FBI served a search warrant on the home of Jeff Judd and then Matt Beasley. It is believed that Matt Beasley was tipped off that the FBI was coming. When confronted by FBI agents he allegedly brandished a weapon, was shot twice, survived, and retreated into his home where he engaged in a four-hour negotiation with the FBI, during which he allegedly confessed to an FBI negotiator that he was running a Ponzi Scheme. Eventually, Matt Beasley was disarmed and arrested by a SWAT team and subsequently charged with one count of Assault on a Federal Officer and denied bail.[2] Matt Beasley was later charged with five counts of Wire Fraud and three counts of Money Laundering.

***The Hindenburg Research Article***

On March 24, 2022, Hindenburg Research published an article on their website purporting to have conducted an extensive investigation into J&J Purchasing and J&J Consulting, concluding that the enterprise was suggestive of a Ponzi Scheme. They found the subject companies to be entirely referral-based businesses that were offering 50% annual returns on a portfolio of 20,000 litigation funding contracts with no instance of default or any late payments over a four-year track record. Academic research showing default rates on post-settlement claims being non-zero,

[2] This charge was later dismissed.

as well as observed personal injury settlement overall averages being significantly lower than the average investment taken in, helped Hindenburg Research determine the mathematical improbability of these claims. The article further details that the various defendants had extremely limited industry experience to be able to back up such extraordinary investment returns and that it allegedly would have taken Matt Beasley 40 years to draft 20,000 contracts in the manner described by the sales agents.

***The SEC's Ex Parte Motion for Entry of Temporary Restraining Order and Asset Freeze***

On April 13, 2022 the SEC filed an Ex Parte Motion for Entry of Temporary Restraining Order and Orders: (1) Freezing Assets; (2) Requiring Accountings; (3) Prohibiting the Destruction of Documents; (4) Granting Expedited Discovery; and (5) Order to Show Cause Re Preliminary Injunction against Matt Beasley, Jeff Judd, J&J Consulting Services, Inc., and the 19 other defendants and relief defendants identified at that time (ECF No. 2). The case was filed in the United States District Court for the District of Nevada and is captioned as Securities and Exchange Commission v. Matthew Wade Beasley et al., Case No. 2:22-cv-00612-CDS-EJY.

This motion reiterated the allegations of the SEC's complaint and included references to the FBI standoff and Matt Beasley's alleged confession, as well as illustrating defendants' apparent attempts to dissipate investor assets, as part of its justification for not giving notice of the Motion to the defendants. This motion was approved by Court Order on April 21, 2022 (ECF No. 3).

***Appointment of Receiver Geoff Winkler***

The SEC filed a Motion to Appoint Receiver on May 3, 2022 (ECF No. 67), which was granted by the Court on June 3, 2022 (ECF No. 88) (the "Appointment Order"). The motion reiterated the SEC's allegations that defendants had raised hundreds of millions of dollars through their purchase agreement scheme and argued that bringing in a federal equity receiver to consolidate all fiduciary functions for the benefit of all investors was the best approach forward (ECF No. 67). In the Appointment Order the Court took full jurisdiction and possession of the assets of the receivership entities, carving out the Beasley Law Group PC's assets except Matt Beasley's Wells Fargo IOLTA and ordering the receiver to investigate quality and whereabouts of all assets, taking custody of and preserving the same (ECF No. 88).

***Information Ascertained from Investors and Promoters***

By the time the receiver was appointed, the Department of Justice, through the FBI, had executed search warrants at the homes of Matt Beasley, Chris Humphries, and Jeff Judd, and seized their paper records and electronic devices, including phones, laptops, and servers. The receiver and his counsel attempted to work with the Department of Justice to obtain these records for the receiver's analysis of the Estate and its assets and also to complement this accounting. However, since the DOJ was conducting a taint review, the receiver has not yet been able to access these documents further necessitating a complete financial reconstruction and forensic accounting to be undertaken in this case.

The receiver and his professionals have held multiple investor calls, met individually with investors, and requested information from investors through two investor questionnaires. Most of the investors the receiver and his professionals spoke with were friends, family, colleagues, and

acquaintances with either a promoter or another investor. Just as Matt Beasley had allegedly explained in his "confession" to the FBI, investors reported that they were told that they could invest in purchase agreements for slip-and-fall settlement advances. Some investors were presented with an agreement that included the purported tort plaintiffs and attorneys' names but were told not to contact any related parties, while other investors contributed assets through less formal means. At times, investors were told that their capital would be reinvested in a new purchase agreement. Matt Beasley is alleged to have admitted to the FBI that the contracts provided to investors were fraudulent, and that no other attorneys were involved in any operations. Most investor funds appear to have been sent to Matt Beasley's Wells Fargo IOLTA.

Based on information obtained in discussions with defendants Mattt Beasley, Jeff Judd and others, the receiver has been told that soon after J&J Purchasing, LLC was established, Chris Humphries sent emails to investors telling them that changes would be taking place in the new year with standardized return rates of 12.5%. Thus, in January of 2022, the agreements with J&J Consulting Services, Inc. were changed to an agreement with J&J Purchasing, LLC. At that time, investors were given a revised Non-Compete/Non-Discloser/Non-Solicitation Agreement along with the new Confidential Subscription Agreement. While it is uncertain what precipitated these changes, it is important to note that Matt Beasley did indicate an awareness of an investigation sometime in 2021. Notably, most investors the receiver and his team have spoken to mentioned that they never suspected fraud because their quarterly payouts had been accurate and timely up until the FBI executed their search warrant on March 3, 2022.

There is no evidence of a company website or promotional materials for the J&J Ponzi Scheme. It seems that most individuals that were involved with the associated defendants learned about the opportunity from a friend, neighbor, colleague or relative. Information on operations was learned primarily through conversations with defendants, investors and other third parties, as well as information in court pleadings before the completion of this accounting effort.

***Summary of Defendants, Relief Defendants, and Poolers***

As described above, the SEC alleged in its Complaint, the J&J Entities directly, and through Matt Beasley, Beasley Law, Jeff Judd, Chris Humphries, J&J Consulting Services, Inc. (Alaska), J&J Consulting Services, Inc. (Nevada), J and J Purchasing LLC, Shane Jager, Jason Jongeward, Denny Seybert, Roland Tanner, Larry Jeffery, Jason Jenne, Seth Johnson, Chris Madsen, Richard Madsen, Mark Murphy, Cameron Rohner, and Warren Rosegreen engaged in a long-running fraudulent offering of securities via personal injury settlement contracts. The Judd Irrevocable Trust, PAJ Consulting Inc, BJ Holdings LLC, Stirling Consulting, LLC, JL2 Investments LLC, Rocking Horse Properties, LLC, Triple Threat Basketball, LLC, ACAC LLC, Anthony Alberto Jr., and Monty Crew LLC, are entities or individuals that allegedly received proceeds from the fraud and have received transfers from the Beasley Law Group IOLTA.

In addition to the named defendants and relief defendants, multiple investors "pooled" their investments with other investors. There are a few ways in which pooling worked: 1) pooling investments and payments to investors (both investments and payments went through the pooler), 2) pooling just investments (all investments went through the pooler, payments went directly to the investor), and 3) pooling just payments (investments were made directly by the

investor, payments were made to the pooler). There were other situations when a certain investor bought out another investor directly instead of sending their money to the Beasley Law Group IOLTA. There are also numerous cases where investors demonstrated cash investments with defendants that never appear to be deposited into their operating accounts.

**STATE OF THE RECORDS ON JUNE 3, 2022**

Generally, the Enterprise maintained no formal books or records regarding the investments into the personal injury purchase agreements, or the alleged underlying settlement agreements. As of the inception of the receivership, the receiver discovered the following specific facts about the state of the records.

First and foremost, no formal books were maintained. The only unbiased and error-free documents to refer to were bank statements from the defendants' accounts and the accounts of their respective entities. The receiver, being notified of this, immediately worked to request all relevant documents from the financial institutions, which totaled 545 bank/brokerage accounts at 51 financial institutions and 171 business and personal credit card accounts.

Several defendants had maintained spreadsheets of their own purchase agreements and the status of the investors they brought into the Scheme. While the receiver collected all the records he could, it is important to note that the files were not consistent, contained some errors and estimations, and at times omitted important information. These spreadsheets differentiated from defendant to defendant and, therefore, were reviewed by the receiver's team with skepticism, and were ultimately used only as a secondary source of information to validate other information.

The receiver also reached out to investors directly to solicit information that was not otherwise available 1) to get a better understanding of how the J&J Ponzi Scheme worked, 2) if there were transactions that occurred outside of the banking system, and 3) to determine the breadth of the Enterprise. There was a total of two questionnaires sent to investors: the first was sent on February 27, 2023 and 650 responses were received, and the second questionnaire was sent on March 15, 2024 and received 757 responses. These investor responses proved critical in completing the accounting reconciliation.

In Matt Beasley's alleged confession to FBI negotiators in March 2022, he is reported to have stated that all his dealings were kept in emails and text messages. Consequently, the FBI raid ended with the electronic devices and paper records being seized. As of March 2025, these devices and records have not been released to the receiver. Matt Beasley did, however, comply with the requests of the receiver to turn over some text messages and emails from his phone for the purposes of analysis.

Finally, the physical purchase agreements were often saved by the defendants themselves. Of the 11,342 purchase agreements created in furtherance of the J&J Ponzi Scheme, the receiver's team is in possession of, and has analyzed, 1,590. These records contain mostly falsified information, however, key details such as investment amounts, dates, term, and interest rates have helped to

narrow down investor funds in the bank statements, as well as allow for further analysis on the legitimacy of the purported contracts.

The state of the records on June 3, 2022, showed that no books for the Enterprise existed. Any records available, such as text messages, bank statements, or purchase agreements required a lengthy process of requests and subpoenas, along with the cooperation of several defendants. The lack of any formal record-keeping as of June 3, 2022 necessitated a complete reconstruction of the accounting records for the J&J Ponzi Scheme in order to conduct a forensic analysis of the records for the purposes of this report.

## THE PROCESS & METHODOLOGY TO RECONSTRUCT FINANCIAL RECORDS

The reconstruction of the J&J Ponzi Scheme's financial records started in June 2022 and concluded in early 2025 with a reconciled database of transactions representing 179 bank accounts and over 164,000 transactions for the time period October 14, 2016 through June 3, 2022. These financial records are the basis for the analysis and findings presented in this report.

### *Sources of Financial Records*

In June 2022, the SEC approved a document access letter and started sharing obtained documents with the receiver. However, these documents were incomplete; limited by the number of accounts, the types of documents, and the time periods covered. It was thus determined that the receiver needed to subpoena all necessary documents from the financial institutions directly. The receiver worked with counsel at Allen Matkins to issue subpoenas to all financial institutions beginning on September 23, 2022, and issued the last subpoena on February 27, 2025. In total, 51 financial institutions turned over documents for 716 accounts to date.

In addition to financial institution documents, documents we received directly from defendants and/or their counsel. This information was used to better understand the flow of investment funds and the identities and relationships of defendants, promoters, and investors.

### *Intake*

As financial documents were obtained from various parties, including financial institutions, the SEC, defendants, or investors, the new documents were catalogued and saved to a secure web-based server. The incoming documents were then indexed based on receipt date, source name, defendant name, name of financial institution, account owner name, bates file number, file name, account number, account type, document type and date range. The documents were then reviewed for clarity, completeness, and relevance for the data set.

### *Receiving Documents*

Once new documents were indexed, a bank account index summary would be updated. This included adding new bank accounts to the index by account name, legal account owner, related defendant, bank name, account number, account type, account opening date, account closing date, date range of account, available supporting documentation, and missing supporting documentation. At this step, each account was assigned a unique 10-digit identifier based on the

three initials of the account name, the three initials of the bank and last four digits of the account number. As more documents were received, the index was used to identify when an account was complete and ready to move forward in the forensic accounting process. The index was also used to identify missing documents still needed from financial institutions.

***Normalize Data***

When an account was marked complete, meaning all bank statements, withdrawal and deposit slips, and checks and cashier's checks were compiled, the forensic accounting team would prepare the account's documents for digitization, including normalizing the data based on the J&J Ponzi Scheme Chart of Accounts (the "COA").

***Digitize Data***

The forensic accounting team used software to convert PDF files of bank and brokerage statements into a consistent reconciled format in excel. This software links source documents such as deposit slips, withdrawal slips, checks, and cashier's checks to the correlating transaction in the database.

***Compile Data for Categorization***

Once an account was digitized, the team member responsible for digitization would review the digitized output of the account for accuracy. This included reconciling beginning and ending balances with the original bank statement and reviewing consistency of dates. If there were errors in the digitized output, those errors would be corrected before moving forward in the process. Upon completion of this review, the digitized excel file with all supporting files were saved in the categorization folder to await next steps.

***Categorization***

Accounts with known investor flows were prioritized for categorization early in the forensic accounting process. This prioritization helped to identify any previously unknown defendant accounts that may have been involved in the J&J Ponzi Scheme. When such an account was discovered, the categorizer would update the bank account index summary and notify the team member responsible for requesting documents from banks and the receiver would determine if there were funds available for the benefit of the receivership estate.

All transactions were categorized using the same formatting into a standardized excel template that included the following: 10-digit account code, transaction id, source file, page number, line number, account owner name, associated defendant, financial institution, account number, account type, date, inflows, outflows, and Category 1 through Category 8.

Using the standard chart of accounts, the categorizer was responsible for categorizing each line item in the bank statement. COA Category 1, which is the highest level of accounting organization for analysis, followed by Categories 2 through 8 where appropriate given Category 1, options for categorization are as follows:

1. "Asset" – Flows used to acquire real property, vehicles, cryptocurrency, art, and other items that have already been or are to be taken into possession of the receiver for the

estate; Category 2 provides detail regarding the type of asset.

2. "Bank Fees, etc." – Bank fees and charges, microdeposits, returned check and wires (both credit and debit sides), corrections made by banks to fix bank error, which are necessary to balance the accounts, but generally non-case related.

3. "Personal Flow" - Transactions in personal accounts for shopping, food, entertainment, etc. These include transfers to the defendants' other accounts that otherwise contained no scheme-related activity.

4. "Internal Transfer" - Transfers a single defendant made within their own personal and business accounts. These include only those transfers for which both credit and debit sides are available in the transaction list. Category 2 in this case provides the name of the sending defendant, Category 3 provides the name of the receiving defendant (which are the same for this category), Category 4 provides the unique ID of the sending account, and Category 5 provides the unique ID of the receiving account. Category 6, where possible, provides guidance on the underlying investors' funds involved in the transfer.

5. "Operating Flow" – Transfer within business accounts like revenue and expenses which were deemed legitimate and non-case related.

6. "Taxes" – Taxes paid to various institutions.

7. "Third Party Flow" – There are four types of third parties: 1) Net Loss Investors; 2) Net Winner Investors; 3) Breakeven Investors; and 4) Non-Investor Net-Winners (other parties that the receiver has recoverable actions against). Category 2 provides the name of the third party found on the transaction level while Category 3 provides the relationship-level third party name; Category 7 provides the names of the defendant associated with indicated third party (i.e. the party who gets "sales credit" for bringing in the investor's principal); Category 8 provides the name of the pooler who is associated with the third party, if any.

8. "Transfer Between Named Parties" - Transfers within personal and business accounts between defendants. These include only those transfers for which both credit and debit sides are available in the transaction list. Category 2 provides the name of the sending defendant, Category 3 provides the name of the receiving defendant, Category 4 provides the unique ID of the sending account, Category 5 provides the unique ID of the receiving account. Category 6, where possible, provides guidance on the underlying investors' funds involved in the transfer.

The categorizer used the data provided in the bank statement as well as the links to the various source documents to identify the categories for each transaction. Depending on the category type, eight categories were not always used. Once an account was categorized, the categorizer would email a summary of the account to the senior forensic accountant and the forensic accounting expert to review the categorized account file.

***Review***

The categorized account files were reviewed and confirmed by senior staff and were not integrated into the accounting database until this step was completed.

The senior accountant's review included 1) confirming accounts balanced, 2) flagging when a transaction needed additional information, and 3) confirming category selection and overall quality control of the categorized file.

***Integration***

Once the categorized account file was approved by either the senior forensic accountant or the forensic accounting expert, the account was then ready for integration into the master financial data set.

This step was managed by the senior forensic accountant to ensure quality control. During this step, the senior forensic accountant also tied out transfers between defendants, converting Category 1 by eliminating the "one side" classification upon confirmation of the transaction in both the sending and receiving accounts.

***Relationship Database***

Due to the lack of investor records discovered after the receiver's appointment, we created an investor relationship database concurrent with the forensic accounting effort. The relationship database was built using the following data sources: 1) investor names identified during categorization; 2) defendant-supplied investor lists; 3) investor responses to two questionnaires administered by the receiver; 4) investor registrations through the receiver's website; and 5) various Secretary of State websites.

The purpose of the relationship database was to link every investor inflow and outflow to a relationship. Therefore, if a transaction in a defendants' bank statement showed a $100,000 inflow by a "Bob Smith," the forensic accounting team knew to categorize that investment as belonging to the same "Bob Smith." However, an investment might later be discovered that came from "Smith and Family LLC." At this hypothetical juncture, the categorizer would need more information to know if "Smith and Family LLC" belonged to "Bob Smith" or a separate relationship. These examples can continue with further relationship status for spouses or ex-spouses, children, and other family members. The investor database was built and maintained to show these relationships. To identify the correct investor, the forensic accounting team would evaluate information from three sources; the bank statement, the Secretary of State website, and the investor's response to the questionnaire, all of which were housed in the relationship database.

In addition, the relationship database also contained information about investors that pooled other investors' investments. This information was referenced for investors that invested directly into the J&J Ponzi Scheme and received payments back via a pooler.

***Personnel***

The reconstruction process began in June 2022. The primary focus at the beginning was the intake of documents. Beginning in January 2023, the forensic accounting team began the additional phases of process with the categorization of the Beasley Law Group IOLTA account. AFS received records for 716 bank, brokerage, and credit card accounts from 51 financial institutions. From June 7, 2022, through today, nineteen team members spent over 19,700 hours on this reconstruction and associated responsibilities in support of third party litigation and claims administration.

***The Investor Management Tool***

AFS utilized multiple data sets and sources to determine the money in and money out for each investor. To organize the data, the receiver's operations team built the Investor Management Tool (IMT). The IMT references a unique ID for each investor and compares the money in and money out for each using three sources; 1) master financial data set, 2) the defendants' investor lists, and 3) the investor response to the questionnaires to determine the final net loss or gain for each investor.

## THE PURPORTED OPERATIONS OF BEASLEY LAW GROUP AND J&J CONSULTING

From October 2016 through early June 2022, it appears that the salespeople of J&J Consulting were solely focused on the acquisition of investor capital to buy interests in settlement claims procured by lawyer Matt Beasley of Beasley Law Group. The offerings made to solicit investment were always in amounts of $50,000 (2.9%), $80,000 (10.5%) or $100,000 (86.7%) and promised returns of 2.5% to Beasley Law Group, 15.0% to the salespeople, and 12.5% to the investor in 60 (5.5%) or 90 days (94.1%).

The average contract cost $94,786 in support of a $311,757 settlement award; it had an average term of 88.4 days; it implied an average annual interest rate of 121.7%; it promised $2,369 to Matt Beasley, $14,217 to the salespeople, and $11,848 to its investor by the due date on the contract; and the alleged contracts never failed to perform.

Matt Beasley was wildly successful at procuring interests in purported settlement claims, and the salespeople of J&J Consulting were equally successful at selling them. In 68 months, they sold 11,342 contracts for $1.07 billion, generating $188.4 million in revenue for Matt Beasley and the J&J Consulting salespeople and $134.2 million in interest income for its investors. The 11,342 personal injury claimants identified in the contracts purportedly won settlements worth $3.53 billion in their combined cases.

There were 5,485 of these contracts that were "new money contracts" from 1,213 investors who directly deposited $519.9 million with Matt Beasley and the J&J Consulting salespeople. There were also 5,857 contracts that were "renewal contracts" worth $555.1 million. Renewal contracts are those where, at the conclusion of their prior contract, the investors chose to reinvest their capital in a new investment instead of cashing out their capital. Only the former type of contract

implied new money deposited into Beasley Law Group contracts, but both types had the same terms and payouts. Indeed, these terms were favorable enough that every new money contract renewed 1.1 times on average, and every time this happened, a contract was available in the exact right investment amount on the exact right day.

At the conclusion of 2,081 contracts, investors chose to withdraw their capital, reclaiming $197.2 million of the $519.9 million total investment. On June 3, 2022, there were 3,404 in-progress contracts with a purchase cost of $322.6 million. These contracts had revenue due to Matt Beasley within 90 days totaling $419.5 million. Of this, $362.9 million was due in accounts payable to investors in the form of interest and principal, and $56.5 million was due to Matt Beasley and the salespeople of J&J Consulting.

When all of the active June 3, 2022 contracts would go on to execute perfectly, just like the 7,938 contracts that were successfully completed already, the receiver understands that Beasley Law Group and J&J Consulting operators boasted that, in six years: 1) we helped 11,342 settlement claimants enjoy early cash access worth $1.07 billion to their won settlements, 2) our investors had their entire initial principal investments of $519.9 million returned to them with a grand total of $174.5 million in interest (a 33.5% average ROI), and 3) we earned $244.9 million for facilitating this near-miraculous service for so many people. The following summarizes the combined Income Statement and Balance Sheet of the purported enterprise as of June 3, 2022:

**J&J Consulting/Beasley Law Group**
**Purported Income Statement**

| | |
|---|---|
| **Ordinary Income** | |
| New Money Contract Sales | 675,974,082 |
| Reinvested Money Contract Sales | 721,800,815 |
| **Gross Revenue** | 1,397,774,897 |
| COGS (Principle Repayment) | (1,075,087,995) |
| **Net Revenue** | 322,686,902 |
| **Expenses** | |
| Jeff Judd | 79,985,662 |
| Shane Jager | 36,182,119 |
| Matt Beasley | 22,810,846 |
| Chris Humphries | 10,558,448 |
| Chris Madsen | 9,734,343 |
| Anthony Alberto | 6,151,909 |
| Warren Rosegreen | 5,841,577 |
| Jason Jenne | 5,428,125 |
| Mark Murphy | 5,240,861 |
| Roland Tanner | 2,569,850 |
| Richard Madsen | 1,570,368 |
| Larry Jeffery | 1,297,697 |
| Cameron Rohner | 508,950 |
| Denny Seybert | 355,544 |
| Jason Jongeward | 199,805 |
| Seth Johnson | (12,150) |
| **Total Expenses** | 188,423,955 |
| **Net Ordinary Income** | 134,262,947 |
| **Other (Income)/Expenses** | |
| Interest Paid To Investors | 134,262,947 |
| Cash On Hand | - |
| **Net Other (Income)/ Expenses** | 134,262,947 |
| **Net Income** | - |

**J&J Consulting/Beasley Law Group**
**Purported Balance Sheet**

| | |
|---|---|
| **Assets** | |
| Cash | - |
| Accounts Receivable | 419,541,147 |
| **Toal Assets** | 419,541,147 |
| **Liabilities** | |
| Interest Due to Investors | 40,298,929 |
| Due to Operators | 56,555,317 |
| Principle Due To Investors | 322,686,902 |
| **Total Liabilities** | 419,541,147 |
| **Equity** | |
| Investor Capital In | - |
| Investor Capital Out | - |
| Net Investor Capital | - |
| Net Income | - |
| **Total Equity** | - |
| **Total Liabilities and Equity** | 419,541,147 |

Unfortunately for investors, none of this was true. For the 11,342 contracts that were sold, there was never a single penny of revenue deposited from any source.

**THE ACTUAL OPERATIONS OF THE J&J PONZI SCHEME**

Sixteen individuals by themselves, and through their seventy-five entities, administered the J&J Ponzi Scheme. This Enterprise fabricated the appearance of the business operations described above through the wholesale appropriation and movement of the $519.9 million in investor cash deposits, all while never completing a single legitimate revenue-generating contract. Based on available information, it appears that Matt Beasley spent a lot of money on gambling and alcohol and wound up in dire straits due to a significant debt to his alleged bookie, Anthony Alberto. In interviewing Matt Beasley, it appears that the motivation to run the J&J Ponzi Scheme included threats to his life arising from his gambling and alcohol addictions. His opportunity to run it was his access to his business IOLTA account with Wells Fargo and his access to Jeff Judd's network of high-net-worth investors. Thanks to his participation in the J&J Ponzi Scheme, Matt Beasley was able to repay $10.7 million to extinguish his gambling debts. Matt Beasley would go on to enrich himself personally by an additional $22.8 million and make recoverable distributions to other third-party associates totaling another $2.2 million.

Jeff Judd and Shane Jager were the primary actors on the sales side of the J&J Ponzi Scheme, having appropriated and directed $102.1 million and $43.1 million respectively in investor deposits for themselves and their family or other affiliated persons or entities. They had access to a large network of high-net-worth investors but lacked access to a business IOTLA account to give the J&J Ponzi Scheme the front of legitimacy it needed to seem real for potential investors.

Together, Jeff Judd, Shane Jager, Chris Humphries, and Matt Beasley (and Anthony Alberto through Matt Beasley) appropriated $194.2 million of the $246.4 million the investors lost, or 78.8%. They were the main operators of the J&J Ponzi Scheme. The next level of salespeople each got over $5.0 million personally and contributed 16.7% towards the overall investor loss. These salespeople are Chris Madsen, Warren Rosegreen, Jason Jenne and Mark Murphy. The bottom seven salespeople (Seth Johnson, Jason Jongeward, Denny Seybert, Cameron Rohner, Larry Jeffery, Richard Madsen, and Roland Tanner) brought on investors who suffered a $92.3 million net cash loss, but only personally benefitted $11.1 million overall (4.5% of the damages).

The sixteen individuals that ran the J&J Ponzi Scheme did so through seventy-five entities, many of which had significant business operations of their own ranging from consulting and construction to development and investing. The detailed net cash results of these entities, divided between J&J Ponzi Scheme and Non-J&J Ponzi Scheme operations, may be found in Exhibit A. Only four defendants had positive net cash from non-Enterprise operations, and when considered with the transfers from these accounts they transferred to their personal accounts, it was only Seth Johnson who had total positive cash from business operations. In total, non-Enterprise operations had an aggregate loss of $109.6 million on a cash basis, and the defendants transferred out a further $54.0 million from these accounts to their personal accounts, as summarized here:

| Associated Defendant | Net Cash From NON BLG/JJC Business Operations | Net Transfers (To)/From Personal Accounts | Total Business Operations Cash Profit/(Loss) |
|---|---|---|---|
| Seth Johnson | 2,178,064 | (2,056,308) | 121,755 |
| Jason Jongeward | 128,230 | (488,966) | (360,736) |
| Cameron Rohner | (361,569) | (73,595) | (435,164) |
| Roland Tanner | 690,021 | (1,454,295) | (764,273) |
| Denny Seybert | (809,783) | 14,500 | (795,283) |
| Larry Jeffery | 198,127 | (1,538,800) | (1,340,673) |
| Anthony Alberto | (2,550,594) | (68,311) | (2,618,905) |
| Richard Madsen | (2,397,337) | (337,003) | (2,734,340) |
| Mark Murphy | (3,784,599) | (567,382) | (4,351,981) |
| Warren Rosegreen | (3,961,003) | (868,000) | (4,829,003) |
| Jason Jenne | (5,637,351) | 228,855 | (5,408,496) |
| Chris Humphries | (1,612,653) | (4,237,265) | (5,849,918) |
| Chris Madsen | (8,778,518) | 292,637 | (8,485,880) |
| Matt Beasley | (15,320,801) | (3,609,267) | (18,930,067) |
| Shane Jager | (35,244,339) | (35,236) | (35,279,575) |
| Jeff Judd | (32,414,427) | (39,266,582) | (71,681,009) |
| Total | (109,678,530) | (54,065,018) | (163,743,547) |

In summary, the J&J Ponzi Scheme had no legitimate revenue of its own, and the associated seventy-five entities lost over $109.6 million. Therefore, there was never any interest with which to pay to investors in the first place, never commissions to pay salespeople, and never fees for Matt Beasley and Jeff Judd to share. The updated Income Statement and Balance Sheet reflecting the net cash loss of the investors, and the amounts needed to be recovered from the defendants and those parties they unjustly enriched follows:

**J&J Ponzi Scheme Income Statement**

| | Purported | Actual |
|---|---|---|
| **Ordinary Income** | | |
| New Money Contract Sales | 675,974,082 | - |
| Reinvested Money Contract Sales | 721,800,815 | - |
| **Gross Revenue** | 1,397,774,897 | - |
| COGS (Principle Repayment) | (1,075,087,995) | |
| **Net Revenue** | 322,686,902 | - |
| **Expenses** | | |
| Jeff Judd | 79,985,662 | - |
| Shane Jager | 36,182,119 | - |
| Matt Beasley | 22,810,846 | - |
| Chris Humphries | 10,558,448 | - |
| Chris Madsen | 9,734,343 | - |
| Anthony Alberto | 6,151,909 | - |
| Warren Rosegreen | 5,841,577 | - |
| Jason Jenne | 5,428,125 | - |
| Mark Murphy | 5,240,861 | - |
| Roland Tanner | 2,569,850 | - |
| Richard Madsen | 1,570,368 | - |
| Larry Jeffery | 1,297,697 | - |
| Cameron Rohner | 508,950 | - |
| Denny Seybert | 355,544 | - |
| Jason Jongeward | 199,805 | - |
| Seth Johnson | (12,150) | - |
| **Total Expenses** | 188,423,955 | - |
| **Net Ordinary Income** | 134,262,947 | - |
| **Other (Income)/Expenses** | | |
| Interest Paid To Investors | 134,262,947 | - |
| Cash On Hand | - | - |
| **Net Other (Income)/ Expenses** | 134,262,947 | - |
| **Net Income** | - | - |

**J&J Ponzi Scheme Balance Sheet**

| | Purported | Actual |
|---|---|---|
| **Assets** | | |
| Cash | - | - |
| Accounts Receivable | 419,541,147 | - |
| **Toal Assets** | 419,541,147 | - |
| **Liabilities** | | |
| Interest Due to Investors | 40,298,929 | (58,004,481) |
| Due to Operators | 56,555,317 | (188,423,955) |
| Principle Due To Investors | 322,686,902 | - |
| **Total Liabilities** | 419,541,147 | (246,428,436) |
| **Equity** | | |
| Investor Capital In | - | 519,920,355 |
| Investor Capital Out | - | (273,491,918) |
| Net Investor Capital | - | 246,428,436 |
| Net Income | - | - |
| **Total Equity** | - | 246,428,436 |
| **Total Liabilities and Equity** | 419,541,147 | - |

## VISUALIZATIONS OF THE J&J PONZI SCHEME CASH FLOWS

To help conceptualize the flow of cash between and among these defendants and entities, we have prepared a series of visualizations to help.

The 1,213 investors and creditors were brought into the J&J Ponzi Scheme by an associated defendant or one of their agents. The $519.9 million in cash brought into the J&J Ponzi Scheme, as attributed to the salesperson who brought in the money, is summarized below:

VISUALIZATION ONE: SIXTEEN SALESPEOPLE RAISED $519.9 MILLION FROM 1,213 INVESTORS




Primarily, these investors were instructed to send their funds to Beasley Law Group, and $394.3 million of the investment dollars were sent there directly. The remaining 21.9% of the funds were sent to other defendants and $11.8 million was invested through third parties as detailed below:

VISUALIZATION TWO: $519.9 MILLION IN INVESTOR FUNDS RAISED BY WHERE FUNDS DEPOSITED




$42.0 million in net investors cash was transferred from ten defendants to Matt Beasley, who began the process of transferring all these funds to the other defendants and back to the investors. This occurred by transferring $362.0 million to Jeff Judd, Shane Jager, Chris Humphries, Warren Rosegreen, Anthony Alberto, and BJ Holdings, who then pushed the funds along from there. The defendant transfer of funds is detailed here:

VISUALIZATION THREE:
THE FLOWS OF NET TRANSFERS AMONG DEFENDANTS
AND THEIR ENTITIES




^Prestige Consulting sent Jeff Judd <$0.1m

*These entities sent net flows to Matt Beasley per the top left box

The balance per associated defendant entity after these transfers was as follows:

VISUALIZATION FOUR: INVESTOR FUND BALANCES
AFTER INTER-DEFENDANT TRANSFERS



The defendants made $331.4 million in payments to investors and agents and retained $188.4 million of the $519.9 million invested as detailed here:

VISUALIZATION FIVE: AMOUNTS PAID TO INVESTORS V. AMOUNTS RETAINED BY DEFENDANT ENTITIES



Of the $331.4 million paid to investors and agents, $58.0 million of these funds need to be recovered as fake profits or other recoverable enrichments, as shown in the white pie slices below. The total net cash loss for the 948 losing investors is $246.4 million and is composed of $188.4 million in capital the defendants retained and $58.0 in recoverable capital sent to third parties is detailed below:

VISUALIZATION SIX: GROSS DAMAGES BY DEFENDANT



Of the $188.4 million retained by the defendants, $82.4 million is recovered to date, as detailed below:

VISUALIZATION SEVEN: CAPITAL RETAINED AND RECOVERED TO DATE BY DEFENDANT



Below is a summary of the net outstanding amounts among Defendants, which totals $163,929,523 and includes the balance funds personally received ($105,925,042) and funds transferred to third parties ($58,004,481) as of 3/31/2025:

VISUALIZATION EIGHT: NET OUTSTANDING BALANCES AMONG DEFENDANTS ON 3/31/2025



**THE ACTIVITIES IN THE PERSONAL AND ENTITY ACCOUNTS OF THE ASSOCIATED DEFENDANTS AND THEIR JOINT VENTURES**

Sixteen individuals, individually and through their seventy-five entities, administered the J&J Ponzi Scheme. Below is a detailed analysis of each party's involvement in the J&J Ponzi Scheme.

***Jeffrey "Jeff" J. Judd***

Jeff Judd was born in 1972 and is married with two sons and two daughters residing in Nevada. Jeff Judd is primarily involved in sales and had nine business relevant to the J&J Ponzi Scheme: J&J Consulting Services, Inc., Judd Nevada Trust, The Judd Irrevocable Trust, PAJ Consulting, Inc., PRJ Consulting, Inc., KAJ Holdings, LLC., The Judd Family Foundation, Target Marketing Insurance Services Inc, J and J Purchasing, LLC, and J&J Consulting Services, Inc., Alaska. Jeff Judd jointly owned three entities directly related to the J&J Ponzi Scheme with related defendants: BJ Holdings (Matt Beasley), LLC, Nevada Pro Pest Control, Inc. (Shane Jager), ORC Holdings, LLC (Shane Jager). Between these twelve entities, Jeff Judd operationally lost $76.5 million.

During the entirety of the J&J Ponzi Scheme, Jeff Judd raised $103.3 million from 160 investors as summarized in the following table. Jeff Judd's net loss investors lost $40.7 million, his net winner investors unjustly gained $22.1 million, and Jeff Judd received a net $79.9 million. Jeff Judd's *Fraud Proximity Ratio* is 0.4, indicating that Jeff Judd was enriched 2.5 times more than his investors were damaged by the J&J Ponzi Scheme.

| Investor Type | Money In | Money Out | MI(MO) |
|---|---|---|---|
| Breakeven Investor | 12,500 | 12,500 | - |
| Net Loss Investor | 67,576,760 | 26,784,895 | 40,791,865 |
| Net Winner Investor | 35,735,530 | 56,021,603 | (20,286,073) |
| Non-Investor Net Winner | - | 1,853,692 | (1,853,692) |

As of June 3, 2022, Jeff Judd raised $7.8 million directly from investors through his business and personal accounts, he received $137.2 million from related defendants, and he paid $65.7 million to investors for a total of $79.3 million. After allocating the joint ventures Jeff Judd's final total is $80 million resulting from the J&J Ponzi Scheme. His results demonstrate $40.7 million in allowed claims to investors and $22.1 million to potentially recover. At the commencement of the receivership Jeff Judd did not make any preferential payments and the receiver was able to recover $37.5 million.

***Jeff Judd's Entities***

<u>J&J Consulting Services, Inc. ("JJC")</u>

JJC, a Nevada corporation, was incorporated in May 2005, and was jointly owned by Jeff Judd, its President, Treasurer and Director, and Jennifer Judd its Secretary. The entity is a named defendant in the case and was the primary vehicle in the J&J Ponzi Scheme for receiving investor funds from Beasley Law Group and distributing them back to investors. In December 2016, JJC began accepting investor money and had two bank accounts, a checking account at Wells Fargo and a checking account at US Bank. These two accounts had $763.5 million in

combined deposits and payments flow in and out of them over the over the 64-month period ending in March of 2022. These accounts were closed and the final $177k was recovered by the receiver after June 3, 2022.

JJC had no legitimate business operations, its $381.7 million inflows consisted of 83.3% of transfers from other defendant accounts, 14.4% from transferred from other Judd accounts, 1.9% of inflows raised from 132 investors and 0.4% from all other sources, including any possible revenue. JJC had $381.6 million in outflows, 49.1% were transfers to other defendant accounts, 27.3% went to other Judd accounts, 16.7% went back to investors and 6.8% were spent on all other business operations.

In summary, JJC received a net $130.4 million from other defendants, sent a net $56.4 million to investors and transferred a net $49.1 million to other Jeff Judd accounts, suffering a net cash loss of $24.7 million, as summarized by year:

| Year | Net Transfers from Beasley Law Group | Net Investor Deposits (Outflows) | Net Tranfers to All Other Defendants | Net All Other J&J Consulting Operations | Net Transfers To Other Judd Accounts |
|---|---|---|---|---|---|
| 2016 | - | 36,053 | - | (67,531) | - |
| 2017 | 321,450 | 337,759 | - | (558,431) | (66,675) |
| 2018 | 1,778,817 | 29,578 | (224,800) | (1,021,460) | (581,510) |
| 2019 | 36,113,898 | (7,096,467) | (21,998,770) | (2,644,095) | (3,769,274) |
| 2020 | 96,192,452 | (17,111,855) | (57,820,283) | (8,779,728) | (12,914,575) |
| 2021 | 160,714,665 | (25,675,117) | (96,536,231) | (10,392,980) | (28,186,840) |
| 2022 | 12,620,314 | (6,975,861) | (670,600) | (1,276,782) | (3,638,450) |
| Total | 307,741,596 | (56,455,910) | (177,250,684) | (24,741,006) | (49,157,324) |

JJC's main purpose was to receive investor money from Matt Beasley and disburse funds to defendants and investors all while retaining a portion of the earnings for Jeff Judd. This pattern is summarized below.

| Other Defendants | Net Payments To/ (Deposits From) J&J Consulting |
|---|---|
| Matt Beasley | 307,741,596 |
| Seth Johnson, Cameron Rohner | 80,000 |
| Matt Beasley, Jeff Judd | (195,100) |
| Denny Seybert | (2,652,000) |
| Richard Madsen | (3,060,600) |
| Larry Jeffery | (5,233,000) |
| Jason Jenne | (8,505,375) |
| Mark Murphy | (10,303,776) |
| Chris Humphries | (11,699,133) |
| Chris Madsen | (13,537,776) |
| Shane Jager | (13,717,550) |
| Warren Rosegreen | (19,002,591) |
| Shane Jager, Jeff Judd | (89,423,783) |

JJC sent $49.1 million to other Judd entities and personal accounts, including $36.7 to Jeff Judd personal accounts, $5.5 million to the Judd Nevada Trust, $2.7 million to the Judd Family Foundation, $1.1 million to PRJ Consulting, $1 million to PAJ Consulting, $717k to KAJ Holdings, $650k to the Judd Irrevocable Trust, $498k to Target Marketing Insurance Services, and $10,100 to J and J Purchasing.

JJC spent $137k toward a Hawker 900 Jet (co-owned between Judd and Beasley), $100k on a diamond ring for his wife Jennifer, $12k on a gold chain and $20k towards Judd's Home Equity Line of Credit with Wells Fargo. JJC had an ending balance of $177k, $6.7 million has been recovered by the receiver.

In summary, JJC received a net $130.4 million from other defendants, sent a net $56.4 million to investors and transferred a net $49.1 million to other Jeff Judd accounts, suffering a net cash loss of $24.7 million.

<u>Judd Nevada Trust ("JNT")</u>

JNT was established in Nevada in December 2020, Jeff Judd and his wife Jennifer Judd were trustees. The trust had three bank accounts, including accounts with US Bank, Nevada State Bank and Credit Union One.

The Trust received no inflows from investors and sent $750k to an investor on March 11, 2022 for a net amount to investors of $750k. JNT received no transfers from other defendants and sent over $1.2 million to GDBH, LLC an entity co-owned by Shane Jager and Chris Madsen, for a net outflow to other defendants of over $1.2 million. JNT received $5.5 million from J&J Consulting and $2.7 million from the Judd Family Foundation. It sent $7.6 million to other Judd accounts for a net of $664k to JNT.

The trust had positive net operations of $1.7 million due to the sale of real estate. Between December 2020 and the end of March 2022. By June 2022, JNT had a total ending balance of $385k in all three accounts. The Receiver recovered $332k from the three bank accounts.

In Summary, JNT sent a net $750k to investors and sent $1.2 million to other defendants. JNT received net $664k from other Judd accounts, had positive net operations of $1.7 million and an ending balance of $385k. The receiver recovered $332k from JNT.

<u>The Judd Irrevocable Trust ("JIT")</u>

JIT was established in December 2020 and lists Matt Beasley as the trustee. The Trust had one bank account with US Bank that closed on February 15, 2022.

The trust received $1.4 million in transfers from Beasley Law Group, $650k from J&J Consulting and $400k from Judd's personal accounts. JNT spent $2.4 million on two insurance policies. The trust had an ending balance of $50,000 when it closed in February 2022. The Receiver has recovered $1.7 million related to the Trust.

In Summary, JIT received a net $1.4 million from other defendants and $1.0 million from other Judd accounts. JIT had $2.4 million in operating losses. The Receiver has recovered $1.7 million related to the Trust.

<u>PAJ Consulting, Inc. (“PAJ”)</u>

Preston Judd, Jeffrey Judd's son, formed PAJ in Nevada in October 2019, Matt Beasley was listed as the Registered Agent. The entity had one account with US Bank. The entity was dissolved before October 2022 and is a relief defendant in the case.

PAJ received $1.0 million from J&J Consulting, $824k from Beasley Law Group and $35,000 from Chris Madsen. The remaining $149k of inflows into the account came via online gambling, credit card advances and cryptocurrency investments. PAJ transferred $1.3 million to a personal US Bank account belonging to Preston Judd.

In Summary, PAJ received a net $859k from other defendants, sent a net $195k to personal accounts and had a net operating loss of $664k.

<u>PRJ Consulting, Inc. (“PRJ”)</u>

Parker Judd, Jeffrey Judd’s son, formed PRJ in July 2021. The entity had one bank account with US Bank. The entity was dissolved before the end of October 2022.

PRJ received $1.1 million from J&J Consulting and $700k from Beasley Law Group. PRJ transferred $1.0 million to a personal US Bank account belonging to Parker and Jennifer Judd.

In Summary, PRJ received a net $700k from other defendants and a net $109k from other Judd accounts. The entity had a net operating loss of $782k and an ending balance of $26,782 at the end of March 2022.

<u>KAJ Holdings, LLC (“KAJ”)</u>

Kennedy Judd, Jeffrey Judd’s daughter, formed KAJ in June 2021, Matt Beasley was listed as the Registered Agent. The entity was dissolved in June 2022.

The entity had no revenue from business operations and received $717k from J&J Consulting. KAJ had one bank account with US Bank that was closed in late March 2022. In October 2021, the entity transferred $499k to a title company to purchase a home in Lehi, UT. The remaining funds were used to pay credits cards, withdraw cash and transfer funds to a personal account belonging to Kennedy Judd.

In Summary, KAJ received $717k from J&J Consulting and lost a net $686k through its operations.

<u>The Judd Family Foundation (“JFF”)</u>

JFF was formed in Nevada in September 2019 by Jeff Judd and his wife Jennifer Judd. The foundation had two bank accounts, one with US Bank and another with Credit Union One. The foundation was revoked in September 2022.

JFF received a net $7.5 million cash from Jeff Judd personal accounts, $2.7 million from J&J Consulting and sent $2.7 million to the Judd Nevada Trust for a net of $7.5 million to JFF. The foundation had a net loss of $4.2 million and an ending balance of almost $3.3 million on June 3, 2022. The Receiver recovered $6.8 million from JFF.

In Summary, JFF received $7.5 million from other Judd accounts, had a net operating loss of $4.2 million and an ending balance of almost $3.3 million. The Receiver recovered $6.8 million in the sale of this entity's recovered assets.

<u>Target Marketing Insurance Services, Inc. ("TMI")</u>

Jeff Judd owned two bank accounts at US Bank under the name TMI, between September 2019 and the end of January 2020. According to these two accounts the entity had no revenue from business operations and was used as a conduit to transfer funds between other Judd owned accounts. TMI received $1.0 million from J&J Consulting and sent $500k back to J&J Consulting. The remaining $500k was sent to the Judd Family Foundation.

In Summary, TMI had nominal operations and acted as a conduit for Judd to transfer funds between his other accounts.

<u>J and J Purchasing, LLC ("JJP")</u>

JJP was incorporated in the state of Florida in October 2021, Jeff Judd was the sole owner. The entity was dissolved in September 2022 and is a named defendant in the case.

The entity had no discernable revenue from business operations and had total inflows of $10,100 from J&J Consulting. The Receiver recovered $9,980 in August 2022.

In summary, JJP received $10,100 from J&J Consulting and had an ending balance of $9,990 on June 3, 2022, the Receiver recovered $9,980 in August 2022.

<u>J&J Consulting Services, Inc. Alaska ("JJCA")</u>

JJCA was incorporated in Alaska on November 20, 2019 and was jointly owned by Jeff Judd its President, Treasurer and Director and Jennifer Judd its Secretary. The entity had no known bank accounts and no discernable revenue. J&J Consulting (Alaska) was dissolved on December 1, 2023. The entity is a defendant named in the case.

***Shane M. Jager***

Shane Jager, married with two daughters and a son, is currently residing in California and was born in 1975. Shane Jager is primarily involved in the pest control and real estate industries and solely owns eight entities relevant to the J&J Ponzi Scheme: Elite Pest Control LLC, Fajardo Properties LLC, Infused LLC, Pride Pest Control LLC, Stirling Consulting Services LLC, The D-Wayne Foundation, Jager Family Trust, The Arjen S Jager and Kelli Jager Living Trust. He also jointly owns three entities with related defendants relevant to the J&J Ponzi Scheme: Nevada Pro Pest Control Inc. (Jeff Judd), ORC Holdings LLC (Jeff Judd), and GDBH LLC (Chris Madsen). Between these eleven entities, Jager operationally lost $37.2 million.

During the entirety of the J&J Ponzi Scheme, Shane Jager raised $102.4 million from 269 investors as summarized in the following table. Shane Jager's net loss investors lost $48.8 million, his net winner investors unjustly gained $6.9 million, and Shane Jager received a net $36.1 million. Shane Jager's *Fraud Proximity Ratio* is 1.10, indicating that Shane Jager was enriched almost as much as his investors were damaged as a result of the J&J Ponzi Scheme.

| Investor Type | Money In | Money Out | MI(MO) |
|---|---|---|---|
| Breakeven Investor | 472,500 | 472,500 | - |
| Net Loss Investor | 77,253,368 | 28,436,252 | 48,817,116 |
| Net Winner Investor | 24,759,429 | 31,264,510 | (6,505,081) |
| Non-Investor Net Winner | - | 427,663 | (427,663) |

As of June 3, 2022, Shane Jager raised $6.2 million directly from investors through his business and personal accounts, he received $86.9 million from related defendants, and he paid $58.8 million to investors for a net total of $34.3 million. After allocating the joint ventures Shane Jager's final total is $36.1 million resulting from the J&J Ponzi Scheme. His results demonstrate $48.8 million in allowed claims to investors and $6.9 million to potentially recover. At the commencement of the receivership Shane Jager did not make any preferential payments and the receiver was able to recover $25.3 million.

***Shane Jager's Entities***

Stirling Consulting LLC ("Stirling Consulting")

Stirling Consulting was founded by Shane Jager in April 2018, and organized in the State of Nevada. The primary purpose of this entity was the investor operations of the J&J Ponzi Scheme. The entity was dissolved in April 2022 and is a named defendant in the case. Beginning in August of 2018, Stirling Consulting began accepting investor money and had one checking account at Wells Fargo Bank. This account had $294.6 million in combined deposits and payments over the 47 months ending in June of 2022.

Stirling Consulting had no discernable business revenue. Nearly 95% of the $147.3 million in deposits were capital funds transferred from other defendant accounts, 2.8% of capital funds raised from 66 investors and salespeople, and 2.5% were from other Shane Jager accounts. This entity sent $147.3 million in payments. 38.9% of these were payments directly back to investors, 35.1% were transfers to other defendant accounts, 23.3% went to other Shane Jager accounts and 2.5% were spent on all other business operations.

Stirling Consulting sent a net $53.1 million to investors. This is due to most Shane Jager investors sending funds directly to the Beasley IOLTA account and Beasley transferring investor and salesperson interest payments to Stirling Consulting, receiving funds from Nevada Pro Pest Control (co-owned between Judd and Jager), or from J&J Consulting Services. This is made more evident in the net $87.7 million from other defendants, as summarized below.

| Other Defendants | Net Payments To/ (Deposits From) Stirling Consulting |
|---|---|
| Shane Jager, Jeff Judd | (86,873,083) |
| Matt Beasley | (30,686,225) |
| Jeff Judd | (13,717,550) |
| Cameron Rohner | 1,267,750 |
| Seth Johnson, Cameron Rohner | 1,503,250 |
| Seth Johnson | 1,574,000 |
| Jason Jongeward | 12,846,791 |
| Roland Tanner | 26,322,250 |

Stirling Consulting sent $30.7 million to other Shane Jager entities and personal accounts, including $29.1 million to Jager Family Trust, $1.0 million to the D-Wayne Foundation, $546k to the Arjen S. Jager and Kelli Jager Living Trust Kelli Jager Trustee, $33,560 to personal accounts and $2,850 to Infused LLC.

Stirling Consulting paid $3.6 million in closing costs for 2394 E La Sal Peak Dr, Heber City, UT and contributed to the closing proceeds of $173k for 19 Sky Arc, Henderson, NV. The ending balance was $2,303 on June 3, 2022, $2,293 was recovered by the receiver on August 2, 2022. On January 19, 2023, the receiver recovered a net amount of $5.0 million for 2394 E La Sal Peak Dr.

In summary, Stirling Consulting gave a net $53.1 million to investors, received a net of $87.7 million from other defendants, transferred a net of $30.7 million to other Shane Jager accounts, suffering a $3.8 million net cash loss, as summarized by year:

| | Net Investor Payments | Net Transfers From Other Defendants | Net Transfers to Other Jager Accounts | Net All other Stirling Consulting Operations |
|---|---|---|---|---|
| 2018 | (407,933) | 571,250 | (74,170) | (3,906) |
| 2019 | (4,139,798) | 5,362,750 | (853,826) | (13,105) |
| 2020 | (10,508,648) | 19,447,983 | (5,481,153) | (3,774,076) |
| 2021 | (28,352,056) | 48,265,034 | (16,563,946) | (6,974) |
| 2022 | (9,788,113) | 14,115,800 | (7,790,350) | (2,460) |
| Total | (53,196,548) | 87,762,817 | (30,763,445) | (3,800,521) |

Jager Family Trust

The Jager Family Trust was established in June 2003. Willow Jager and Shane Jager are trustees. The trust is still active. This entity had two bank accounts with Wells Fargo and one brokerage account with Fidelity Investments. One of the Wells Fargo accounts had a beginning balance of $32,323 in October of 2017 and the other two accounts were opened during the J&J Ponzi Scheme timeframe. These three accounts had over $106.5 million in combined deposits and payments over the 45 months ending in June of 2022.

Jager Family Trust had no discernable business revenue. Of its $53.4 million in deposits, 72.6% were from other Shane Jager accounts, 17.9% primarily from personal investments or distributions from business entities not associated with the J&J Ponzi Scheme, 3.6% from distribution from assets recovered by the receiver, 3.4% of capital funds raised from 12 investors and salespeople, 2.4% of capital funds transferred from other defendant accounts, and 0.1% associated with bank fees, charges or interest. This entity sent $53.1 million in payments, 41.3% of these were payments to purchase assets recovered by the receiver, 19.8% were sent to potentially recoverable assets of the receivership, 16.9% went to other Shane Jager accounts, 9.6% was used for non-recoverable items such as assets sold prior to the receivership or entertainment, 6.6% was paid to various tax authorities, 3.8% of these were transfers to other

defendant accounts, 1.9% of these were payments directly back to investors and sales people, and 0.1% associated with bank fees, charges or interest.

Jager Family Trust purchased a net asset amount of over $30.6 million worth of real estate, vehicles, investments, and other various assets. These purchases were funded through Shane Jager accounts associated with the J&J Ponzi Scheme. To date, the receiver has recovered over $10.5 million from the sale of assets purchased by Jager Family Trust. The assets recovered were primarily real estate and investments.

In summary, Jager Family Trust received a net of $852k from investors, sent a net of $742k to other defendants, received a net of $29.7 million from other Shane Jager accounts, suffering a $29.5 million net loss.

<u>The D-Wayne Foundation</u>

The D-Wayne Foundation was formed in Nevada in April 2020 and dissolved in August 2024. Willow Jager, Shane Jager’s wife is listed as the President, Treasurer, and Director. Kennon McGehee is listed as the Secretary.

The D-Wayne Foundation had no discernable revenue and received net transfers of $1.1 million from Shane Jager's personal and business accounts. The D-Wayne Foundation contributed $1.0 million to the total purchase price of a property (19 Sky Arc.). The remaining $160k was transferred into another Shane Jager personal account in April of 2022. The Receiver recovered over $1.7 million from the D-Wayne Foundation in July 2023.

In summary, the D-Wayne Foundation received a net of $1.1 million from other Shane Jager accounts suffering a net loss of $1.1 million. The Receiver recovered $1.1 million from the D-Wayne Foundation in July 2023.

<u>The Arjen S. Jager and Kelli Jager Living Trust</u>

The Arjen S. Jager and Kelli Jager Living Trust was established in July of 2013 by Arjen S. Jager and Kelli Jager. This trust is still active, and Shane Jager is listed as a Trustee. The Arjen S. Jager and Kelli Jager Living Trust had two accounts at JPMorgan Chase.

From October 2017 through June 2022, these accounts had a combined $3.8 million in total deposits and payments. These deposits and payments included $2.1 million in internal transfers between associated Shane Jager accounts, $1.3 million in discretionary spending and income or property sale, $212k in deposits and payments to associated third party, $127k spent on potential assets, $40,000 transferred to Beasley Law Group and remaining $43,301 were related taxes or bank fees. This trust received $546,675 from Stirling Consulting and sent a net amount of $548,346 to Jager Family Trust. The net transfer amount was $1,671, with the funds flowing from Stirling Consulting to Jager Family Trust. The total ending balances of the two banks accounts were $9,821 on June 3, 2022 and were recovered by the Receiver on November 10, 2022.

In summary, The Arjen S. Jager and Kelli Jager Living Trust had a net operating gain of $244k, gave a net $40k to other defendant entities, transferred a net $1,671 to other Shane Jager accounts and gave $193k to an associated third party.

Fajardo Properties LLC ("Fajardo Properties")

Fajardo Properties was incorporated in the state of Nevada on September 13, 2017, and filed for dissolution in September 2022. The business managers were Shane Jager and Kennon C McGehee. The primary purpose of the business is real estate investments. Fajardo Properties purchased a commercial real estate property located at 6785 S Eastern Ave, Las Vegas, NV 89119 in October 2017 and sold the property in March of 2022.

The entity received $19,200 from Elite Pest Control, $17,900 from Nevada Pro Pest Control, and sent $1,646 to Jager Family Trust. $151k was sent to an affiliated third party. Revenues for this entity totaled $188k from October 2017 to March 2022 with $180k being net proceeds from the sale of the property mentioned previously. Pride Pest Control DBA Bears Pest Control sent a net of $29,854 to Fajardo Properties. Expenses, bank fees, and taxes totaled $23,846. Showing a net operating gain of $194k. In June 2022, the ending cash balance was $79,830.

In summary, Fajardo Properties had a net operating gain of $194k, received a net of $17,900 from other defendants, gave a net $150k to an associated third party and received a net of $17,554 from other Shane Jager accounts.

Elite Pest Control, LLC ("Elite Pest Control")

Elite Pest Control was incorporated in November of 2020, in the State of Nevada. Shane Jager is listed as the only manager. The primary purpose of this business was pest control. Elite Pest Control was dissolved in March 2021, as the company merged with Pride Pest Control, LLC

From October 2017 to January 2020, Elite Pest Control had revenue of $1.1 million, expenses of $820k, resulting in a total of $247k generated from operations. Elite Pest Control sent $19,200 to Fajardo Properties and $220k to Jager Family Trust. $9,581 was sent to an affiliated third party.

In summary, Elite Pest Control had a net operating gain of $247k, gave $239k to other Shane Jager accounts, and sent $9,581 to an affiliated entity.

Pride Pest Control LLC ("Pride Pest Control")

Pride Pest Control was incorporated in the State of Nevada in January of 2013, by Kennon C McGhee. Shane Jager became a managing member when Pride Pest Control merged with Elite Pest Control. The merger date is not known, but Shane Jager stated his business partnership with Kennon McGhee began in 2016 or 2017. The primary purpose of this business is pest control.

From May 2020 to June 2022, Pride Pest Control had revenues of $367k, expenses of $161k, resulting in a total of $206k generated from operations. The net amount of $189k was sent to an affiliated third party. In June of 2022, the ending balance for the account was $16,691.54.

In summary, Pride Pest Control had a net operating gain of $206k, gave $189k to an associated third party and had an ending balance of $16,691.54 on June 1, 2022.

Infused LLC ("Infused")

Shane Jager formed Infused in April 2018, and the entity remains active. Willow Jager, Shane Jager's wife, Karsen Jager, Shane Jager's son, and Shane Jager are all listed as managing members of this entity. Infused provides landscape fertilization services.

The entity sent a net amount of $8,700 to other Shane Jager entities. Infused received a net amount of $4,555 from Nevada Pro Pest Control and sent $15,000 to Beasley Law Group. Infused received $2,850 from Stirling Consulting and sent $11,550 to Jager Family Trust. From October 2018 through June 2022, infused generated $65,128 in revenue and received $4,000 from a PPP loan. Operating expenses totaled $44,479, resulting in a net of $24,649 from operations. $5,504 remained in the account at the beginning of the Receivership. On July 21, 2023, the Receiver recovered the remaining balance of $10,108.

In summary, Infused had a net operating gain of $24,648, gave a net $10,445 to other defendant entities, and transferred a net $8,700 to other Shane Jager accounts.

***Christopher "Chris" R. Humphries***

Chris Humphries who lives in Nevada was born in 1974; he is married and has four children. Chris Humphries is primarily involved in the service industry with his pest control business and owns five businesses relevant to the J&J Ponzi Scheme: JCH Consulting LLC, BugRaiders Pest Control LLC, Anderson Dairy Creamery, The CJ Humphries Foundation, and CJ Investments LLC. Between these five businesses Chris Humphries operationally lost $7.6 million.

During the entirety of the J&J Ponzi Scheme, Chris Humphries raised $81.8 million from 142 investors as summarized in the following table. Chris Humphries' net loss investors lost $41.1 million, his net winner investors gained $2.6 million unjustly and he received a net $10.5 million. Chris Humphries' *Fraud Proximity Ratio* is 3.10, meaning his investors were damaged over three times as much as Chris Humphries was enriched by his involvement in the J&J Ponzi Scheme.

| Investor Type | Money In | Money Out | MI(MO) |
|---|---|---|---|
| Net Loss Investor | 70,863,001 | 29,670,940 | 41,192,061 |
| Net Winner Investor | 10,945,000 | 13,554,385 | (2,609,385) |

As of June 3, 2022, Chris Humphries raised $17.3 million directly from investors through his business and personal accounts, he received $36.2 million from related defendants, and he paid $43.0 million to investors for a total of $10.5 million resulting from the J&J Ponzi Scheme. His results demonstrate that $41.1 million in allowed claims to investors and $2.6 million to potentially recover. At the commencement of the receivership Chris Humphries did not make any preferential payments and the receiver was able to recover $4.7 million.

***Chris Humphries Entities***

CJ Investments, LLC ("CJ Investments")

CJ Investments is an entity incorporated in Nevada in November 2019 and is owned by Chris and Jessica Humphries. This entity has been revoked by the Nevada Secretary of State since

December 2023. CJ Investments banked with Wells Fargo during the entirety of its operations with over $109 million in combined transactions and had transactions more than $12.9 million with US Bank from December 2019 through June 2022.

The majority of Chris Humphries' 142 investors transacted through CJ Investments. Overall, CJ Investments deposited a total of $12.7 million from investors and paid out $42.0 million to investors for a net payment of $29.3 million to investors. Starting in February 2020, Matt Beasley transferred a net of $25.9 million to CJ Investments and Jeff Judd transferred a net of $10.6 million for a total of $36.6 million. In total net transfers from other defendants total $36.6 million. Starting in December 2019 CJ Investments received $11,450 from Anderson Dairy Creamery. A net of $11,500 was sent to JCH Consulting, a net of $31,434 to Bug-Raiders Pest Control, $450K sent to CJ Humphries Foundation, and $4.0 million sent to Chris Humpries personal accounts.

CJ Investments was created strictly for the purpose of the J&J Ponzi Scheme. The only operational inflows were $38,330 with $1.6 million in expenses showing a net cash loss of $1.5 million. Of this $1.6 million, $558k was used to purchase potentially recoverable assets.

In summary, CJ Investments suffered a $1.5 million cash entity loss and received a net of $36.6 million from other defendants, paid a net of $29.3 million to investors and other third parties, and transferred $4.4 million to other Chris Humphries accounts.

<u>Bug Raiders Pest Control, LLC ("Bug Raiders")</u>

Bug Raiders is an entity incorporated in the State of Nevada in April 2005 owned by Chris Humphries and Jessica Humphries. This entity is still active according to the Nevada Secretary of State. Bug Raiders banked with Wells Fargo and had over $1.7 million in combined transactions.

The two investors that transacted through Bug Raider's account deposited $80,000 and Bug Raider's paid out $55,000 to these investors for a net of $25,000. Jeff Judd transferred $41,632 into Bug Raider's account and Bug Raider's sent $1,200 to Mark Murphy and $370k to Matt Beasley for a net $329k paid to other defendants. Bug Raiders received $4,800 personally from Chris Humphries, $31,434 from CJ Investments, and $279k from JCH Consulting. In total net transfers from other Chris Humphries accounts of $315k.

Bug Raiders, an operational pest control company prior to the J&J Ponzi Scheme, had operational inflows of $1.1 million and outflows of $1.0 million resulting in net operating gain of $28,029. The account began with $12,645 prior to the J&J Ponzi Scheme and ended with $51,341 at the end of the Scheme. The receiver was able to recover $53,291 from this entity.

In Summary, Bug Raiders was funded by its operational net income of $28,029, a net of $25,000 from investors, $315k from entities related to Chris Humphries, and paid $329k to other defendants.

JCH Consulting, LLC (“JCH Consulting”)

JCH Consulting filed in Nevada in March 2019, owned by Chris and Jessica Humphries. This entity ceased operations by June of 2022 and has been in revoked status by the Nevada Secretary of State. JCH Consulting banked with Wells Fargo and had over $4.0 million in transactions.

In May 2019, 13 investors transacted through JCH Consulting. Overall, JCH Consulting received $800k and paid out $742k to investors for a net amount to investors of $57,332. JCH Consulting received $983k from Jeff Judd and $11,500 from CJ Investments. JCH Consulting sent $550k to Matt Beasley for a net amount from defendants of $433k. JCH Consulting sent $18,000 to Anderson Dairy Creamery, $240k to Chris Humphries personal accounts, and $279k to Bug Raiders Pest Control. In total, JCH Consulting sent a net of $525k to other Chris Humphries accounts.

JCH Consulting operationally provided consulting services to one entity. Total operational inflows were $63,563 and total outflows were $19,573, showing a net gain of $43,990. The receiver recovered $8,457 from this entity.

In summary JCH Consulting was funded by a net gain of $43,990, $57,332 from investors and $433k from related defendants. JCH Consulting paid a net $525k to entities related to Chris Humphries.

Anderson Dairy Creamery (“Anderson Dairy”)

Anderson Dairy Creamery was incorporated in Nevada in July 2019 and was owned by Chris and Jessica Humphries and Christopher and Julie Tandy jointly. This entity ceased operations by June of 2022 and has been in revoked status by the Nevada Secretary of State. Anderson Dairy banked with Wells Fargo during the entirety of its operations and had $257k in combined transactions from July 2019 and June 2022.

There were two investors, one being Julie Tandy herself, as well as a company owned by Julie Tandy that deposited $50,000 into Anderson Dairy’s account and withdrew $36,970 for a net payment of $13,030. There were no related or named defendant transfers in Anderson Dairy bank account. Beginning in November 2019, Anderson Dairy received $18,000 from JCH Consulting and sent $11,450 to CJ Investments. In total net transfers made internally to other entities owned by Chris Humpries were $6,550. Anderson Dairy’s only operational inflows were $2,384 and $21,962 in expenses showing a net cash loss of $19,577.

In summary, Anderson Dairy suffered a $19,577 cash entity loss, received a net of $6,550 from other entities owned by Chris Humphries, and paid a net of $13,030 to investors.

CJ Humphries Foundation

CJ Humphries Foundation is a non-profit incorporated in Nevada in December of 2020 owned by Chris and Jessica Humphries. The entity ceased operations by June of 2022 and have been in revoked status by the Nevada Secretary of State. CJ Humphries foundation banked with US Bank and had $900k in combined transactions. There were no investors or other related defendants involved with this entity.

CJ Humphries Foundation received $450k from CJ Investments and sent $40,000 to charitable entities that are considered potentially recoverable assets at this time. The Receiver recovered $346k in October 2022.

In summary, CJ Humphries Foundation received $450k from other Chris Humphries accounts, sent $40k potentially recoverable assets to charitable entities and the Receiver recovered $346k from the foundation.

***Jason M. Jongeward***

Jason Jongeward was born in 1971 and is married with four sons living in Washington. Jason Jongeward is primarily involved in the construction industry and owns two businesses relevant to the J&J Ponzi Scheme: JL2 Investments LLC and Jongeward Construction & Development LLC. Jason Jongeward operationally had a net profit of $420k.

During the entirety of the J&J Ponzi Scheme, Jason Jongeward raised $59.4 million from 139 investors as summarized in the following table. Since Jason Jongeward's net loss investors lost $43.4 million and he received a net $199k of that and distributed $549k unjustly to the net winners, Jason Jongeward's *Fraud Proximity Ratio* is 58.0, indicating that Jason Jongeward's investors suffered 58 times more than Jason Jongeward was enriched by the J&J Ponzi Scheme.

| Investor Type | Money In | Money Out | MI(MO) |
|---|---|---|---|
| Net Loss Investor | 59,033,404 | 15,597,250 | 43,436,154 |
| Net Winner Investor | 460,972 | 786,805 | (325,833) |
| Non-Investor Net Winner | - | 223,400 | (223,400) |

As of June 3, 2022, Jason Jongeward raised $2.0 million directly from investors through his business and personal accounts, he received $11.7 million from related defendants, and he paid $13.5 million to investors for a total of $199k resulting from the J&J Ponzi Scheme. His results demonstrate that $43.4 million in allowed claims to investors and $549k to potentially recover. At the commencement of the receivership Jason Jongeward did not make any preferential payments and the receiver was able to recover $252k.

***Jason Jongeward's Entities***

<u>Jongeward Construction & Development LLC ("JCD")</u>

JCD was founded in January of 2008 by Jason Jongeward and is still an active business engaged in construction and development services.

In November 2019, Jason Jongeward invested $40,000 with Beasley Law Group through JCD. There are no other instances of JCD sending or receiving funds with other defendants or with known investors.

<u>JL2 Investments LLC (JL2")</u>

JL2 was founded in November 2019 and is wholly owned by Jason Jongeward and was actively engaged in the investor operations of the J&J Scheme until it ceased operations with the receiver's appointment in June 2022. JL2 banked with Washington Trust Bank from its inception

until August 2021 and had two bank accounts with Wells Fargo from March 2021 through June 2022.

Jason Jongeward was responsible for 141 investors committing $59.4 million into the Beasley Law Group/J&J Consulting organization. Five of these investors had potentially recoverable profits more than their investments for a total of $549k. The other 136 individuals lost a net $43.4 million.

On a direct basis, JL2 received $679k from investors and repaid $12.2 million back to investors. JL2 received $12.8 million from Shane Jager and sent $610k to Matt Beasley. JL2 sent a net $489k to other Jason Jongeward personal accounts. All other JL2 operations lost $151k during the 31 months of their operations. The receiver recovered $25,247 from JL2 Investments' accounts in June 2022.

In summary, JL2 was funded by $12.2 million from other defendants (mostly Shane Jager), it sent $11.5 million to investors, $489k to other Jongeward accounts, lost $151k in operations and the receiver recovered $25,247 in June 2022.

***Matthew "Matt" W. Beasley***

Matt Beasley was born in 1972 and currently resides in federal prison in the State of Nevada. Prior to the J&J Ponzi Scheme, Matt Beasley was a licensed attorney in Nevada and owned two entities directly related to the J&J Ponzi Scheme: Beasley Law Group and Expert Litigation Services. He also jointly owns BJ Holdings with Jeff Judd that is directly related to the J&J Ponzi Scheme. Between these entities Matt Beasley operationally lost $16.8 million.

During the entirety of the J&J Ponzi Scheme, Matt Beasley raised $889k million from three investors as summarized in the following table. Matt Beasley's net loss investors lost $490k, his net winner investors unjustly gained $2.2 million, and Matt Beasley received a net $22.8 million. Matt Beasley's *Fraud Proximity Ratio* is 0.00, indicating that Matt Beasley very little damages to his own investors relative to how much he benefitted from the J&J Ponzi Scheme.

| Investor Type | Money In | Money Out | MI(MO) |
|---|---|---|---|
| Net Loss Investor | 490,000 | - | 490,000 |
| Net Winner Investor | 399,730 | 2,281,554 | (1,881,824) |
| Non-Investor Net-Winner | - | 404,003 | (404,003) |

As of June 3, 2022, Matt Beasley raised $394.3 million directly from investors through his business and personal accounts, he received $344.5 million from related defendants, and he paid $27.0 million to investors for a net total of $22.7 million. After allocating the joint ventures Matt Beasley's final total is $22.8 million resulting from the J&J Ponzi Scheme. His results demonstrate $490k in allowed claims to investors and $2.2 million to potentially recover. At the commencement of the receivership Matt Beasley did not make any preferential payments and the receiver was able to recover $8.1 million.

***Matt Beasley's Entities***

Beasley Law Group, PC ("BLG")

BLG is a law firm wholly owned by attorney Matt Beasley[3] founded on April 18, 2011 in Nevada and last filed its federal and state taxes for the year ending December 31, 2020. In late 2016, BLG had two bank accounts at Bank of Nevada; a lawyer's IOLTA account and a normal business checking account. Beginning in October 2016, BLG began accepting investor money in its IOLTA account at Bank of Nevada. In February 2017, BLG was informed by the Bank of Nevada that they would be closing its accounts due to suspicious activity in its accounts and so Beasley opened two new accounts at Wells Fargo: an IOLTA and a normal business checking account. In November of 2020, BLG would go on to open a second IOLTA account at Wells Fargo. These five accounts would have over $1.0 billion in combined deposits and payments flow in and out of them over the 64-month period ending in March of 2022. These accounts were closed and the final $3.8 million was recovered by the Receiver after his appointment on June 3, 2022.

BLG had no discernable business revenue and its $510.7 million in deposits consisted 77.2% of investment funds raised from 869 investors and salespeople, 22.3% of investment funds transferred from other defendant accounts, and 0.5% all other sources. As for its $506.9 million in payments, 5.3% of these were payments directly back to investors, 91.4% of these were transfers to other defendant accounts and 3.2% were spent on all other business operations. In summary, BLG raised a net $367.2 million from investors, transferring a net of $344.0 million to other defendants, and transferring a net of $5.4 million to other Matt Beasley accounts, suffering a $13.9 million net cash loss, as summarized by year below:

| Year | Net Investor Deposits | Net Transfers (To)/From Other Defendants | Net Transfers To Other Beasley Accounts | Net All Other Beasley Law Group Operations |
|---|---|---|---|---|
| 2016 | 123,000 | 70,000 | (19,500) | (112,153) |
| 2017 | 1,427,995 | 2,133,950 | (1,460,770) | (1,664,378) |
| 2018 | 9,391,673 | (5,258,372) | (1,795,472) | (1,404,441) |
| 2019 | 31,913,214 | (28,930,352) | (395,506) | (2,103,592) |
| 2020 | 82,043,498 | (75,469,384) | (743,087) | (3,322,487) |
| 2021 | 191,603,088 | (184,897,505) | (896,972) | (4,397,931) |
| 2022 | 50,776,200 | (51,668,370) | (135,000) | (972,321) |
| Total | 367,278,668 | (344,020,033) | (5,446,307) | (13,977,303) |

On a direct basis, BLG received a net $367.2 million in investors' funds, but BLG and Matt Beasley were not primarily involved in investment sales or acquiring investors. Indeed, there are no arm's-length investors originating from the direct efforts of Matt Beasley or BLG and only eight third parties associated with BLG. The only third party with a potential claim for loss is Libertas Funding, which was not an investor at all, but instead lent money to Matt Beasley. There are eight third parties with net cash received totaling over $2.2 million, and these parties are all

[3] Matt Beasley was temporarily suspended by the Nevada Supreme Court on April 1, 2022 in Case No. 84445.

relatives, affiliates, and poolers associated with BLG. The receiver is reviewing these transactions and determining the recoverability of these assets.

The primary operational role of the accounts at BLG was to take in investor funds and send those funds to other defendants. Indeed, 93.7% of all the investor funds received by BLG were transferred to the other fifteen defendants, with the following net cash balance with BLG as of June 3, 2022:

| Other Defendant | Net Payments To/ (Deposits From) Beasley Law Group |
|---|---|
| Mark Murphy | 7,738,650 |
| Chris Madsen | 7,115,500 |
| Richard Madsen | 7,010,000 |
| Roland Tanner | 5,587,000 |
| Denny Seybert | 4,094,000 |
| Seth Johnson | 3,655,000 |
| Jason Jenne | 2,860,750 |
| Cameron Rohner | 2,755,000 |
| Jason Jongeward | 1,120,000 |
| Larry Jeffery | 129,000 |
| Anthony Alberto | (6,128,709) |
| Warren Rosegreen | (8,908,742) |
| Chris Humphries | (24,580,000) |
| Shane Jager | (30,596,725) |
| Jeff Judd | (315,620,757) |

From 2016 through March 2022, BLG sent $2.2 million to Matt Beasley's personal accounts and $3.1 million to another Matt Beasley entity, Expert Litigation Services, Inc. BLG sent a net $500,000 to the Matt Beasley/Jeff Judd joint venture BJ Holdings LLC.

The receiver has recovered $7.8 million attributed to BLG assets to date and has identified a further $2.0 million of purchases that represent yet unrecovered potentially valuable assets. Of unique importance, BLG made over $4.0 million in direct payments to 36 third party individuals that were on behalf of Anthony Alberto in satisfaction of his gambling debts. Of note, BLG sent 23 cashier's checks from Wells Fargo Bank totaling $738,500 that mostly had false or misleading remitters written on them to obfuscate their origin in an IOLTA account.

BLG ceased operations in March of 2022 when Matt Beasley was taken into custody by the FBI.

ELS is a company with no discernable legitimate revenue, wholly owned by Matt Beasley. ELS was created in March of 2017 and served the primary purpose of depositing BLG-originated Wells Fargo cashier's checks in its account at Citibank, where those funds were subsequently spent or distributed to Matt Beasley's other personal accounts.

ELS was funded by 85 deposits and credits from BLG totaling $3,158,000 and miscellaneous refunds and gambling winnings totaling $45,387 and spent $1.9 million cash withdrawals, gambling, and personal expenses of Matt Beasley. This included $558,700 paid to Anthony Alberto directly in satisfaction of gambling debts and $1.5 million transferred to Matt Beasley's personal accounts. Of note, ELS deposited 23 cashier's checks from Wells Fargo totaling $738,500 that originated from the BLG IOLTA account but mostly had false or misleading remitters written on them to obfuscate their origin.

ELS ceased operations on January 17, 2019, when Matt Beasley transferred the final $3,959 balance to his personal US Bank account a/e 7143.

***Christopher "Chris" M. Madsen***

Chris Madsen was born in 1976 and is the brother of co-defendant Richard Madsen. He is married and resides in Nevada. Chris Madsen is primarily involved in the real estate industry and has eight business affiliations relevant to the J&J Ponzi Scheme: ACAC LLC, All American Builders, Inc #2, US Team Industries, LLC, Precision Sanitation, LLC, Promenade Partners, Business Center LLC, HGD Brothers LLC, and Business Investment LLC. He also jointly owns one entity with Jeff Judd, a related defendant that is relevant to the J&J Ponzi Scheme: GDBH LLC. Between these nine entities, Chris Madsen operationally lost $9.9 million.

During the entirety of the J&J Ponzi Scheme, Chis Madsen raised $22.4 million from 61 investors as summarized in the following table. Chis Madsen's net loss investors lost $9.0, his net winner investors received $3.8 million unjustly and he received a net $9.7. Chis Madsen's *Fraud Proximity Ratio* is 3.10, indicating that Chis Madsen's investors were damaged three times as much as Chris Madsen was enriched by the J&J Ponzi Scheme.

| Investor Type | Money In | Money Out | MI(MO) |
|---|---|---|---|
| Net Loss Investor | 16,638,605 | 7,601,643 | 9,036,962 |
| Net Winner Investor | 5,845,625 | 8,461,261 | (2,615,636) |
| Non-Investor Net Winner | - | 1,206,921 | (1,206,921) |

As of June 3, 2022 Chis Madsen raised $21.7 million directly from investors through his business and personal accounts, he received $6.0 million from related defendants, and he paid $19.2 million to investors for a total of $8.5 million. After allocating the joint ventures Chis Madsen's final total is $9.7 million resulting from the J&J Ponzi Scheme. His results demonstrate $9.0 million in allowed claims to investors and $3.8 million to potentially recover. At the commencement of the receivership Chris Madsen made $460k in preferential payments and the receiver was able to recover $2.3 million.

***Chris Madsen's Entities***

<u>All American Builders, Inc. ("AAB")</u>

AAB was incorporated in Nevada in October 2009 by owner Chris Madsen. The entity is an operating business providing construction services in the Las Vegas market. All American Builders had four accounts with Bank of America with over $86.7 million in combined

transactions. Based on review of the banking records, All American Builders co-mingled funds related to the construction business with funds related to the J&J Ponzi Scheme.

For the J&J Ponzi Scheme, five out of Chris Madsen's 80 investors transacted through AAB There were no investments made to All American Builders, however, AAB paid out $743k to investors, for net amount to investors of $743k. AAB received $1.7 million from GDBH, LLC, an entity co-owned by Chris Madsen and Shane Jager. It transferred $430k to Matt Beasley, for a net $1.2 million to All American Builders from other defendants. AAB received $140k from ACAC, LLC and $4,547 from Promenade Partners, LLC. AAB sent $482k to Chris Madsen's personal accounts, $311k to Business Investment, LLC and $8,000 to HGD Brothers, LLC, for a net amount of $656k to other Chris Madsen accounts. AAB earned $24.8 million from construction services with $24.7 million in expenses showing a net profit of $167k for the construction business.

In Summary, AAB earned a $167k cash operating profit. It received a net of $1.2 million from other defendants, paid a net of $743k to investors and other third parties, transferred $656k to other Chris Madsen's accounts.

<u>ACAC, LLC ("ACAC")</u>

ACAC was incorporated in Utah in September 2005 and owned by Chris Madsen. The entity has been voluntarily dissolved status by the Utah Secretary of State. ACAC had one account with Bank of America with over $93.6 million in combined transactions.

The majority of Chris Madsen's 80 investors transacted through ACAC. Overall, ACAC deposited a total of $16.9 million from investors and paid out $15.8 million to investors for a net payment of $1.0 million to investors. ACAC received a net $13.5 million from Jeff Judd and It transferred a net $6.5 million to Matt Beasley, a net $1.4 million to Richard Madsen, for a net $5.4 million from ACAC to other defendants. ACAC received a net $519k from other Chris Madsen's accounts and a net $244k from HGD Brothers LLC. It transferred a net of $140k to AAB and $30,000 to Business Investment, LLC. ACAC earned $1.1 million with $8.4 million in expenses, showing a net loss of $7.1 million.

In Summary, ACAC LLC suffered a $7.1 million cash operating loss. It received a net of $5.4 million from other defendants, a net of $1.0 million from other investors and other third parties, transferred a net of $594k from Chris Madsen's other accounts.

<u>Business Center LLC ("Business Center")</u>

Business Center was incorporated in California in 2012 and owned by Chris Madsen. Business Center had one account with Bank of America with over $195k in combined transactions.

For the J&J Ponzi Scheme, two out of Chris Madsen's 80 investors transacted through Business Center. Overall, Business Center deposited a total of $90,111 from investors and paid out $11,833 to investors for a net payment of $78,277 to investors. None of other defendants transferred to/from Business Center. Business Center transferred a net $17,500 to other Chris

Madsen's accounts. Business Center earned $480 with $57,005 in expenses showing a net loss of $56,525.

In Summary, Business Center suffered a $56,525 cash operating loss. It did not receive from other defendants, received a net of $78,277 from investors and other third parties and transferred a net of $17,500 to other Chris Madsen's accounts.

HGD Brothers, LLC ("HGD Brothers")

HGD Brothers, was incorporated in Utah in April 2007 and owned by Chris Madsen. This entity has been in active status by the Utah Secretary of State. HGD Brothers had one account with Bank of America with over $2.2 million in combined transactions.

For the J&J Ponzi Scheme, two out of Chris Madsen's 80 investors transacted through HGD Brothers. Overall, HGD Brothers deposited a total of $168k from investors and paid out $50,000 to investors for a net payment of $118k to investors. No defendants transferred to/from HGD Brothers. HGD Brothers received a net of $275k from Chris Madsen's other accounts and net of $108k from Business Investment, LLC. It transferred a net $244k to ACAC, $8,000 to AAB, and a net $5,000 to US Team Industries, LLC. HGD Brothers earned $435k operational revenue earned with $632k in expenses showing a net loss of $197k.

In Summary, HGD Brothers suffered a $197k cash operating loss. It did not receive from other defendants, received a net of $118k from investors and other third parties, transferred a net of $151k from other Chris Madsen's accounts.

Business Investment, LLC ("Business Investment")

Business Investment was incorporated in Nevada in October 2015 and is 50% owned by Chris Madsen and 50% by Stephen Thueringer. The entity has been in active status by the Nevada Secretary of State. Business Investment had one account with Bank of America with over $2.4 million in combined transactions.

For the J&J Ponzi Scheme, one out of Chris Madsen's 80 investors transacted through Business Investment. There were no investments made to Business Investment, however, Business Investment paid out $176k to an investor, for net amount to investors of $117k. No defendants transferred to/from Business Investment. Business Investment received a net $311k from AAB, a net $30,000 from ACAC and $3,360 from Chris Madsen's other accounts. It transferred $108K to HGD Brothers. Business Investment did earn $424k of operational revenue with $826k in expenses showing a net loss of $401k.

In Summary, Business Investment suffered a $401k cash operating loss. It did not transact with other defendants, but did receive a net of $176k from investors and other third parties and transferred a net of $236k from other Chris Madsen's accounts.

US Team Industries LLC ("US Team")

US Team was incorporated in Nevada in May 2016, and is 50% owned by Chris Madsen and is 50% owned by Shea Thueringer. This entity ceased operations by May 2020 and has been in a

revoked status by the Nevada Secretary of State since June 2020. US Team had one account with Bank of America with over $220k in combined transactions.

For the J&J Ponzi Scheme, none of Chris Madsen's investors transacted through US Team, nor did any of the other defendants transfer to or from US Team. US Team transferred a net $6,250 to other Chris Madsen's accounts and $5,000 to HGD Brothers. It received $500 from Precision Sanitation, LLC. US Team earned $104K with $91,717 in expenses, showing a net loss of $12,959.

In Summary, US Team earned a net $12,959 cash operating profit. It did not receive from other defendants nor investors and other third parties, transferred $10,750 to other Chris Madsen's accounts.

Precision Sanitation, LLC ("Precision Sanitation")

Precision Sanitation was incorporated in 2014 and is 50% owned by Chris Madsen. The entity is an operating business providing sanitation services in the Las Vegas market. Precision Sanitation had one account with Bank of America. Precision Sanitation had one account with Bank of America with $19,053 in combined transactions.

For the J&J Ponzi Scheme, none of Chris Madsen's investors transacted through Precision Sanitation, nor did any of the other defendants transfer to or from Precision Sanitation. Precision Sanitation received $125 from other Chris Madsen's accounts and transferred $500 to US Team. Precision Sanitation only earned $1,533 with $3,306 in expenses showing a net loss of $1,773.

In Summary, Precision Sanitation suffered a net $1,773 cash operating loss. It did not receive funds from other defendants nor other investors and other third parties and transferred a net $375 to Chris Madsen's other accounts.

Promenade Partners, LLC ("Promenade Partners")

Promenade Partners was incorporated in Nevada in February 2013 and owned by Chris Madsen. This entity has been in revoked status by the Nevada Secretary of State since March 2022. Promenade Partners had one account with Bank of America ($146k in combined transactions).

For the J&J Ponzi Scheme, none of Chris Madsen's investors transacted through Promenade Partners, nor did any of the other defendants transfer to or from Promenade Partners. Promenade Partners transferred $4,547 to AAB. Promenade Partners earned $48,700 with $68,349 in expenses showing a net loss of $19,649.

In Summary, Promenade Partners suffered a net $19,649 cash operating loss. It did not receive from other defendants nor to investors and other third parties, transferred $4,547 to Chris Madsen's other accounts.

***Roland S. Tanner***

Roland Tanner was born in 1956 and resides in Nevada with his wife. Professionally, Roland Tanner is involved in real estate investment and owns five entities relevant to the J&J Ponzi Scheme: Anthem Assets, LLC, Tanner Capital Group, LLC, Nevada Housing Solutions, ZZYZX

Capital and Tanner Legacy, LLC. Between these five entities Roland Tanner operationally lost $1.3 million.

During the entirety of the J&J Ponzi Scheme, Roland Tanner raised $37.6 million from 48 investors as summarized in the following table. Roland Tanner's net loss investors lost $15.1 million, his net winner investors unjustly gained $870k and Roland Tanner received a net $2.5 million. Roland Tanner's *Fraud Proximity Ratio* is 4.40, indicating Roland Tanner's investors were damaged 4.4 more times than Roland Tanner was enriched by the J&J Ponzi Scheme.

| Investor Type | Money In | Money Out | MI(MO) |
|---|---|---|---|
| Breakeven Investor | 240,000 | 240,000 | - |
| Net Loss Investor | 34,137,212 | 18,981,327 | 15,155,885 |
| Net Winner Investor | 3,298,575 | 4,141,623 | (843,048) |
| Non-Investor Net Winner | - | 27,500 | (27,500) |

As of June 3, 2022, Roland Tanner raised $3.2 million directly from investors through his business and personal accounts, he received $20.7 million from related defendants, and he paid $21.3 million to investors for a net total of $2.5 million resulting from the J&J Ponzi Scheme. His results demonstrate that $15.1 million in allowed claims to investors and $870k to potentially recover. At the commencement of the receivership Roland Tanner did not make any preferential payments and the receiver was able to recover $1.1 million.

***Roland Tanner's Entities***

Anthem Assets, LLC ("Anthem Assets")

Anthem Assets was created in Nevada in May 2020 and is owned by Roland Tanner. It ceased operations before June 2022. Anthem Assets banked with Wells Fargo and had a combined total of $48.2 million in transactions.

Anthem Assets had 46 investors that deposited $733k into its account; Anthem Assets sent $18.7 million to investors for a net payment of $17.9 million to investors. Beginning in June of 2020, Anthem Assets transferred $410k to Nevada Housing Solutions, $700k to Tanner Legacy, $828k to ZZYZX Capital, and $3.5 million to Tanner Capital Group, a total payment of $5.4 million to related entities owned by Roland Tanner. In June of 2020 and continuing through March of 2022, Stirling Consulting sent Anthem Assets $23.4 million.

It appears that Anthem Assets was created strictly for the purpose of the J&J Ponzi Scheme. The only operational inflows were $519 with $10,319 in expenses showing a net cash loss of $9,800. The receiver recovered $4,088 from Anthem Assets.

In summary, Anthem Assets suffered a net entity loss of $9,800. Anthem Assets was funded by Stirling Consulting with deposits totaling $23.4 million. It paid $17.9 million to investors, and $5.4 million to related entities owned by Roland Tanner.

Tanner Capital Group, LLC ("Tanner Capital")

Tanner Capital Group is an entity incorporated in Nevada in February 2015 owned by Alison and Roland Tanner. This entity is still active with the Nevada Secretary of State. Tanner Capital

banked with Wells Fargo, having $54,808 in combined transactions, and Charles Schwab where over $21.2 million in combined transactions occurred.

Starting in September 2018 18 investors deposited $869k into Tanner Capitals accounts and paid over $1.1 million to investors, a total payment of $240k. Starting in August 2018 Shane Jager sent Tanner Capital a net of $3.3 million. Tanner Capital then sent Matt Beasley a net of $2.39 million, a total net of $950k. Starting in August of 2018 Anthem Assets transferred a net of $3.5 million to Tanner Capital, ZZYXZ Capital transferred a net of $231k, Nevada Housing Solutions transferred a net of $30,378, Roland Tanner's personal accounts received a net of $1.2 million, and the Tanner Family Trust received a net of $1.2 million.

Tanner Capital is a rental company with total operating revenue of over $1.0 million and operating expenses of $2.4 million, an overall cash entity loss of more than $1.3 million. This entity began the J&J Ponzi Scheme with a beginning balance of $250k and ended with a balance of $878k. Three potentially recoverable assets totaling $227k are being.

In summary, Tanner Capital suffered an entity cash loss of more than $1.3 million. It is funded by a net of $950k from related defendants and $1.2 million from related entities owned by Roland Tanner. Tanner Capital paid a net of $240k to investors.

Nevada Housing Solutions, LLC ("NHS")

NHS filed in Nevada in September 2015 and is owned by Roland Tanner and Carl Bassett. It is still an active business according to the Nevada Secretary of State. NHS banks with City National Bank with over $7.5 million in combined transactions.

NHS had two investors with deposits to NHS of $222k and $782k in payments to these investors, an overall net of $560k. Starting in October of 2020 through May of 2021, Beasley Law Group received $800k from NHS. In June 2020, NHS received $410k from Anthem Assets and paid Tanner Capital Group $30,379, a net of $379k.

Operationally, NHS generated $3.1 million in revenue and $1.5 million in business expenditures showing a net gain of $1.6 million between the years of 2019 through 2022 by renting and flipping houses for sale.

In summary, this entity is being funded by a profitable net income of $1.5 million, sent a net of $800k to related defendants, and received a net of $379k from related entities owned by Roland Tanner. NHS paid investors a net of $560k.

ZZYZX Capital, LLC ("ZZYZX Capital")

ZZYZX Capital was established in June 2018 in Nevada. The entity was owned by Roland Tanner and his sons, the ownership share was 38% Roland Tanner, 21% Jordan Tanner, 21% Nathan Tanner and 20% Brandon Tanner. The entity had one brokerage account with Charles Schwab. ZZYZX Capital dissolved in May 2023.

ZZYZX Capital received $698k from investors and sent $774k back to investors, for a net amount to investors of $76,120. The investors that transacted with ZZYZX Capital were relatives

of Roland Tanner and two of those investors were also co-owners in ZZYZX Capital. ZZYZX Capital received $359k from Stirling Consulting and sent $1.0 million to BLG, for a net amount of $730k to other defendants. ZZYZX Capital received $828k from Anthem Assets, sent $232k to Tanner Capital Group and sent $71,826 to Roland Tanner's personal account, for a net $524k from other Roland Tanner accounts. ZZYZX Capital had positive net gains of $187k due to the sale of real estate and a starting account balance of $95,107.

In Summary, ZZYZX Capital sent a net $76,120 to related investors, sent $730k to other defendants, received $524k from other Roland Tanner accounts, had positive net gains of $187k.

<u>Tanner Legacy, LLC ("Tanner Legacy")</u>

Tanner Legacy was established in Nevada in September 2020 and was wholly owned by Roland Tanner. The entity was dissolved in May 2023. Tanner Legacy had one brokerage account with Charles Schwab.

Tanner Legacy sent a net $2.1 million to other defendants including a net $1.3 million to Matt Beasley and $800k to Shane Jager. Tanner Legacy received a net $700k from Roland Tanner's other entity Anthem Assets, LLC for a net of $700k received from all Tanner accounts. Tanner Legacy had positive net gains of $1.5 million due to the transfer of investment funds from Roland Tanner's other unrelated investments.

In Summary, Tanner Legacy sent $2.1 million to other defendants, received a net $700k from other Roland Tanner accounts and had positive net gains of $1.4 million due to proceeds from unrelated investments.

<u>Tanner Family Trust</u>

The Tanner Family Trust was established under an agreement dated March 20, 2015, with Roland and his wife Allison Tanner listed as Trustees. The Trust had one brokerage account with Charles Schwab.

The Tanner Family Trust received $1.3 million from Tanner Capital Group and sent $136k to Roland Tanner's personal accounts for a net $1.1 million to the Tanner Family Trust from other Roland Tanner accounts. The Tanner Family Trust invested $1.8 million in real estate which contributed to its net operating loss of $1.1 million. The real estate has been deemed potentially recoverable by the receiver.

In summary, the Tanner Family Trust received $1.1 million from other Roland Tanner accounts and had a net operating loss of $1.1 million.

***Mark A. Murphy***

Mark Murphy was born in 1957 and is a Certified Public Accountant, licensed in the State of Nevada where he resides. Mark Murphy owns ten entities that are relevant to the J&J Ponzi Scheme: Triangle Consultants LLC, AAA Las Vegas Event Planner Inc., Chopin Investments Inc., Desert Elevator Inc., North Texas Properties LLC, Mark Murphy Foundation, Hope Ranch

Inc., Mark A Murphy LTD DBA Steel Dust, American Colocation Services LLC, and American Investment Company LLC. Mark Murphy operationally lost $5.2 million.

During the entirety of the J&J Ponzi Scheme, Mark Murphy raised $16.9 million from 60 investors as summarized in the following table. Mark Murphy's net loss investors lost $8.2 million, his net winner investors unjustly gained $4.1 million, and Mark Murphy received a net of $5.2 million. Mark Murphy's *Fraud Proximity Ratio* is .9, indicating that Mark Murphy was enriched more than his investors were damaged as a result of the J&J Ponzi Scheme.

| Investor Type | Money In | Money Out | MI(MO) |
|---|---|---|---|
| Breakeven Investor | | | - |
| Net Loss Investor | 11,814,310 | 3,579,962 | 8,234,348 |
| Net Winner Investor | 5,121,645 | 9,115,767 | (3,994,122) |
| Non-Investor Net Winner | - | 160,100 | (160,100) |

As of June 3, 2022, Mark Murphy raised $16.3 million directly from investors through his business and personal accounts, he received $2.5 million from related defendants, and he paid $13.6 million to investors for a net total of $5.2 million resulting from the J&J Ponzi Scheme. His results demonstrate $8.2 million in allowed claims to investors and $4.1 million to potentially recover. At the commencement of the receivership Mark Murphy did not make any preferential payments and the receiver was able to recover $326k.

***Mark Murphy's Entities***

American Colocations Services LLC

American Colocation Services LLC was founded in March 2007 and is wholly owned by Mark Murphy. The principal business activity was financial management; however, it was also actively engaged in the investor operations of the J&J Ponzi-like Scheme. American Colocation Services LLC has two bank accounts with Bank of America from its inception.

The majority of Mark Murphy's 66 investors transacted through American Colocation Services LLC. Overall, American Colocation Services LLC deposited a total of $10.8 million from investors and paid out $11.3 million to investors for a net payment of $588k to investors. American Colocation Services LLC received $10.0 million from Jeff Judd. The entity sent $6.2 million to Matt Beasley. American Colocation Services LLC sent a net $1.5 million to other Mark Murphy personal and business accounts.

In summary, American Colocation Services LLC suffered a $1.6 million cash entity loss and received a net of $3.8 million from other defendants, paid a net of $588K to investors and other third-party accounts, and transferred $1.5 million to other Mark Murphy accounts.

Mark A Murphy LTD D/B/A Steel Dust

Mark A Murphy LTD DBA Steel was founded in March 2011 and is wholly owned by Mark Murphy. The principal business activity was financial management; however, it was also actively engaged in the investor operations of the J&J Ponzi-like Scheme. Mark A Murphy LTD DBA Steel had two accounts with Bank of America from its inception.

Mark A Murphy LTD DBA Steel received $62,515 from Jeff Judd as well as $7,950 from Chris Humphries and sent $720k to Matt Beasley. Mark A Murphy LTD DBA Steel sent a net of $1.6 million to American Investment Company LLC, which is owned by Mark Murphy's girlfriend Virginia Kirkendall, a net of $258k to Mark Murphy personal accounts, a net of $76,140 to Hope Ranch Inc, a net of $25,000 to North Texas Properties LLC and a net of $20,710 to AAA Las Vegas Event Planner Inc. Mark A Murphy LTD DBA Steel received a net of $483k from Mark Murphy Foundation, a net of $129k from American Colocation Services LLC, a net of $84,600 from Desert Elevator Inc and a net of $33,280 from Chopin Investments, Inc. Asset purchases included a $60,000 watercraft, $39,180 in firearms, $11,000 Harley Davidson motorcycle and $225k in legal retainers.

In summary, Mark A Murphy LTD DBA Steel suffered a $442k cash entity loss and transferred a net of $649K to other defendants, received in net $2.3 million from investors and other third parties, and transferred $1.2 million to other Mark Murphy accounts. The receiver recovered $12,126 from Mark A Murphy LTD DBA Steel operations' accounts in June 2022.

<u>AAA Las Vegas Event Planner Inc</u>

AAA Las Vegas Event Planner Inc was founded in July 2020 and is owned by Mark Murphy and Virginia Kirkendall. The principal business activity was financial management; however, it was also actively engaged in the investor operations of the J&J Ponzi Scheme until it ceased operations in June 2022. AAA Las Vegas Event Planner Inc had one account with Bank of America from its inception.

AAA Las Vegas Event Planner Inc received $210 from investors and repaid $30 back, a net of $180. AAA Las Vegas Event Planner Inc sent $175k to Matt Beasley. AAA Las Vegas Event Planner Inc received $45,710 from other Mark Murphy business accounts.

AAA Las Vegas Event Planner Inc had a net income of $129k during the full time of its operations but, if the entity did not receive a SBAD loan of $149k in August 2020, it would have a cash loss.

<u>American Investment Company LLC</u>

American Investment Company LLC was founded in August 2008 and is wholly owned by Virginia Kirkendall. The principal business activity was financial management; however, it was also actively engaged in the investor operations of the J&J Ponzi Scheme until it ceased operations in June 2022. American Investment Company LLC had one account with Bank of America from its inception.

American Investment Company LLC received $2,596 from investors and repaid $50,497 back to investors, a net of $47,900. American Investment Company LLC also received a net of $1.8 million from other Mark Murphy accounts. American Investment Company LLC suffered a $1.7 million cash entity loss, paid a net of $47,900 to investors and other third parties.

Chopin Investments Inc

Chopin Investments Inc was founded in February 2015 and is wholly owned by Mark Murphy. The principal business activity was financial management; however, it was also actively engaged in the investor operations of the J&J Ponzi Scheme until it ceased operations. Chopin Investments Inc had one account with Bank of America from its inception.

Chopin Investments Inc received $30,000 from investors and did not make any repayments to investors. Chopin Investments Inc received $159k from Jeff Judd. Chopin Investments Inc sent a net of $233k to other Mark Murphy personal and business accounts.

In summary, Chopin Investments Inc had a cash entity gain of $43,517 and received $159k from other defendants, received a net of $30,000 from investors and other third parties, and transferred $233k to other Mark Murphy accounts.

Hope Ranch Inc.

Hope Ranch Inc is a non-profit founded in February 2006 and is wholly owned by Mark Murphy. The primary business of the entity was an equestrian related charity; however, it was also actively engaged in the investor operations of the J&J Ponzi Scheme. Hope Ranch Inc. had one account with Bank of America from its inception.

Hope Ranch Inc. repaid $15,111 to investors even though there was no money received from investors into this entity's bank account. Hope Ranch Inc received a net of $137k from other Mark Murphy personal and business accounts. Hope Ranch Inc. had a net loss of $122k during full-time operations.

In summary, Hope Ranch Inc suffered a $122k cash entity loss, paid a net of $15,111 to investors and other third parties, and received $137k from other Mark Murphy accounts.

Desert Elevator Inc.

Desert Elevator Inc was founded in February 2006 and is wholly owned by Mark Murphy. The primary business of the entity was financial management; however, it was also actively engaged in the investor operations of the J&J Ponzi Scheme until it ceased operations in July 2023. Desert Elevator Inc had one account with Bank of America from its inception.

Desert Elevator Inc. received $124k from investors. No money was paid out to investors. Desert Elevator Inc received $39,300 from Jeff Judd and paid $20,000 to Matt Beasley. Desert Elevator Inc transferred $181k to Mark Murphy personal and business accounts.

In summary, Desert Elevator Inc had a cash entity gain of $37,665 and received a net of $19,300 from other defendants, received a net of $37,665 from investors and other third parties, and transferred $181k to other Mark Murphy accounts.

North Texas Properties LLC

North Texas Properties LLC was founded in October 2020 and is wholly owned by Mark Murphy. North Texas Properties LLC had one account with Bank of America from its inception.

North Texas Properties LLC did not receive money from investors, nor did it pay out money to investors. North Texas Properties LLC received $25,000 from Mark A Murphy LTD DBA Steel Dust and paid $25,000 to American Colocation Services LLC.

In summary, North Texas Properties LLC had a cash entity gain of $68.

Mark Murphy Foundation

Mark Murphy Foundation was founded in October 2020 and is wholly owned by Mark Murphy, Mark Murphy Foundation banked with Bank of America from its inception and had one bank account with Bank of America.

Mark Murphy Foundation received $48,485 from investors and repaid investors $601k. Mark Murphy Foundation received $1.4 million from American Colocation Services LLC, $185k from Chopin Investments, Inc, and $75,000 from Desert Elevator, Inc. A net of $21,950 was sent to Hope Ranch, Inc, a net of $186k to American Investment Company LLC, a net of $263k to Mark Murphy personal accounts, and sent $483k to Mark A. Murphy LTD DBA Steel Dust.

In summary, the Mark Murphy Foundation suffered a $104k cash entity loss, paid a net of $553k to investors and other third parties, and transferred $657k to other Mark Murphy accounts.

Triangle Consultants LLC

Triangle Consultants LLC was founded in July 2020 and is owned by Mark Murphy and Virginia Kirkendall. The principal business activity was financial management however it was also actively engaged in the investor operations of the J&J Ponzi Scheme until it ceased operations in August 2023. Mark A Murphy LTD D/B/A Triangle Consultants LLC banked with Bank of America from its inception and had one bank account with Bank of America. Triangle Consultants LLC received $145 but did not repay any investor. Triangle Consultants LLC sent $125k to Matt Beasley and sent $25,000 to AAA Las Vegas Event Planner Inc.

In summary, Triangle Consultants LLC had a cash entity gain of $149k and transferred $125K to other defendants, received a net of $145 from investors and other third parties, and transferred $25,000 to other Mark Murphy accounts.

***Warren D. Rosegreen***

Warren Rosegreen was born in 1973 and is married, has two sons, and resides in Nevada. Warren Rosegreen is primarily involved in the real estate industry and owns one identified business relevant to the J&J Ponzi Scheme: Triple Threat Basketball LLC. Warren Rosegreen operationally lost $4 million.

During the entirety of the J&J Ponzi Scheme, Warren Rosegreen raised $27.2 million from 66 investors as summarized in the following table. Warren Rosegreen's net loss investors lost $5.0 million, his net winner investors unjustly gained $6.2 million, and Warren Rosegreen received a net $5.8 million. Warren Rosegreen's *Fraud Proximity Ratio* is .4, indicating that Warren Rosegreen was enriched 2.5 times what his investors were damaged as a result of the J&J Ponzi Scheme.

| Investor Type | Money In | Money Out | MI(MO) |
|---|---|---|---|
| Breakeven Investor | 120,000 | 120,000 | - |
| Net Loss Investor | 12,088,454 | 7,001,994 | 5,086,460 |
| Net Winner Investor | 15,062,350 | 20,991,674 | (5,929,324) |
| Non-Investor Net-Winner | - | 275,000 | (275,000) |

As of June 3, 2022, Warren Rosegreen raised $2.8 million directly from investors through his business and personal accounts, he received $27.9 million from related defendants, and he paid $25.0 million to investors for a net total of $5.8 million resulting from the J&J Ponzi Scheme. His results demonstrate that $5.0 million in allowed claims to investors and $6.2 million to potentially recover. At the commencement of the receivership Warren Rosegreen did not make any preferential payments and the receiver was able to recover $187k.

***Warren Rosegreen's Entity***

Triple Threat Basketball LLC

Triple Threat Basketball, LLC ("Triple Threat") was founded in Nevada in April 2009 and was dissolved in April 2023. BD & Associates CPAs PLLC was listed as the registered agent and Warren Rosegreen and Priscilla Rosegreen owned the entity. Triple Threat had three business checking accounts with Wells Fargo Bank that had over $79.3 million in combined deposits and withdrawals between December 2016 and June 2022.

Before the J&J Ponzi Scheme, Triple Threat was a legitimate business with many revenue sources but primarily focused on commissions received for real estate sales. This entity was used by Warren Rosegreen for J&J Ponzi Scheme operations.

Between December 2016 and June 3, 2022, Triple Threat identifiable operations deposited $1.3 million mostly in the form of miscellaneous revenue and an SBA COVID relief loan. Triple Threat's operating outflows during the same timeframe totaled $5.3 million resulting in a net cash loss of $3.9 million.

Warren Rosegreen received a net of $19.0 million transferred from Jeff Judd and $9.1 million from Matt Beasley for a total of $28.1 million net received transferred from other defendants by Triple Threat during this time. Warren Rosegreen transferred a net $868,000 from Triple Threat to his personal accounts during this time.

Warren Rosegreen engaged 68 investors that invested $27.3 million into the J&J Ponzi Scheme, 33 of which profited with estimated recoverable profits of $5.9 million, 33 of which combined to lose of $5.1 million, and two the broken even. In the Triple Threat accounts, Warren Rosegreen directly received $1.5 million from 26 investors and sent $24.7 million to 61 investors for a net $23.1 million sent to investors.

There are two assets that have been purchased with the funds of the entity totaling $134k, which are real estate investments and purchase of a vehicle. Both assets have been recovered and liquidated by the receiver resulting in a total of $175k cash recovered to date.

In summary, Triple Threat was an operating business whose operations were significantly negative and unprofitable (-$3.9 million) but for receiving funds from other defendants ($28.1 million) to send payouts to investors (-$23.1 million) from December 2016 to June 3, 2022.

***Richard "Rocco" Madsen***

Richard Madsen was born in 1980 and resides in Utah. Richard Madsen owns four businesses relevant to the J&J Ponzi Scheme: Battleborn Funding LLC, Ruger Investments, Red Hills Investment LLC and RRM Consulting LLC. Richard Madsen operationally lost $1.5 million.

During the entirety of the J&J Ponzi Scheme, Richard Madsen raised $26.3 million from 141 investors as summarized in the following table. Richard Madsen's net loss investors lost $11.3 million, his net winner investors unjustly gained $2.6 million, and Richard Madsen received a net $1.6 million. Richard Madsen's *Fraud Proximity Ratio* is 2.7, indicating that Richard Madsen's investors were damaged 2.7 times as much as he was enriched by the J&J Ponzi Scheme.

| Investor Type | Money In | Money Out | MI(MO) |
|---|---|---|---|
| Breakeven Investor | 391,000 | 391,000 | - |
| Net Loss Investor | 22,003,550 | 10,714,408 | 11,289,142 |
| Net Winner Investor | 3,910,572 | 5,552,743 | (1,642,171) |
| Non-Investor Net Winner | - | 933,322 | (933,322) |

As of June 3, 2022, Richard Madsen raised $16.6 million directly from investors through his business and personal accounts, he received $2.6 million from related defendants, and he paid $12.5 million to investors for a net total of $1.6 million resulting from the J&J Ponzi Scheme. His results demonstrate $11.3 million in allowed claims to investors and $2.6 million to potentially recover. At the commencement of the receivership Richard Madsen did not make any preferential payments and the receiver was able to recover $285k.

***Richard Madsen's Entities***

<u>Battleborn Funding, LLC ("Battleborn")</u>

Battleborn was owned by Richard Madsen and non-defendants Greg Herlean, Steve Byrne, and Steve Little. It was established in Nevada, November 2020. The entity had one bank account with Seacoast Bank and did not deposit any revenue from business operations. Battleborn was actively engaged in the investor operations of the J&J Ponzi Scheme until it ceased operations in May 2021.

During the timeframe, Battleborn received $6.1 million from investors and repaid $6.8 million back to investors, for a net of $640k back to investors. Battleborn received $5.8 million from the BLG and sent $4.9 million back BLG for a net of $900k to Battleborn. Battleborn sent a net $230k to other Richard Madsen accounts including $148k to Ruger Investments and $82,000 to RRM Consulting. All other Battleborn operations suffered a loss of $30k during the six months of their operations.

In summary, Battleborn, founded in November 2020, was funded by $900k from BLG. The entity sent $640k to investors and $230k to other Richard Madsen accounts suffering a net loss of $30,126 in operations.

Ruger Investments ("Ruger")

Ruger was owned by Richard Madsen and started operations in February 2021 and its sole business was the J&J Ponzi Scheme. Ruger had two checking accounts with Bank of America and only received revenue from the J&J Ponzi Scheme. The entity was dissolved in February 2023.

From February 2021 until the end of March 2022 Ruger received $5.5 million from investors and repaid $2.1 million back to investors, a net of $3.4 million to Ruger. Ruger received $730k from Jeff Judd and $225k from Chris Madsen. The entity sent $5.2 million to Matt Beasley for a net amount of $4.2 million transferred to other defendants. Ruger received $1.0 million from Red Hills Investments and $148k from Battleborn Funding. It sent $227k to RRM Consulting and $2,000 to other Richard Madsen personal accounts. Ruger received a net $933k from other Richard Madsen accounts. All other Ruger operations lost $73,939 during the timeframe February 2021 through March 2022.

In summary, Ruger founded in February 2021, was funded by $3.4 million from investors and $933k from other Richard Madsen accounts. It sent a net $4.2 million to other defendants, suffering a loss of $73,939 in operations. Ruger turned over $1,792 to the Receiver in June 2023.

Red Hills Investment, LLC ("RHI")

RHI is owned by Richard Madsen and was registered with the Utah Secretary of State in February 2021. The entity was dissolved before the end of September 2024. RHI's only revenue was through the J&J Ponzi Scheme.

The RHI accounts received $4.5 million from investors and repaid $2.2 million back to investors for a net of $2.3 million to RHI. RHI sent out a net of $585k to other defendants including sending $2.7 million to Matt Beasley and $216k to Chris Madsen. RHI received $2.3 million from Jeff Judd. RHI sent a net of $1.0 million to other Richard Madsen accounts including $1.0 million to Ruger Investments, $4,532 to RRM Consulting and $22,000 to Richard Madsen's personal accounts.

All other RHI operations show a net loss of $653k. There is $411k in potentially recoverable real estate in Utah, and the remaining dollars are comprised of cash withdrawals, credit card payments and other discretionary personal spending.

In summary, RHI, founded in February 2021, was funded by $2.3 million from investors. The entity sent a net $585k to other defendants and $1.04 million to other Richard Madsen accounts. The entity shows a loss of $653k, however a large portion is related to potentially recoverable real estate. The receiver recovered $545k on June 5, 2023.

RRM Consulting, LLC ("RRM")

RRM was owned by Richard Madsen and was registered with the Nevada Secretary of State in November 2009. The entity was dissolved in November 2022. RRM had one bank account at Bank of America which had inflows and outflows co-mingled between the investor operations of the J&J Ponzi Scheme and Mr. Madsen's personal finances. The account had an opening balance of $37,419 on March 31,2017.

RRM accounts received $47,900 from investors and repaid $176k for a net of $128k back to investors. RRM received a net $1.7 million from Chris Madsen, Richard Madsen's brother. RRM sent about as much as it received to other Richard Madsen accounts for a net outflow of $1,011.

All other RRM operations suffered a loss of $1.6 million. Most of these outflows are Richard Madsen's personal assets and expenses. These include $368k in assets, $112k in taxes, $592k in credit card payments and $190k in cash.

In summary, RRM received a net $1.7 million from Chris Madsen, sent a net $128k to investors and had a net operating loss of $1.4 million. The receiver has recovered $32,535 since June 3, 2023.

***Anthony M. Alberto, Jr.***

Anthony Alberto Jr. was born in 1988. He is known to reside in both Nevada and Pennsylvania. Anthony Alberto Jr. primarily worked as a professional poker player. Matt Beasley allegedly confessed to FBI negotiators that Anthony Alberto Jr. was his "bookie" and payments made to Anthony Alberto Jr. were used to pay gambling debts. Anthony Alberto Jr. owns one business relevant to the J&J Ponzi Scheme: Monty Crew LLC. Operationally, Anthony Alberto Jr. suffered a net operating loss of $6.1 million.

During the entirety of the J&J Ponzi Scheme, Anthony Alberto did not raise any funds from investors but distributed $4.5 million unjustly to 37 non-investor net winners as summarized in the following table. Since Anthony Albert received a net of $6.2 million his *Fraud Proximity Ratio* is 0, indicating that he did not have investors in the J&J Ponzi Scheme.

| Investor Type | Money In | Money Out | MI(MO) |
|---|---|---|---|
| Non-Investor Net Winner | - | 4,570,140 | (4,570,140) |

As of June 3, 2022, Anthony Alberto didn't raise any money from investors, he received $6.6 million from related defendants and paid $545k to investors for a total of $6.1 million resulting from the J&J Ponzi Scheme. His results demonstrate that $4.5 million to potentially recover. At the commencement of the receivership Anthony Alberto did not make any preferential payments and the receiver was not able to recover any funds.

***Anthony Alberto's Entity***

Monty Crew, LLC

Monty Crew, LLC is an entity incorporated in Nevada in January 2019, owned by Anthony Alberto. This entity has been revoked by the Nevada Secretary of State. Monty Crew, LLC banked with Bank of America and Comerica Bank during the entirety of its operations.

Starting February 2019, Matt Beasley transferred a net $2.8 million to the entity, showing net defendant transfers of $2.8 million. Monty Crew, LLC sent a net $68,311 to Anthony Alberto's personal accounts and $196k to an individual believed to be the significant other of Alberto. Monty Crew, LLC earned $256k of operational revenue with $2.8 million in expenses showing a net loss of $2.5 million.

In Summary, Monty Crew, LLC received a net $2.8 million from other defendants, paid a net $187k to investors and other third parties, transferred $68,311 to other Anthony Alberto's accounts and suffered a $2.5 million cash operating loss.

***Larry D. Jeffery***

Larry Jeffery was born in 1973 and resides in California. Larry Jeffery is primarily involved in the real estate industry and has three businesses relevant to the J&J Ponzi Scheme: Capital Core Financial, Inc., FDC Consulting Corp, and Pearl Squirrel Fund LLC. Larry Jeffery operationally lost $1.2 million.

During the entirety of the J&J Ponzi Scheme, Larry Jeffery raised $13.4 million from 33 investors as summarized in the following table. Larry Jeffery's net loss investors lost $8.4 million, his net winner investors unjustly gained $331k and Larry Jeffery received a net $1.2 million. Larry Jeffery's *Fraud Proximity Ratio* is 5.2, indicating that his investors suffered five times as much as he was enriched, as a result of their involvement with him in the J&J Ponzi Scheme.

| Investor Type | Money In | Money Out | MI(MO) |
|---|---|---|---|
| Net Loss Investor | 12,174,098 | 3,724,670 | 8,449,428 |
| Net Winner Investor | 1,303,589 | 1,635,320 | (331,731) |

As of June 3, 2022, Larry Jeffery raised $1.2 million directly from investors through his business and personal accounts, he received $5.1 million from related defendants, and he paid $5.1 million to investors for a total of $1.2 million resulting from the J&J Ponzi Scheme. His results demonstrate that $8.4 million in allowed claims to investors and $331k to potentially recover. At the commencement of the receivership Larry Jeffery did not make any preferential payments and the receiver was able to recover $759k.

***Larry Jeffery's Entities***

Capital Core Financial, Inc. ("CCF")

CCF is a real estate company incorporated in California in March 2016. CCF is currently an active business. CCF has two accounts at Wells Fargo during the J&J Ponzi Scheme.

Operationally, CCF showed a net gain of $1.3 million. This entity began the J&J Ponzi Scheme with $18,464 in its accounts and ended with $7,968. CCF held two business checking accounts with Wells Fargo Bank. These accounts had a volume of transactions totaling $12.1 million. In November of 2019, CCF accounts received $503k from investors and paid $1.1 million to investors. CCF received a total of $1.9 million from Jeff Judd and $1.8 million was sent to Matt Beasley showing a net $110k received from the J&J Ponzi Scheme.

In summary, CCF was funded with an entity net gain of $1.3 million, and $110k from related defendants. It paid $646k to investors.

<u>FD Consulting Corporation ("FDC")</u>

FDC is an entity incorporated in January 2021 in the state of California owned by Larry Jeffery. The business is still active. FDC held an account at Wells Fargo with a volume of transactions totaling $15.9 million.

Starting in March 2021, FDC deposited a total of $753k from investors and paid out $3.9 million, showing a net payment of $3.1 million. Also starting in March 2021, FDC received $1.7 million from Matt Beasley and $3.3 million from Jeff Judd, a total of over $5.0 million received from related defendants. FDC received $7,500 from Pearl Squirrel Fund, $100k from Capital Core Financial, and paid $756k to Larry Jeffery's personal accounts, a net of $648k to accounts related to Larry Jeffery. FDC was created strictly for the purpose of the J&J Ponzi Scheme. FDC suffered a net loss of $1.2 million. The receiver was able to recover $758k from this entity.

In summary, it appears that FDC was created solely for the purpose of the J&J Ponzi Scheme and suffered an entity cash loss of $1.2 million. It was funded by over $5.0 million from related defendants and paid $3.1 million to investors and $648k to entities and accounts owned by Larry Jeffery.

<u>Pearl Squirrel Fund LLC ("PSF")</u>

PSF is an entity that was formed in the state of Nevada in February of 2022, owned by Larry Jeffery. This company is no longer active. PSF held a bank account at Wells Fargo Bank with a volume of transactions totaling $200k.

PSF transferred $92,000 to Larry Jeffery's personal accounts and $7,500 FD Consulting Group, a total of $99,500. PSF was created solely for the purpose of the J&J Ponzi Scheme and did not contain any operational activity. There was $100k deposited into this account and $30 in outflows, showing an entity cash gain of $99,975. The receiver recovered $465 from PSF in June 2023.

In summary, PSF was created with the purpose of supporting the J&J Ponzi Scheme. It was funded by an entity cash gain of $99,975 and paid $99,500 to entities and personal accounts owned by Larry Jeffery.

***Cameron T. Rohner***

Cameron Rohner was born in 1978, and he resides in Arizona. Cameron Rohner is involved in stone quarrying and miscellaneous wholesale trade and manufacturing and owns two entities relevant to the J&J Ponzi Scheme: CR6 LLC and Cameron Rohner LLC. In these two entities Cameron Rohner operationally lost $623k.

During the entirety of the J&J Ponzi Scheme, Cameron Rohner raised $8.2 million from 18 investors as summarized in the following table. Cameron Rohner's net loss investors lost $6.2 million, his net winner investors unjustly gained $75,750 and he received a net $508k. Cameron Rohner's *Fraud Proximity Ratio* is 10.70, indicating that Cameron Rohner's investors were damaged 10.7 more times than Cameron Rohner was enriched by the J&J Ponzi Scheme.

| Investor Type | Money In | Money Out | MI(MO) |
|---|---|---|---|
| Net Loss Investor | 7,955,000 | 1,706,133 | 6,248,867 |
| Net Winner Investor | 275,000 | 300,750 | (25,750) |
| Non-Investor Net Winner | | 50,000 | (50,000) |

As of June 3, 2022, Cameron Rohner raised $690k directly from investors through his business and personal accounts, received $757k from related defendants, and he paid $958 to investors for a total of $489k. After allocating the joint ventures Cameron Rohner's final total is $508k resulting from the J&J Ponzi Scheme. His results demonstrate that $6.2 million in allowed claims to investors and $75,750 to potentially recover. At the commencement of the receivership Cameron Rohner did not make any preferential payments and the receiver was able to recover $21,606.

***Cameron Rohner's Entities***

<u>CR6 LLC</u>

CR6 LLC was founded in Arizona by Cameron Rohner in January 2021 and was listed as inactive as of November 2023. The entity was created specifically to participate in the J&J Ponzi Scheme. The entity had one business checking account with JP Morgan Chase Bank from its inception and that account had its final $53 balance secured the receiver.

In its accounts, CR6 LLC received $690,000 from investors and repaid $913,700 back to investors, a net $223,700 sent to 11 investors. CR6 LLC received a net of $758k from other defendants, with a net $1.1 million received from Shane Jager and a net from $320k from Prestige Consulting LLC, the Johnson/Rohner joint venture, and a net $680k sent to BLG. CR6 LLC sent a net $379k to Rohner's personal accounts and $50k was withdrawn in cash.

Total business operations inflows of $131k were mostly miscellaneous and overall, the business operations of CR6 LLC were a $155k loss.

In summary, CR6 LLC lost $155k cash from business operations, sent a net $223k to investors and a net $379k to Rohner's personal accounts with a net $758k in transfers from Prestige Consulting and Shane Jager.

Cameron Rohner LLC

Cameron Rohner LLC was formed in Arizona in May 2007 by Cameron Rohner and his wife Amber Rohner and is still an active entity engaged in stone quarrying, miscellaneous wholesale trade and manufacturing. Cameron Rohner LLC banked with JP Morgan Chase Bank from December 2019 through June 3, 2022.

Cameron Rohner LLC had only one outflow of $45,000 to one J&J Ponzi Scheme investor. Cameron Rohner LLC had one transfer between associated defendants consisting of an outflow of $50,000 to Seth Johnson's personal account. Cameron Rohner LLC received a net $305k in internal transfers from Rohner's personal bank accounts.

The revenues and other deposits of the entity consisted of $1.9 million in revenue plus loan proceeds and these netted against total expenses of $2.1 million yielded a $200k net cash loss from operations.

In summary, Cameron Rohner LLC as an entity suffered a net operational loss of $200k and was able to fund $45,000 in investor payments and $50,000 in payments to Seth Johnson with $305k in internal transfers, primarily from CR6 LLC.

***Jason A. Jenne***

Jason Jenne was born in 1970 and is married with two children and resides in Nevada. Jason Jenne worked in the consulting industry as a project manager and owns one business relevant to the J&J Ponzi Scheme: J&D Consulting Firm Inc. Jason Jenne operationally lost $4.4 million.

During the entirety of the J&J Ponzi Scheme, Jason Jenne raised $7.0 million from seven investors as summarized in the following table. Since Jason Jenne's net loss investors lost $453k and he received a net $5.4 million and distributed $620k unjustly to the net winners, Jason Jenne's *Fraud Proximity Ratio* is 0.07, indicating that Jason Jenne was enriched more than ten times than his investors were damaged by the J&J Ponzi Scheme.

| Investor Type | Money In | Money Out | MI(MO) |
|---|---|---|---|
| Net Loss Investor | 1,467,500 | 1,014,000 | 453,500 |
| Net Winner Investor | 5,620,000 | 6,240,000 | (620,000) |

As of June 3, 2022, Jason Jenne raised $7.0 million directly from investors through his business and personal accounts, he received $5.6 million from related defendants, and he paid $7.2 million to investors for a total of $5.4 million resulting from the J&J Ponzi Scheme. His results demonstrate $453k in allowed claims to investors and $620k to potentially recover. At the commencement of the receivership Jason Jenne made $167k in preferential payments and the receiver was able to recover $375k.

***Jason Jenne's Entity***

J&D Consulting Firm, Inc.

J&D Consulting Firm is a business founded in December 2017 and solely owned by Jason Jenne. Its principal business activities were the investor operations of the J&J Scheme, and it ceased operations upon the Receiver's appointment in June 2022. Jason Jenne had seven investors who contributed $7.0 million; two were net winners circa $620,000 and five lost a net $453,500. Jason Jenne made 31 payments totaling $167,000 to his investors in July 2022 in what appears to be a violation of the permanent injunction and freeze order. The Receiver is determining his next steps as to these payments and is likely to seek to recover these funds.

Investor flows of $4.8 million were deposited into J&D Consulting Firm's account at Wells Fargo (a further $2.1 million were deposited into his personal accounts) and $6.3 million were returned to them. So, on a net basis, J&D Consulting sent $1.5 million to investors. J&D Consulting transferred a net $1.5 million to BLG and received back a net $8.5 million from Jeff Judd. On a net basis, J&D Consulting Firm received $6.9 million from other defendants. In total, Jason Jenne transferred $228k from his personal accounts to the J&D Consulting account.

J&D Consulting had nominal other operations that generated revenue from the sale of real property, vehicles, and tax refunds. However, all the operations of J&D Consulting lost a net $5.6 million over the 4.5-year period of its activity. This includes over $1.5 million in cash withdrawn, $550k in credit card payments, $846k in payroll to Mr. Jenne, and over $317k in real estate and vehicle payments.

In summary, J&D Consulting was funded by $6.9 million from net Jeff Judd/Matt Beasley entity transfers and $228k from Jason Jenne's personal accounts. It sent a net $1.5 million to investors and burned $5.6 million in business operations and purchases for Jason Jenne.

***Denny D. Seybert***

Denny Seybert was born in 1977, and he resides in Nevada. Denny Seybert is primarily involved in the real estate industry and owns five businesses relevant to the J&J Ponzi Scheme: Rocking Horse Properties LLC, LV Capital LLC, Hobbyhorse Associates LLC, C&C Group Holding LLC, and Twenty17 Bayou City LLC. Within these five entities, Denny Seybert operationally lost $344k.

During the entirety of the J&J Ponzi Scheme, Denny Seybert raised $9.7 million from 55 investors as summarized in the following table. Denny Seybert's net loss investors lost $5.8 million, his net winner investors unjustly gained $222k and he gained $355k. Denny Seybert's *Fraud Proximity Ratio* is 10.20, indicating that his investors were damaged 10.2 times more than Denny Seybert was enriched by the J&J Ponzi Scheme.

| Investor Type | Money In | Money Out | MI(MO) |
|---|---|---|---|
| Net Loss Investor | 9,379,913 | 3,480,332 | 5,899,581 |
| Net Winner Investor | 336,162 | 533,925 | (197,763) |
| Non-Investor Net Winner | - | 25,000 | (25,000) |

As of June 3, 2022, Denny Seybert raised $5.5 million directly from investors through his business and personal accounts, he received $1.4 million from related defendants, and he paid $3.7 million to investors for a total of $355k resulting from the J&J Ponzi Scheme. His results demonstrate that $5.8 million in allowed claims to investors and $222k to potentially recover. At the commencement of the receivership Denny Seybert did not make any preferential payments and the receiver was able to recover $560k.

***Denny Seybert's Entities***

<u>Rocking Horse Properties LLC ("Rocking Horse Properties")</u>

Rocking Horse Properties was created in January of 2019 in Nevada and was wholly owned by Denny Seybert. Rocking Horse Properties had one account with Wells Fargo. While Rocking Horse Properties began as a real estate business entity, it allowed funds related to the J&J Ponzi Scheme to flow through its account from September 2019 to March 2022, in addition to legitimate business operations. The business was dissolved on January 19, 2023.

Rocking Horse Properties engaged in transfers with 56 of Denny Seybert's investors directly. Overall, Rocking Horse Properties received $5.4 million from investors and paid out $2.6 million to investors for a net $2.8 million gained from investors. Rocking Horse Properties received a net $2.7 million from J&J Consulting Services Inc and gave a net $3.7 million to Beasley Law Group for a net $1.1 million to other defendants. Rocking Horse Properties received $688k from Hobbyhorse Associates LLC, $337k from C&C Group Holding LLC, $125k from Twenty17 Bayou City LLC and $54,000 from Denny Seybert's personal accounts. Rocking Horse Properties sent $646k to LV Capital LLC for a net of $558k to Rocking Horse Properties from other Denny Seybert accounts.

Rocking Horse Properties saw a net loss of $2.3 million in operations between September 17, 2019 and June 3, 2022. Revenues were largely commissions made from the sale of various real estate properties. Rocking Horse Properties' operational losses were counteracted with the inflows from investors.

Two real estate properties were purchased through Rocking Horse Properties, which the receiver believes are potentially recoverable. Additionally, Rocking Horse Properties had two investments, two vehicles, and one watercraft. These assets are under review by the receiver to determine recoverability.

In summary, Rocking Horse Properties had a net operating loss of $2.3 million, received a net $2.8 million from investors, gave a net $1.0 million to other named defendants and received $558k from other Denny Seybert accounts. Rocking Horse had a negative balance of $8,907 on June 3, 2022 and the Receiver has recovered $5,000 from Rocking Horse Properties as of August 2023.

<u>LV Capital LLC ("LV Capital")</u>

LV Capital is a company with no discernable legitimate revenue, jointly and equally owned by Denny Seybert and Coltyn Simmons. LV Capital was created in January of 2020 and its primary

role was transferring monies to investors from Rocking Horse Properties, using its only bank account, via Wells Fargo Bank. LV Capital did not renew with the Nevada Secretary of State.

LV Capital received $126k from investors and sent $700k back to investors for a net amount to investors of $575k. LV Capital received a net $646k from Rocking Horse Properties and sent $53,000 to Denny Seybert's personal accounts. Notably amongst the transfers between LV Capital and Rocking Horse Properties, 41 individual transactions were sent to LV Capital for $18,000 each, consistent and containing memos referencing different names and purchase agreements.

LV Capital suffered a net operating loss of $16k. The ending balance in the account was $2,370 as of March 31, 2022 which was recovered by the Receiver in 2023.

In summary, LV Capital had a net operating loss of $16k, sent a net $575k to investors, and received a net $593k from other Seybert accounts. LV Capital had no legitimate operations and participated in flow-through for the J&J Ponzi Scheme.

<u>Hobbyhorse Associates LLC ("Hobbyhorse Associates")</u>

Hobbyhorse Associates is a real estate company in Nevada owned equally between Denny Seybert and Jaime Velez. The business was formed in June of 2005 and had one business account at JP Morgan Chase. The account was predominantly used for real estate business related activities; however, it did interact with Beasley Law Group as part of the J&J Ponzi Scheme.

During the timeframe January 2020 until June 2, 2022 the real estate operations of Hobby Horse Associates earned nearly $4.2 million in revenue had expenses of $3.9 million for a net profit of $305k related to the real estate business.

Hobbyhorse Associates sent $60,000 to Beasley Law Group in November 2020. It also sent $688k to Rocking Horse Properties during the timeframe January 2020 until June 2, 2022.

In summary, Hobbyhorse Associates was predominantly an operating real estate business that sent funds to other Denny Seybert accounts as well as a transfer of $60,000 to the Beasley Law Group.

<u>C&C Group Holdings LLC ("C&C Group Holding")</u>

C&C Group Holding is a real estate company in Nevada wholly owned by Denny Seybert. C&C Group Holding was created in November of 2017 and used Bank of the West to conduct business via one account. C&C Group Holding served the primary purpose of house flipping, managing rental properties, and other real estate activities and had co-mingled operations with the J&J Ponzi Scheme.

From September 2019 until mid-May 2022, C&C Group Holdings sent $350k to Beasley Law Group. During the same timeframe, the entity received a net $332k from other Denny Seybert accounts and sent $10,000 to a related third party.

C&C Group Holdings operations had a net profit of $628k due to the sale of real estate and three loans from the Bank of the West. C&C Group Holding ceased operations on November 30, 2024. One vehicle asset was purchased through C&C Group Holding and is potentially recoverable.

In Summary, C&C Group Holdings had a net profit of $628k, sent $10,000 to a related third party, sent $350k to other defendants and sent $332k to other Denny Seybert accounts.

Twenty17 Bayou City LLC ("Twenty17 Bayou City")

Twenty17 Bayou City is a real estate business in Texas jointly and equally owned by Denny Seybert, Omid Shahabe, and Michael Hoffman. Twenty17 Bayou City was created in February of 2018 and served the primary purpose of managing rental properties and conducting a sale of real estate, banking with one account at Wells Fargo Bank. Twenty17 Bayou City ceased operations in December of 2020.

Twenty 17 Bayou City sent a net $125k to Rocking Horse Properties and received $8,500 from Denny Seybert's personal accounts for a net $117k to Denny Seybert accounts. The entity also received $9,500 from an associated third party. The entity had a net profit of $104k which was primarily funded by the sale of real estate.

In Summary, Twenty 17 Bayou City had a net profit of $104k, received $9,500 from an associated third party and transferred $117k to other Denny Seybert accounts.

***Seth A. Johnson***

Seth Johnson was born in 1987 and resides in Arizona. Seth Johnson is primarily involved in the construction and restoration industry. Seth Johnson owns two entities relevant to the J&J Ponzi Scheme: S.A. Johnson LLC and Prestige Consulting. Between these two entities, Seth Johnson operationally had a profit of $656k.

During the entirety of the J&J Ponzi Scheme, Seth Johnson raised $2.7 million from 10 investors as summarized in the following table. Seth Johnson's net loss investors lost $1.8 million, his net winner investors unjustly gained $50,000 and Seth Johnson paid a net of $12,150. Seth Johnson's *Fraud Proximity Ratio* is 48.8, indicating that Seth Johnson's investors suffered 48.8 more times than Seth gained from the J&J Ponzi Scheme.

| Investor Type | Money In | Money Out | MI(MO) |
|---|---|---|---|
| Net Loss Investor | 2,725,000 | 877,933 | 1,847,067 |
| Non-Investor Net-Winner | - | 50,000 | (50,000) |

As of June 3, 2022, Seth Johnson raised $10,900 directly from investors through his business and personal accounts, he received $137k from other related defendants, and he paid $180k to investors for a net total loss of $31,950. After allocating the joint ventures Seth Johnsons' final loss is $12,150 resulting from the J&J Ponzi Scheme. His results demonstrate $1.8 million in allowed claims to investors and $50,000 to potentially recover. At the commencement of the receivership Seth Johnson did not make any preferential payments and the receiver was able to recover $353k.

***Seth Johnson's Entity***

S.A. Johnson LLC

S.A. Johnson LLC is a legal entity registered by Seth Johnson in Arizona in September 2016 and still active business engaged primarily in construction and development and had nominal business interactions in the J&J Ponzi Scheme, namely receiving a net $63,000 from Prestige Consulting LLC.

S.A. Johnson LLC has one business checking account with JP Morgan Chase with relevant transactions. Its business's cash operations have been overwhelmingly positive, more than $2.1 million over the J&J Ponzi Scheme period.

In summary, business operations related to S.A. Johnson LLCs were highly profitable outside of the J&J Ponzi Scheme, bringing about transfers of over $2.0 million to Seth Johnson's other accounts. S.A. Johnson LLC did not transact directly with J&J Ponzi Scheme investors and received $63,000 from Prestige Consulting LLC.

***Joint Ventures***

BJ Holdings, LLC ("BJH")

BJH was incorporated in March 2021, in Nevada. J&J Consulting (Judd) and BLG (Beasley) were managing members and Matt Beasley was the registered agent. BJH had one account with US Bank. BJH was dissolved in March 2022 and is a relief defendant in the case.

The entity had no revenue from business operations and received $4.6 million in deposits including $3.9 million from Jeff Judd's personal accounts, $216k from J&J Consulting and $500k from BLG. BJH sent $4.5 million to a Judd personal account ending 6245 and $180k to Cirrus Aviation. The Judd personal account ending 6245 sent $4.5 million to Cirrus Aviation to buy a Hawker Jet 900 airplane. The receiver recovered the jet on December 21, 2022 for $5.3 million.

In summary, BJH received a net $180k from other defendants and had a net operating loss of $180k and was used to pool resources to purchase an airplane.

GDBH, LLC ("GDBH")

GDBH, or Grand Desert Behavioral Hospital, was incorporated in Nevada in July 2021 and was initially owned by Chris Madsen (23.75%), Shane Jager (23.75%), and other parties (52.5%). The entity had one account with Bank of America. GDBH is currently in default status with the Nevada Secretary of State.

GDBH had no revenue from business operations and instead appears to have been a partnership for investing in real estate. The entity's only source of inflows came from defendants, including $2.5 million from Jeff Judd, $825k from Shane Jager and sent $896k to Chris Madsen for a net $2.4 million from defendants.

GDBH invested over $1.5 million in Grand Desert Behavioral Hospital in August 2021 and had operating expenses of $846k with an ending balance of $221k on June 3, 2022. As of July 2023, the receiver recovered over $2.8 million from GDBH.

In Summary, GDBH received a net $2.4 million from defendants, had a net operating loss of $2.2 million, had an ending balance of over $221k on June 3, 2022 and the receiver has recovered over $2.8 million.

Nevada Pro Pest Control Inc. ("Nevada Pro Pest")

Nevada Pro Pest was incorporated in October 2018. Shane Jager was listed as the Director, Secretary and Treasurer, and Jeff Judd was listed as the President. Nevada Pro Pest operated under the DBAs Nevada Pest Control and Swat Bug Killers. In April 2020, Judd and Jager filed a "Certificate of Business: Fictitious Firm Name" with Clark County Nevada for the name "Pigeons Be Gone". This entity ceased operations by June of 2022. Nevada Pro Pest was initially created to provide pest control services to residential and commercial clients. Despite having a small "front" business with apparently legitimate operations, Nevada Pro Pest was created specifically for the J&J Ponzi Scheme, namely, to serve as a conduit between the outflows of Jeff Judd's J&J Consulting and Shane Jager's Stirling Consulting, which accounted for 97% of its activity.

In November of 2018, Nevada Pro Pest began operations and had two checking accounts at Wells Fargo Bank. Neither of these accounts received or paid any investors. These accounts had $173.4 million in combined deposits and payments over the 44 months ending in June of 2022. These accounts were frozen in June of 2022, and the receiver recovered the remaining funds.

Nevada Pro Pest generated minimal business revenue in comparison to total deposits received in the bank accounts. $86.7 million in deposits consisted of 97.9% from funds transferred between defendant accounts (namely from J&J Consulting to Stirling Consulting), 2.1% from business operations, and 0.2% from between Nevada Pro Pest accounts. This entity sent $86.6 million in payments; 98.0% were transfers to defendant accounts, 1.6% went to business operations, and 0.2% in transfers to Nevada Pro Pest accounts.

Beginning in April of 2020, Nevada Pro Pest became an intermediary for Judd and Jager to transfer funds from one business partner to another. There were 128 instances where single-day transactions of the same dollar amount were transferred from one business owner's account into Nevada Pro Pest and then to the other business owner's account. The total amount transferred was $167.5 million, with the majority of these transfers going from J&J Consulting to Nevada Pro Pest and then to Stirling Consulting. These funds were associated with the J&J Ponzi Scheme, and the transfers were primarily from J&J Consulting to Stirling Consulting.

| | Net Transfers From Jeff Judd | Net Transfers to Shane Jager | Net All other Nevada Pro Pest Control Operations |
|---|---|---|---|
| 2018 | - | - | 8,200 |
| 2019 | - | (1,200) | 38,322 |
| 2020 | 23,938,183 | (23,976,338) | 14,417 |
| 2021 | 59,603,000 | (59,712,770) | 98,581 |
| 2022 | - | (1,700) | 59,327 |
| Total | 83,541,183 | (83,692,008) | 218,846 |

In summary, Nevada Pro Pest had a net operating gain of $218k and sent a net of $150k to associated defendants, as summarized by year:

ORC Holdings LLC ("Orc Holdings")

Shane Jager and Jeff Judd created ORC Holdings in July 2020, to invest in real estate development. ORC Holdings had co-mingled operations with the J&J Ponzi Scheme and had two bank accounts, one with Wells Fargo the other with US Bank. This entity ceased operations by June of 2022.

The entity had no discernable revenue from operations and received net funds of over $4.6 million from J&J Consulting Services and Jeff Judd ($5.8 million from J&J Consulting and $1.2 million out to Jeff Judd) and $600k from Jager Family Trust while sending over $3.9 million to Stirling Consulting. ORC Holdings purchased ownership into a real estate development investment of Home2 Suites in Las Vegas, Nevada, for over $1.2 million. The Receiver has recovered the sum of $1.4 million from selling its ownership interest in the real estate development and turnover of the ORC Holdings bank accounts.

In summary, ORC Holdings received a net of over $1.2 million from Jeff Judd and Shane Jager and used it to buy real estate, which the receiver later recovered $1.4 million for.

Prestige Consulting LLC

Prestige Consulting LLC is a legal entity registered in Arizona in October 2020 and owned by Seth Johnson and Cameron Rohner, its stated purpose is "Any Legal Purpose", and the entity is inactive as of November 2023.

There was one business checking account at JP Morgan Chase that transacted $12.8 million in combined transactions for this legal entity. The entity had no discernable revenue and the total net cash operating loss was $10,549. Prestige Consulting LLC received a net $1.5m from Shane Jager's Stirling Consulting Services LLC and transferred $3.8 million to BLG, $80k to Jeff Judd, $369k to Cameron Rohner, and $243k to Seth Johnson's personal accounts. Overall, the net amount sent to other defendants was $3.0 million. Prestige Consulting LLC deposited a net $3.0 million from 22 investors (a total of $4.9 million deposits from 21 investors and payments of $1.8 million to 16 investors).

Receiver has recovered two assets funded by this entity – a legal retainer of $20,000 and a residual account balance of $3,100.

In summary, this entity was created and used solely for the purpose of accepting money from investors, sending payouts to investors and transferring money between defendants and its members. Its net investors' flows ($3.0 million) and its net transfers with other defendants (-$3.0 million) combine for a positive $19,800 transfer of balance to Johnson and Rohner each.

## ASSETS RECOVERED, POTENTIALLY RECOVERABLE, CREDIT CARD PAYMENTS, PHYSICAL CURRENCY, AND DEFENDANTS' UNRECOVERABLE SPENDING

The defendants' total personal enrichment of $188.4 million can be categorized into five different types of payments as shown in the chart below. These categories include recovered assets of $86.7 million, potentially recoverable assets of $47.3 million, credit card payments of $19.5 million, cash of $21.4 million, personal, and business-related net payments of $13.2 million.

| Operator | Recovered Assets | Potentially Recoverable Asset | Credit Cards | Cash | Unrecoverable Spending (Business & Personal) | Operator's Personal Enrichment (Ou) |
|---|---|---|---|---|---|---|
| Jeff Judd | 42,157,970 | 9,433,016 | 3,876,852 | 1,258,960 | 23,258,865 | 79,985,662 |
| Shane Jager | 25,270,556 | 12,621,104 | 2,095,217 | 635,168 | (4,439,927) | 36,182,119 |
| Matt Beasley | 9,348,074 | 2,157,438 | 915,888 | 4,081,553 | 6,307,892 | 22,810,846 |
| Chris Humphries | 4,578,445 | 1,465,470 | 804,365 | 3,508,003 | 202,165 | 10,558,448 |
| Chris Madsen | 2,135,630 | 4,984,034 | 5,053,242 | 2,572,747 | (5,011,310) | 9,734,343 |
| Anthony Alberto | - | 345,284 | 4,441 | 3,122,739 | 2,679,445 | 6,151,909 |
| Warren Rosegreen | 223,730 | 1,751,878 | 911,193 | 1,436,199 | 1,518,577 | 5,841,577 |
| Jason Jenne | 711,684 | 907,420 | 580,913 | 1,724,380 | 1,503,728 | 5,428,125 |
| Mark Murphy | 651,203 | 803,196 | 381,934 | 1,419,110 | 1,985,419 | 5,240,861 |
| Roland Tanner | 6,863 | 3,887,398 | 682,022 | 256,644 | (2,263,078) | 2,569,850 |
| Richard Madsen | 225,319 | 1,737,442 | 1,358,366 | 890,467 | (2,641,227) | 1,570,368 |
| Larry Jeffery | 904,568 | 1,777,132 | 669,379 | 208,468 | (2,261,849) | 1,297,697 |
| Cameron Rohner | 14,488 | 372,790 | 801,898 | 98,466 | (778,692) | 508,950 |
| Denny Seybert | 87,124 | 2,035,801 | 579,296 | 217,810 | (2,564,487) | 355,544 |
| Jason Jongeward | 475,478 | 708,371 | 260,544 | 48,645 | (1,293,232) | 199,805 |
| Seth Johnson | 3,681 | 2,385,651 | 620,868 | (70,758) | (2,951,592) | (12,150) |
| Total | 86,794,813 | 47,373,424 | 19,596,419 | 21,408,600 | 13,250,698 | 188,423,955 |

### *Recovered Assets*

Assets recovered from individual defendants fall into two categories: assets that have been sold, with all related funds fully administered to the receivership estate, and assets that remain in the receiver's possession but have not yet been liquidated. The table below presents the asset types for fully administered assets, showing the purchase cost incurred by the defendant and the corresponding recovery amount, which determines the gain or loss. Assets that have been turned over but are not yet liquidated are listed under the in-possession category.

| Asset Type | Asset Cost | Recovery | Gain/(Loss) | In Possession |
|---|---|---|---|---|
| Real Estate | 29,525,265 | 29,618,916 | 93,651 | - |
| Account Turnover* | 16,436,624 | 13,664,396 | (2,772,228) | - |
| Investment | 14,772,920 | 15,306,583 | 533,662 | 2,188,000 |
| Legal Retainer | 8,618,025 | 8,618,025 | - | - |
| Aircraft | 4,907,092 | 5,268,141 | 361,049 | - |
| Insurance Policy | 4,327,755 | 3,696,973 | (630,782) | - |
| Cryptocurrency | 4,106,226 | 1,973,977 | (2,132,249) | - |
| Vehicle | 1,824,946 | 1,429,139 | (395,808) | 87,565 |
| Precious Metals & Currency | 711,910 | 2,534,055 | 1,822,145 | - |
| Watercraft | 350,857 | 149,102 | (201,755) | - |
| Personal Property | 140,180 | 239,607 | 99,427 | - |
| Total | 85,721,800 | 82,498,913 | (3,222,887) | 2,275,565 |

*$2.7 million used to pay off liens on real estate property that is in the process of being turned over to the receiver.

The total original cost for administered assets is $85.7 million, while the recovery value is almost $82.5 million, resulting in a recovery of 96.2% of the original asset cost. This is largely due to $2.7 million in account turnover proceeds being used to pay off liens on a real estate property that is in the process of being turned over to the receiver. Cryptocurrency also shows a loss of $2.1 million, which is largely due to the timing of the purchases, but some of this loss may be recoverable through future sales. Below are the receivership recoveries through March 2025 by individual defendant:

| Defendant | Recovery |
|---|---|
| Jeff Judd | 37,559,612 |
| Shane Jager | 25,399,646 |
| Matt Beasley | 8,122,831 |
| Chris Humphries | 4,742,389 |
| Chris Madsen | 2,391,670 |
| Roland Tanner | 1,160,009 |
| Larry Jeffery | 759,956 |
| Denny Seybert | 560,232 |
| Jason Jenne | 375,027 |
| Seth Johnson | 353,993 |
| Mark Murphy | 326,569 |
| Richard Madsen | 284,873 |
| Jason Jongeward | 252,729 |
| Warren Rosegreen | 187,771 |
| Cameron Rohner | 21,606 |
| Anthony Alberto Jr | - |
| Total | 82,498,913 |

***Potentially Recoverable Assets***

The receiver continues to evaluate potentially recoverable assets of the receivership estate. The identified potential assets total almost $47.4 million and include varying amounts across real property, personal property, investments, and other asset types. As the receiver's investigation progresses, assets will either be requested for turnover or identified as unrecoverable. The potentially recoverable assets do not include credit card payments or the balance of unrecovered cash as of the receivership appointment date. While both unrecovered cash and credit card

payments are considered assets of the estate, they require further review to determine the potentially recoverable amounts.

### *Credit Card Payments*

There were 5,043 credit card payments made by defendants or their controlled entities identified in the 179 bank accounts included in the data set for this report. Those payments were made to 105 different defendant credits cards. As mentioned previously, the receiver discovered 171 credits card accounts during the intake process, not all of those cards were found in the review of credit card payments. It is understood by the receiver that assets may have been purchased using these credit cards or that otherwise recoverable funds may be found in these payments. The receiver's team will continue to review the payments and may seek to recover assets as deemed appropriate. The credit card payments are broken down by the 16 individual defendants.

| Defendant | # of Credit Cards (estimated) | # of Payments | $ of Payments |
|---|---|---|---|
| Chris Madsen | 13 | 747 | 5,053,242 |
| Jeff Judd | 5 | 353 | 3,741,233 |
| Shane Jager | 10 | 499 | 1,959,598 |
| Richard Madsen | 15 | 801 | 1,358,366 |
| Matt Beasley | 10 | 783 | 915,888 |
| Warren Rosegreen | 5 | 312 | 911,193 |
| Chris Humphries | 7 | 165 | 804,365 |
| Cameron Rohner | 5 | 126 | 801,898 |
| Roland Tanner | 5 | 125 | 682,022 |
| Larry Jeffery | 5 | 104 | 669,379 |
| Seth Johnson | 1 | 344 | 620,868 |
| Jason Jenne | 6 | 280 | 580,913 |
| Denny Seybert | 5 | 108 | 579,296 |
| Mark Murphy | 5 | 117 | 381,934 |
| Shane Jager & Jeff Judd, Jointly | 2 | 67 | 271,238 |
| Jason Jongeward | 5 | 100 | 260,544 |
| Anthony Alberto | 1 | 12 | 4,441 |
| Total | 105 | 5,043 | 19,596,419 |

For example, in some of the spending on defendant credit cards, the receiver's team sampled select months for the two defendants with the highest payments to credit cards: Chris Madsen and Jeff Judd.

Chris Madsen had an estimated 13 credit cards that he made payments on. This analysis will cover a personal credit card (a/e 3692) that the receiver had statements from 2018 to 2022. In this time, 990 purchases were made on the card, ranging from $0.34 to $2,587.21. No individual purchases have been determined as potentially recoverable at this time. Looking at a random sample of all transactions on the card September through November of 2018, 108 purchases were made, a vast majority of which were for small travel expenses or entertainment.

Jeff Judd had an estimated five credit cards that he made payments on. This analysis will cover a personal credit card (a/e 9901) that the receiver had statements for from 2017 to 2022. In this time, 171 purchases were made on the card, ranging from $1.75 to $35,000. The largest purchase was for an asset in November 2020 that the receiver is aware of and has already recovered. This large transaction is an outlier in the overall dataset for this card. Looking at a random sample of all transactions on the card March through May of 2019, the five purchases made were nominal and to do with membership fees and small travel expenses.

***Balance of Cash and Equivalents on June 3, 2022***

Between 2016 and 2022, a total of over $1.4 million in physical currency was received and $22.8 million was withdrawn throughout the J&J Ponzi scheme. The overall result was a net cash loss of $21.4 million. While these figures highlight a significant imbalance between incoming and outgoing funds, the ultimate destination of much of the cash remains unknown. As a result, some the funds may still be potentially recoverable, depending on the outcome of further investigations and tracing efforts.

| Defendant | Cash in | Cash out | Net Cash |
|---|---|---|---|
| Matt Beasley | 103,984 | 4,185,537 | (4,081,553) |
| Chris Humphries | 9,630 | 3,517,633 | (3,508,003) |
| Anthony Alberto | 156,872 | 3,279,611 | (3,122,739) |
| Chris Madsen | 29,048 | 2,601,795 | (2,572,747) |
| Jason Jenne | 52,640 | 1,777,020 | (1,724,380) |
| Warren Rosegreen | 393,730 | 1,829,929 | (1,436,199) |
| Mark Murphy | 61,615 | 1,480,725 | (1,419,110) |
| Jeff Judd | 412,385 | 1,671,345 | (1,258,960) |
| Richard Madsen | 81,229 | 971,696 | (890,467) |
| Shane Jager | 49,667 | 684,835 | (635,168) |
| Roland Tanner | 7,000 | 263,644 | (256,644) |
| Denny Seybert | 10,851 | 228,661 | (217,810) |
| Larry Jeffery | 10,570 | 219,038 | (208,468) |
| Cameron Rohner | - | 98,466 | (98,466) |
| Jason Jongeward | 1,600 | 50,245 | (48,645) |
| Seth Johnson | 75,811 | 5,054 | 70,758 |
| Total | 1,456,633 | 22,865,234 | (21,408,600) |

***Defendant Unrecoverable Spending "Burn"***

Defendant burn is a term for any services, goods or assets deemed unrecoverable related to the defendants' business and personal accounts. Net expenditures such as lunch at Taco Bell, family vacations, shopping at Nordstrom, and purchases on Amazon are examples of these.

Notable business-related expenses were payroll and related expenses at $47.0 million, materials and subcontractors of $18.0 million, and the remaining expenses were $10.3 million. Notable personal expenses were $33.8 million in tax-related payments, $7.1 million on home related expenses, and the remaining expenses were $10.9 million.

| Operator | Unrecoverable Spending (Business & Personal) |
|---|---|
| Jeff Judd | 23,258,865 |
| Shane Jager | (4,439,927) |
| Matt Beasley | 6,307,892 |
| Chris Humphries | 202,165 |
| Chris Madsen | (5,011,310) |
| Anthony Alberto | 2,679,445 |
| Warren Rosegreen | 1,518,577 |
| Jason Jenne | 1,503,728 |
| Mark Murphy | 1,985,419 |
| Roland Tanner | (2,263,078) |
| Richard Madsen | (2,641,227) |
| Larry Jeffery | (2,261,849) |
| Cameron Rohner | (778,692) |
| Denny Seybert | (2,564,487) |
| Jason Jongeward | (1,293,232) |
| Seth Johnson | (2,951,592) |
| Total | 13,250,698 |

## THE PONZI-LIKE NATURE OF THE SCHEME

### ***What is a Ponzi Scheme?***

According to the Association of Certified Fraud Examiner's Fraud Examination Manual, a Ponzi Scheme is generally defined as:

> *"An illegal business practice in which new investors' money is used to make payments to earlier investors. The investment opportunity is typically present with the promise of uncommonly high returns. Everyone involved in promoting the Scheme pretends to represent a legitimate organization, but minimal or no commercial activity takes place. The Ponzi Scheme usually unravels either when the operators keep all the proceeds for themselves or when the number of new investors declines and dividends cannot be paid to investors. These Schemes usually run for a short period of time (e.g., one or two years) although some Ponzi Schemes have flourished for a decade or more. In accounting terms, money paid to Ponzi investors is described as income, but it is distribution of capital. Instead of received investment profits, investors receive cash reserves."*

Ponzi Schemes got their name from Charles Ponzi, an Italian immigrant who became infamous for using this type of fraudulent investment Scheme. In 1920, Ponzi promised investors huge returns on investments in international postal reply coupons, which could be exchanged for postage stamps. He claimed he could buy these coupons at a discounted rate in one country and then sell them for a higher price in another, making a profit. However, instead of generating real

profits from these transactions, Ponzi used the money from new investors to pay returns to earlier investors, creating the illusion of a profitable business.

As more people invested, the scheme grew, but it was unsustainable. Eventually, authorities uncovered the fraud, and Ponzi was arrested. By the time the scheme collapsed, Ponzi had defrauded investors of millions of dollars, despite never actually making any legitimate profits from the supposed investment.

***Key Indicia of a Ponzi Scheme***

There are four key characteristics or indicia of a Ponzi Scheme:

1. Promises of High Returns: Ponzi Schemes often attract investors by promising unusually high and consistent returns with little to no risk.
2. Returns Paid to Early Investors: Instead of generating profits through legitimate business activities, Ponzi Schemes use the money from new investors to create the illusion of paying returns to previous investors.
3. Unsustainable Model: Ponzi Schemes depend on a constant influx of new investors to keep paying the returns. Over time, the number of new investors required grows exponentially, making it impossible to maintain.
4. Collapse: Eventually, Ponzi Schemes collapse when it becomes difficult to recruit new investors, or when the organizer takes the remaining funds for themselves. Most participants lose their money, while only a few early investors may profit.

***Applicability to the J&J Scheme***

The Scheme promised a minimum of 12.5% interest per quarter, or 50% per year plus any compounded interest, which is significantly above the average of stock market (S&P 500) returns, which average 7% to 10% per year. Notably, these promised returns were deemed virtually risk-free by defendants and other promoters. In fact, it was reported by Hindenburg Research that, in interviews with the now-defendants, some are quoted as saying “We really, really struggle to see the risk. I think that’s probably why the performance has been—I’ll call it immaculate. We haven’t had any contract default, not one.” As well as “Within two years, you’re able to get your entire investment back, which is unheard of.” This sentiment was shared as a reason for investing, while those aware of Ponzi indicators might see this as a reason to step back and take a second look. In total, investors received over $331 million.

In reconstructing the books and records for the J&J Ponzi Scheme, it was clear that there were no legitimate business operations as there is no evidence of a single settlement contract purchase by Matt Beasley or the subsequent repayments that were expected under the contracts. Since no revenue was ever generated, all payments to investors were necessarily made by funds received from later investors. Additionally, large commissions to Matt Beasley, Jeff Judd, and salespeople along with high amounts of personal spending continued to eat away at the principal investments and would have required significant returns to make up for the shortfall created by such spending.

The model for selling these purchase agreements was unsustainable. Not only were investigations beginning to occur in 2021, but Hindenburg Research also published its findings (previously quoted above) in March 2022. However, bad press was not the only indication that the J&J Ponzi Scheme was unstable. An analysis of the bank records and investor reports show that when principal spending was high, salespeople would ask investors to roll over their principle to a new contact, or to buy out another investor that wanted out directly. This increasing pressure to find new sources of funds was an early indicator of type of growth that the J&J Ponzi Scheme could not handle for much longer.




As can be seen in the chart above, the amount of investor money being received grew exponentially and, if not for the intervention by the Department of Justice and Securities and Exchange Commission, this Scheme likely would have seen over $375 million in total investor deposits in 2022.

Finally, collapse is inevitable within a Ponzi scheme. While the J&J Ponzi Scheme's collapse was due to an intervention from the Department of Justice, it is certain from growth estimates that it would have operationally collapsed in a matter of months. Given that defendants and promoters had already removed over $188.4 million from the principal investments, the J&J Ponzi Scheme would have struggled to continue paying investors in the next 3-6 months given the uphill battle it faced against a bad press, lack of accounting records to keep track of investments and the defendant and promoters demand for additional funds for personal use.

As shown above, the J&J Scheme meets all normal indicia of a Ponzi Scheme. This conclusion seems incontrovertible due to the unambiguous lack of income and income-generating activities. Ultimately, the decision determining whether J&J Consulting was a Ponzi Scheme is up to the trier of fact.

**CONTRACT ANALYSES**

An examination was conducted of 1,590 purchase agreements created between September 2017 and February 2022. This represents 14% of all contracts that were estimated to have been prepared. These contracts were between individuals who filed slip-and-fall injury claims (the sellers) and either J&J Consulting, J&J Purchasing, or Jeffrey Judd (the buyers). Each agreement explains that the seller was injured in a slip-and-fall accident, hired a lawyer, and has already settled their injury claim for a specific amount of money. Under these contracts, the buyer pays the seller an agreed amount upfront, and in return receives repayment of that amount plus interest at the end of the term (maturity). The total repayment increases based on when the buyer gets paid, the later the payment comes, the more money the buyer ultimately receives.

***Example Purchase Agreement***

PURCHASE AGREEMENT

This is a Purchase Agreement ("Agreement") dated the 2nd day of February, 2018. This Agreement is by and between Roberto Florio (“Seller”) whose address is 15773 Upper Fjord Way, Apple Valley, Minnesota 55124, represented by Kerry Doyle, Esq. of Thunder Law whose address is 7375 South Pecos Road, #101, Las Vegas, Nevada 89120 (“Attorney”) and Jeffrey Judd (“Buyer”) whose address is 1129 Jerez Court, Henderson, Nevada 89052 and represented by Matthew Beasley, Esq. of the Beasley Law Group, PC (“Buyer’s Attorney”) whose address is 737 North Main Street, Las Vegas, Nevada 89101. Seller’s date of birth is February 22, 1978.

Seller has a claim arising from a slip and fall incident which occurred on February 22, 2016 ("Claim") at the Stratosphere Casino, Hotel & Tower which is owned and operated by Golden Entertainment. Seller has hired Attorney to represent Seller in this Claim. Seller has settled the Claim. The entire amount of the settlement is $272,000.00 (“Settlement Amount”), less legal fees, superior medical liens existing on the date of this Agreement, costs, and disbursements payable to Attorney under the existing fee agreement between Seller and Attorney (“Proceeds").

Seller desires to sell and assign to Buyer an interest in the Proceeds. Buyer desires to purchase the interest in the Proceeds, on the terms and under the conditions set forth in this Agreement.

BUYER AND SELLER AGREE AS FOLLOWS:

PURCHASE OF INTEREST

Seller hereby sells, transfers, conveys, and assigns to Buyer a $125,000.00 interest ("Interest") in the Proceeds for a purchase price of $100,000.00 ("Purchase Price"). Seller acknowledges receipt of the Purchase Price. Seller understands that the amount of Buyer’s Interest, or, in other words, the amount to be paid to Buyer, will increase to reflect the date the Buyer is paid its Interest in the Proceeds as set forth in the following Disclosure Table ("Disclosure Table"):

DISCLOSURE TABLE

Purchase Price: $100,000.00
Administration Fee: $5,000.00

| Date of Payment to Buyer | Amount Due to Buyer |
|---|---|
| On or before May 3, 2018 | $130,000.00 |
| After May 3, 2018 but on or before June 2, 2018 | $142,500.00 |

*Should Seller not pay Buyer from the Proceeds by June 2, 2018, the Buyer's Interest will increase by $12,500.00 every thirty (30) days thereafter.

Buyer's Interest will be paid by Attorney out of the Proceeds of the Claim and will be deducted directly from the Proceeds of the Claim and will be paid to Buyer prior to any payment to Seller with respect to the Claim. If the Proceeds of the Claim Amount are not enough to pay the full amount due to Buyer, then Buyer shall be entitled to receive 100% of the Proceeds of the Claim. Seller has directed Attorney to, among other things,(i) place an assignment, consensual lien and security interest in favor of Buyer against any and all Proceeds due Seller from the Claim (after payment of any and all legal fees and reimbursable costs) and to protect and satisfy the assignment, consensual lien and security interest in favor of Buyer up to the full amount of Buyer's Interest, (ii) notify Buyer of receipt of Settlement Amount, (iii) pay Buyer from the Proceeds the proper amount due to Seller representing Seller's Interest in the Proceeds at the time of distribution of the Proceeds prior to any payment to Seller with respect to the Claim, (iv) respond to requests for information from Buyer and (v) notify Buyer prior to any disbursements of funds to verify the amount due Buyer. Seller has provided Buyer with an executed Authorization for Attorney to Pay Buyer from Proceeds of Claim/Acknowledgement of Authorization by Seller and Attorney in the form attached as Exhibit "A" ("Authorization and Acknowledgement ").

The amount Buyer is entitled to may be more than is listed in the Disclosure Table above if Seller does not honor the obligations in this Agreement. Seller will also be liable to pay Buyer's Interest, even if there are no Proceeds, if Seller has misled Buyer or Attorney concerning Seller's Claim and will also be liable for Buyer's attorney' s fees or collection costs, as permitted by law.

***Analysis of the Contracts***

The contracts featured a purchase price of $100k, $80,000 or $50,000. 82% of contracts at $100k, 13% at $80,000 and 5% at $50,000, totaling $150.7 million in initial investments. The average contract cost $94,786.

| Price | Number of Contract | Ratio (%) |
|---|---|---|
| 100,000 | 1,306 | 82% |
| 80,000 | 197 | 13% |
| 50,000 | 87 | 5% |

The contract's maturity period ranged from 60 to 151 days. 94.1% of contracts had a standard 90-day maturity, while 5.5% featured a shorter 60-day maturity. A small number of contracts fell outside these common durations. 0.3% pf contracts had maturity between 60 and 90 days, and 0.1% of contracts extended beyond the typical period with maturity exceeding 90 days. The average contract terms was 88.4 days.

| Maturity | Number of Contract | Ratio (%) |
|---:|---:|---:|
| 60 days | 87 | 5.5% |
| Between 60 days and 90 days | 5 | 0.3% |
| 90 days | 1,496 | 94.1% |
| Over 90 days | 2 | 0.1% |

For example, on February 2, 2018, the contract starts with a $100k purchase price with 90-day maturity. The seller must repay $130k to the buyer by May 3, 2018. If they pay between May 4 and June 2, 2018, the total payment jumps to $143K. After June 2, $12,500 interest will be paid every 30 days until the promised amount is paid.

***Errors in the Contracts***

Based on our analysis, these contracts were fictitious. Two of the contracts reviewed had a slip-and-fall injury date after the purchase agreement date, implying, if accurate, that the incident happened after the contract. One contract had an on or before date prior to the date of the contract.

**PURCHASE AGREEMENT**

This is a Purchase Agreement ("Agreement") dated the 8th day of December, 2017. This Agreement is by and between Philip Del Tochio ("Seller") whose address is 1305 Idlewyld Drive SW, Marietta, Georgia 30064, is represented by Matthew Meyerkord, Esq. of Meyerkord Russell & Hergott whose address is 105 East 5th Street, Suite 301, Kansas City, Missouri 64106 ("Attorney") and Jeffrey Judd ("Buyer") whose address is 1129 Jerez Court, Henderson, Nevada 89052 and represented by Matthew Beasley, Esq. of the Beasley Law Group, PC ("Buyer's Attorney") whose address is 737 North Main Street, Las Vegas, Nevada 89101. Seller's date of birth is May 12, 1968.

A. Seller has a claim arising from a slip and fall incident that happened on January 1, 2018 ("Claim") at the River City Casino & Hotel which is owned by Gaming and Leisure Properties and operated by Pinnacle Entertainment, Inc.. Seller has hired Attorney to represent Seller in this Claim. Seller has settled the Claim. The entire amount of the settlement is $267,750.00 ("Settlement Amount"), less legal fees, superior medical liens existing on the date of this Agreement, costs and disbursements payable to Attorney under the existing fee agreement between Seller and Attorney ("Proceeds").

The date of the contract above was December 8, 2017, however, the slip-and-fall injury happened January 1, 2018, which is after the purchase agreement date.

## PURCHASE AGREEMENT

This is a Purchase Agreement ("Agreement") dated the 8th day of December, 2017. This Agreement is by and between Charmine Ross ("Seller") whose address is 9415 Ballentine Street, Overland Park, Kansas 66214, represented by Matthew Meyerkord, Esq. of Meyerkord Russell & Hergott whose address is 105 East 5th Street, Suite 301, Kansas City, Missouri 64106 ("Attorney") and Jeffrey Judd ("Buyer") whose address is 1129 Jerez Court, Henderson, Nevada 89052 and represented by Matthew Beasley, Esq. of the Beasley Law Group, PC ("Buyer's Attorney") whose address is 737 North Main Street, Las Vegas, Nevada 89101. Seller's date of birth is December 3, 1977.

A. Seller has a claim arising from a slip and fall incident that happened on December 21, 2017 ("Claim") at Oak Park Mall which is owned and operated by CBL & Associates Properties, Inc. Seller has hired Attorney to represent Seller in this Claim. Seller has settled the Claim. The entire amount of the settlement is $285,000.00 ("Settlement Amount"), less legal fees, superior medical liens existing on the date of this Agreement, costs and disbursements payable to Attorney under the existing fee agreement between Seller and Attorney ("Proceeds").

The date of the contract above was December 8, 2017, however, the slip-and-fall injury happened December 21, 2017, which is after the purchase agreement date.

## PURCHASE AGREEMENT

This is a Purchase Agreement ("Agreement") dated the 8th day of October, 2021. This Agreement is by and between Tiffany Hayles ("Seller") who is represented by Craig Carlson, Esq. of The Carlson Law Firm whose address is 618 SW Military Drive, San Antonio, Texas 78221 ("Attorney") and J & J Consulting Services, Inc., an Alaska corporation ("Buyer") who is represented by Matthew Beasley, Esq. of the Beasley Law Group, PC ("Buyer's Attorney") whose address is 737 North Main Street, Las Vegas, Nevada 89101.

DISCLOSURE TABLE

| | |
|---|---|
| Purchase Price: | $100,000.00 |
| Administration Fee: | $5,000.00 |

| **Date of Payment to Buyer** | **Amount due to Buyer** |
|---|---|
| On or before January 6, 2021 | $130,000.00 |
| After January 6, 2021 but on or before February 5, 2022 | $142,500.00 |

*Should Seller not pay Buyer from the Proceeds by February 5, 2022 the Buyer's interest will increase by **$12,500.00 every thirty (30) days thereafter.**

The date of the contract above was October 8, 2021; however, the investment matures on or before January 6, 2021, which is before the purchase agreement date.

***Anomalies in the Contracts***

Lack of Common Names

According to U.S. Census data, the 1,000 most common surnames occur at a rate of 40,968 per 100,000 people, indicating that approximately 40.9% of the U.S. population have one of these names. Applying this proportion to our dataset of 1,590 operating agreements, we would expect these common surnames to appear roughly 651 times. However, our analysis reveals that they occur only 351 times, significantly below the expected frequency. This discrepancy suggests that the surname distribution in the operating agreement does not align with expected outcoming meaning that the name data may have been artificially created.

Additionally, based on U.S. Census data, "M" as the most frequent starting letter for surnames, followed by B, C, S, and W. In contrast, our dataset shows "B" as the most common initial letter, with K, L, H, and M following. This further deviation implies that the last names in the operating agreements do not align with broader U.S. surname expected patterns.

| Surname | Proportion per 100k population | Ratio (%) | Expected occurrence | Actual occurrence |
|---|---|---|---|---|
| Smith | 828.2 | 0.8% | 13 | 1 |
| Johnson | 655.2 | 0.7% | 10 | 0 |
| Williams | 551.0 | 0.6% | 9 | 3 |
| Brown | 487.2 | 0.5% | 8 | 2 |
| Jones | 483.2 | 0.5% | 8 | 2 |
| Garcia | 395.3 | 0.4% | 6 | 1 |
| Miller | 393.7 | 0.4% | 6 | 1 |
| Davis | 378.5 | 0.4% | 6 | 0 |
| Rodriguez | 371.2 | 0.4% | 6 | 0 |
| Martinez | 359.4 | 0.4% | 6 | 1 |
| Hernandez | 353.7 | 0.4% | 6 | 1 |
| Lopez | 296.5 | 0.3% | 5 | 1 |

Clusters of Names Starting with the Same First Letters

The 1,590 contracts were issued on 217 days over the course of the J&J Ponzi Scheme. For contracts issued on 56 of those days, the Sellers' surnames started with the same letter at least 50% of the time as shown in the table below. For example, on the first line of the table, on December 3, 2021, 18 contracts were issued, nine of those contracts had a Seller's last name starting with the letter "K". On the last line of the table on April 5, 2019, two contracts were issued, both contracts had a Seller's last name starting with the letter "P".

| Date of Contract | # of Contracts | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S | T | U | V | W | X | Y | Z |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/3/2021 | 18 | 17% | 28% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 6% | **50%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 10/8/2021 | 17 | 24% | 12% | 0% | 0% | 0% | 0% | 0% | **65%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 12/31/2021 | 17 | 6% | 18% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 24% | **53%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 12/10/2021 | 16 | 6% | **50%** | 0% | 0% | 0% | 0% | 0% | 0% | 6% | 13% | 25% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 12/24/2021 | 16 | 0% | **50%** | 0% | 0% | 0% | 0% | 0% | 19% | 13% | 19% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 11/12/2021 | 15 | 0% | 27% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **67%** | 7% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 6/25/2021 | 13 | 8% | 38% | 0% | 0% | 0% | 0% | 0% | **54%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 11/5/2021 | 13 | 38% | 8% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **54%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 1/21/2022 | 13 | 0% | 0% | 38% | 8% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **54%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 2/12/2021 | 12 | 8% | 33% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **58%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 6/18/2021 | 12 | 0% | **42%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **58%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 8/6/2021 | 12 | 8% | 33% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **58%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 9/24/2021 | 12 | 8% | 33% | 0% | 0% | 0% | 0% | 0% | **58%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 3/5/2021 | 11 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 9% | **91%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 5/14/2021 | 11 | 0% | 36% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **64%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 6/4/2021 | 11 | 9% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **73%** | 18% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 11/27/2020 | 10 | 0% | 0% | 10% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **70%** | 20% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 3/26/2021 | 10 | 0% | 20% | 0% | 0% | 0% | 0% | 0% | **80%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 4/9/2021 | 10 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **70%** | 20% | 10% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 7/23/2021 | 10 | 0% | 20% | 20% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **60%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 9/10/2021 | 10 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **60%** | 0% | 30% | 10% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 10/1/2021 | 10 | 40% | 0% | 0% | 0% | 0% | 0% | 0% | **60%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 8/21/2020 | 9 | 0% | 22% | 11% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **56%** | 11% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 8/28/2020 | 9 | 0% | 0% | 0% | 0% | 0% | 0% | 11% | **89%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 9/4/2020 | 9 | 0% | 0% | 11% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 11% | **78%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 12/25/2020 | 9 | 0% | 0% | 33% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **67%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 1/8/2021 | 9 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 22% | 0% | 11% | **56%** | 11% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 6/11/2021 | 9 | 22% | 0% | 22% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **56%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 8/14/2020 | 8 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **75%** | 0% | 0% | 25% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 11/13/2020 | 8 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **63%** | 38% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 7/2/2021 | 8 | **50%** | 0% | 0% | 0% | 0% | 0% | 0% | **50%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 12/4/2020 | 7 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 14% | **86%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 4/23/2021 | 7 | 0% | 14% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **86%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 10/15/2021 | 7 | 0% | 14% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **86%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 1/14/2022 | 7 | 0% | 14% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **86%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 5/29/2020 | 6 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 17% | **67%** | 17% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 6/5/2020 | 6 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **100%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 10/9/2020 | 6 | 0% | 17% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **83%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 11/6/2020 | 6 | 0% | **50%** | 0% | 0% | 0% | 0% | 0% | **50%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 1/15/2021 | 6 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 33% | **67%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 2/5/2021 | 6 | 0% | 33% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **67%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 7/31/2020 | 5 | 0% | 40% | 0% | 0% | 0% | 0% | **60%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 10/30/2020 | 5 | 0% | 0% | **40%** | 0% | 0% | 0% | 0% | **60%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 1/1/2021 | 5 | 20% | 20% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **60%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 4/16/2021 | 5 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **60%** | **40%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 2/22/2019 | 4 | 25% | 0% | 0% | 0% | 0% | 0% | 0% | **50%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 25% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 1/31/2020 | 4 | 0% | 0% | 0% | 0% | 0% | 25% | 0% | 0% | 0% | 0% | 0% | 0% | **50%** | 0% | 0% | 0% | 0% | 0% | 0% | 25% | 0% | 0% | 0% | 0% | 0% | 0% |
| 4/10/2020 | 4 | **50%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 25% | 0% | 25% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 10/2/2020 | 4 | 25% | 0% | 0% | 0% | 0% | 0% | 0% | **75%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 10/16/2020 | 4 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **50%** | **50%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 10/23/2020 | 4 | 0% | 25% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **75%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 12/11/2020 | 4 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **75%** | 0% | 25% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 7/16/2021 | 4 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **100%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 7/3/2020 | 3 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **100%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 9/11/2020 | 3 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **100%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 4/5/2019 | 2 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | **100%** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |

Also apparent from the above table is that the surnames starting with the letter “A” through "M” tended to be used more often and the latter half of the alphabet was used less often. The table below shows the count of contracts by the letter of the surname in the alphabet and compares this to what the US Census Bureau reported as the top 1,000 surnames in the USA in 2010.

| Initial | Count of initial per US Census* | Ratio (%) | Count of initial per purchase agreement | Ratio (%) |
|---|---|---|---|---|
| A | 35 | 3.5% | 80 | 5.0% |
| B | 95 | 9.5% | 213 | 13.4% |
| C | 88 | 8.8% | 84 | 5.3% |
| D | 43 | 4.3% | 41 | 2.6% |
| E | 17 | 1.7% | 13 | 0.8% |
| F | 39 | 3.9% | 34 | 2.1% |
| G | 50 | 5.0% | 55 | 3.5% |
| H | 85 | 8.5% | 167 | 10.5% |
| I | 2 | 0.2% | 13 | 0.8% |
| J | 18 | 1.8% | 66 | 4.2% |
| K | 23 | 2.3% | 211 | 13.3% |
| L | 44 | 4.4% | 194 | 12.2% |
| M | 108 | 10.8% | 130 | 8.2% |
| N | 19 | 1.9% | 38 | 2.4% |
| Others | 334 | 33.4% | 251 | 15.8% |

** 2010 US Census Data*

Apparent Randomness in the Numbers

When reviewing the financial information included in the contracts, the overuse and lack of use of certain numbers became very apparent. A detailed analysis of this information can be found in the "Personal Injury Settlement Amounts per J&J Consulting Contracts" section of the Benford's Law discussion immediately below.

**BENFORD'S LAW ANALYSIS**

The idea behind Benford's Law began in 1881 when astronomer Simon Newcomb noticed that the page numbers in a book of logarithm tables were worn more toward the front of the book and progressively less worn toward the end of the book. This led Newcomb to recognize a distinct pattern related to the occurrence of lower versus higher numerals and digits. Newcomb published an article explaining his observations and calculations of the probability of a single number being the first digit of a number in a dataset. Nearly sixty years later, physicist Frank Benford tested Newcomb's hypothesis against 20 sets of existing data and published a scholarly paper verifying the principle. Since then, Benford's Law has been used in fraud investigations, data verification, and financial audits, in support of the detection of fraudulent, or not-naturally occurring, financial data.

***Benford's Law Explained***

Benford's Law, also known as the First-Digit Law, is a statistical principle that describes the frequency distribution of the leading digits in many sets of numerical data. According to Benford's Law, in many naturally occurring collections of numbers, the first digit is more likely to be small than large. Specifically, the law predicts that the probability $P(d)$ that the first digit is $d$ is given by the formula:

$$P(d) = \log10\left(1 + \frac{1}{d}\right)$$

When calculated, the probability of a specific first digit occurring is as follows:




Therefore, in a naturally occurring dataset, the number one is expected to appear as the first digit more frequently than any subsequent number. The law reflects a logarithmic distribution rather than a uniform one. This does not only hold true for the first digit, but can also be tested on other digits as well using the following formula:

$$P(d) = \sum_{k=10^{n-2}}^{10^{n-1}-1} \log10\left(1 + \frac{1}{10k + d}\right)$$

When calculated, the probability of the first four digits occurs as follows:[4]

| *Number* | *1st Digit Probability* | *2nd Digit Probability* | *3rd Digit Probability* | *4th Digit Probability* | *5th Digit Probability* |
|---|---|---|---|---|---|
| *0* | N/A | 11.97% | 10.18% | 10.02% | 10.00% |
| *1* | 30.10% | 11.39% | 10.14% | 10.01% | 10.00% |
| *2* | 17.61% | 10.88% | 10.10% | 10.01% | 10.00% |
| *3* | 12.49% | 10.43% | 10.06% | 10.01% | 10.00% |
| *4* | 9.69% | 10.03% | 10.02% | 10.00% | 10.00% |
| *5* | 7.92% | 9.67% | 9.98% | 10.00% | 10.00% |
| *6* | 6.69% | 9.34% | 9.94% | 9.99% | 10.00% |
| *7* | 5.80% | 9.04% | 9.90% | 9.99% | 10.00% |
| *8* | 5.12% | 8.76% | 9.86% | 9.99% | 10.00% |
| *9* | 4.58% | 8.50% | 9.83% | 9.98% | 10.00% |

Benford's Law can also be used in other ways, including digits after decimal points and looking at groups of numbers, including looking at the first two numbers in combination. That calculation is:

$$P(D_1D_2 = d_1d_2) = \log\left(1 + \frac{1}{d_1d_2}\right) \qquad d_1d_2 \in [10, 11, ..., 98, 99]$$

When calculated, the probability of the first two digits occurs as follows:

| # | % | # | % | # | % | # | % | # | % | # | % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10 | 4.1% | 25 | 1.7% | 40 | 1.1% | 55 | 0.8% | 70 | 0.6% | 85 | 0.5% |
| 11 | 3.8% | 26 | 1.6% | 41 | 1.0% | 56 | 0.8% | 71 | 0.6% | 86 | 0.5% |
| 12 | 3.5% | 27 | 1.6% | 42 | 1.0% | 57 | 0.8% | 72 | 0.6% | 87 | 0.5% |
| 13 | 3.2% | 28 | 1.5% | 43 | 1.0% | 58 | 0.7% | 73 | 0.6% | 88 | 0.5% |
| 14 | 3.0% | 29 | 1.5% | 44 | 1.0% | 59 | 0.7% | 74 | 0.6% | 89 | 0.5% |
| 15 | 2.8% | 30 | 1.4% | 45 | 1.0% | 60 | 0.7% | 75 | 0.6% | 90 | 0.5% |
| 16 | 2.6% | 31 | 1.4% | 46 | 0.9% | 61 | 0.7% | 76 | 0.6% | 91 | 0.5% |
| 17 | 2.5% | 32 | 1.3% | 47 | 0.9% | 62 | 0.7% | 77 | 0.6% | 92 | 0.5% |
| 18 | 2.3% | 33 | 1.3% | 48 | 0.9% | 63 | 0.7% | 78 | 0.6% | 93 | 0.5% |
| 19 | 2.2% | 34 | 1.3% | 49 | 0.9% | 64 | 0.7% | 79 | 0.5% | 94 | 0.5% |
| 20 | 2.1% | 35 | 1.2% | 50 | 0.9% | 65 | 0.7% | 80 | 0.5% | 95 | 0.5% |
| 21 | 2.0% | 36 | 1.2% | 51 | 0.8% | 66 | 0.7% | 81 | 0.5% | 96 | 0.5% |
| 22 | 1.9% | 37 | 1.2% | 52 | 0.8% | 67 | 0.6% | 82 | 0.5% | 97 | 0.4% |
| 23 | 1.8% | 38 | 1.1% | 53 | 0.8% | 68 | 0.6% | 83 | 0.5% | 98 | 0.4% |
| 24 | 1.8% | 39 | 1.1% | 54 | 0.8% | 69 | 0.6% | 84 | 0.5% | 99 | 0.4% |

[4] Note that percentages throughout this analysis may appear to vary by 0.01% due to rounding of numbers instead of listing number to their hundredths or thousandths after the decimal point.

***Benford's Law Datasets***

Benford's Law is not applicable to all datasets but is observed in a wide variety of contexts, especially those that span several orders of magnitude or are generated by natural processes. Some examples of datasets where Benford's Law is frequently used include:

1. Financial Data: Accounting figures, tax returns, bank statements and stock market prices often follow Benford's Law.
2. Geographical Data: Population numbers, river lengths, and other geographical measurements.
3. Scientific Data: Measurements and constants in physics, astronomy, and other scientific fields.
4. Demographic Data: Birth rates, death rates, and other demographic statistics.

***Applications of Benford's Law***

1. Fraud Detection: One of the most prominent uses of Benford's Law is in forensic accounting and fraud detection. Since fraudulent data often does not follow the natural distribution predicted by Benford's Law, accountants and auditors can use this principle to flag suspicious data.
2. Data Quality Verification: Benford's Law is used in data validation processes to check whether datasets follow expected patterns. Significant deviations from Benford's Law can indicate errors or anomalies in the data collection process.
3. Election and Political Analysis: In certain cases, Benford's Law is applied to election data to identify irregularities or statistical anomalies that may suggest manipulation.

***Limitations of Benford's Law***

While Benford's Law applies to many datasets, it is not universal. Datasets that do not span multiple orders of magnitude or are constrained in some way (e.g., numbers with a fixed upper limit, such as percentages or numbers with predetermined constraints) will not necessarily follow Benford's Law.

It is important to note that Benford's Law does not prove that fraudulent activity in and of itself and instead highlights areas of concern that anybody with access to the data should further investigate to determine the existence of fraud.

***Benford's Law Analysis of the J&J Ponzi Scheme***

Given the usefulness of Benford's Law analysis and its applicability to forensic accounting and fraud examination, we observed what red flags existed during the pendency of the J&J Ponzi Scheme. The focus was on two key areas of the operations that lent credibility to the J&J Ponzi Scheme: the use of an Interest on Lawyer Trust Account (commonly referred to as an "IOLTA") to manage investor money and the personal injury settlement contracts between the injured plaintiff and J&J Consulting. Below is that analysis.

<u>Personal Injury Settlement Amounts per J&J Consulting Contracts</u>

There was a total of 1,590 purchase agreements that the receiver gathered for analysis. Out of all the information available in the purchase agreements, this was the only naturally occurring numerical information that should not have been subject to interference. It was the settlement amount between the injured party (plaintiff) and the party (defendant) responsible. Below are the results of that analysis on the first digit, second digit, and first two digits for the settlement amount.

*First Digit Analysis*




As can be seen on the graph above, in the first digit analysis of the contract settlement amounts, there were only settlements starting with one, two or three, with most of the settlements beginning with two. This caused a number of red flags as the number of settlements starting with a one were far lower than expected (5.5% actual versus 30.1% expected), the number of settlements starting with a two were nearly seventy percent higher than expected (87.2% actual versus 17.6% expected), and there were no settlements that started with the numbers four through nine (combined 0% actual versus 39.8% expected).

*Second Digit Analysis*




As can be seen on the graph above, in the second digit analysis of the contract settlement amounts, there were some significant anomalies including settlements that had second digits starting with eight (41.0% actual versus 8.8% expected, a 32.2% delta) and nine (27.3% actual versus 8.5% expected, an 18.8% delta). Combined, the second digits of eight and nine appeared in 68.3% of the settlement amounts despite only a 17.3% expected outcome, a variance of 51.1%. The number of settlements with a second digit of zero through seven were significantly lower than expected, appearing in31.7% of the settlement amounts whereas the expected settlement amounts in this range are 82.8%, a variance of 51.1%.

*First Two Digit Analysis*[5]




As can be seen on the graph above, in the first two digits analysis of the contract settlement amounts, there were no settlements that started with numbers 36 through 99, despite an expectation of 44.4% of all settlement amounts would fall in this range. Furthermore, if we add in expected settlement values between ten and 25, 85.9% of all settlement amounts should fall in this range, but only 16.9% actually do, creating significant variance of 69%. When we examine numbers 26 through 35, just these ten numbers make up 83.1% of all settlement amounts despite only anticipating 14.1% to fall in this small range. Astonishingly, the first two digits of 28 and 29 are used on 68.3% of settlement contracts despite an expectation that only 3% would fall in this range, a variance of 65.3%. This is because the operators of the Ponzi Scheme made up a fake settlement figure between $280,000 and $299,999 68.3% of the time.

[5] This analysis was run on the first two digits from 10 to 100, however, since there was not data beyond 32, the chart was set to only include number 10 to 50 to better illustrate the areas where data exists.

Beasley Law Group IOLTA (a/e 5598) Inflows

These analyses provide evidence of a substantial number of red flags that were exhibited during the pendency of the J&J Ponzi Scheme outside of just the raw volume of daily, weekly and monthly transactions and dollars being funneled through the Beasley Law Group IOLTA (a/e 5598) at Wells Fargo Bank, and the hundreds of others accounts managed by the other defendants at dozens of banks, including Wells Fargo Bank.

There was a total of 4,393 total inflows into the Beasley Law Group IOLTA (a/e 5598) that were analyzed in this effort. Below are the results of that analysis for the first digit, the second digit and the first two digits of inflows into this account.

*First Digit Analysis*




As can be seen in the chart above, in the first digit analysis of IOLTA inflows there are certain anomalies that stand out in the data. First, the number of transactions starting with the number one were 7.1% more likely to occur than expected (37.2% actual versus 30.1% expected), the number eight being almost three times more likely to occur than expected (20.1% actual versus 5.1% expected) and number five being 3.1% more likely to occur (11.0% actual versus 7.9%

expected). These variances are caused by the contracts uniformly being sold for $50k, $80k and $100k, and these amounts being the primary amounts deposited (as there were no revenues, the presence of revenues would've caused more natural numbers to enter the systems and would've resulted in distribution more closely aligned to the Benford curve). The overages in these three numbers lead to variances in the other first digits of between -1.4% and -6.8% for a total variance of -25.1% in these remaining six numbers.

*Second Digit Analysis*




As can be seen on the graph above, in the second digit analysis of the IOLTA inflows, there is one significant outlier due to zero being the second digit 82.3% of the time despite an expectation of zero being seen as the second digit 12% of the time, a variance of 70.3%. Given the large variance in zero, there were significant variances in the other nine numbers.

*First Two Digit Analysis*




As can be seen on the graph above, in the first two digit analysis of IOLTA inflows, there are six significant outliers in the inflow data. These include the number 10, which occurred 28.75% of the time despite only a 4.1% expected use, the number 20, which was used 9.26% of the time despite only a 2.1% expected use, the number 30, which was used 4.1% of the time despite only 1.4% expected, the number 40, which was used 7.7% of the time despite only 1.1% expected, the number 50, which was used 10.26% of the time despite only 0.9% expected, and the number 80, which was used 19.84% of the time despite only 0.5% expected. There are some other smaller variances, but these six numbers made up 79.95% of all the transactions despite only 10.2% being expected, a variance of 69.75%.

<u>Beasley Law Group IOLTA (a/e 5598) Outflows</u>

There was a total of 1,809 outflows from the Beasley Law Group IOLTA (a/e 5598) that were used in this forensic accounting. Below are the results of that analysis on the first digit, second digit, and first two digits of outflows from this account.

*First Digit Analysis*




As can be seen on the graph above, in the first digit analysis of the IOLTA outflows, there were only a few minor discrepancies that stand out in the data. First, the number of transactions starting with the number one were 1.8% more likely to occur than expected (31.9% actual versus 30.1% expected) and the five, which was 4.5% more likely to occur than expected (12.4% actual versus 7.9% expected).

*Second Digit Analysis*




As can be seen on the graph above, in the second digit analysis of IOLTA outflows, there are a couple significant outliers due to zero being the second digit 40.5% of the time despite an expectation of zero being seen as the second digit on 12% of the transactions, a variance of 28.5%, and the number five being the second digit 14.2% of the time despite only being expected 9.7% of the time, a variance of 4.5%. Given these two variances, there were significant shortfall variances in the other eight numbers that totaled -33.1%.

*First Two Digit Analysis*




As can be seen on the graph above, in the first two-digit analysis of IOLTA outflows, there are nine significant outliers in the inflow data. These include the numbers 10, 20, 25, 30, 40, 50, 60, 75, and 80 which occur 44% of the time despite only expected 13.2% of the time, a variance of 30.8%. The other 81 numbers should make up 86.8% of the transactions, but only actually make up 56% of the transactions, a variance of 30.8%.

**VELOCITY OF FUNDS ANALYSES**

A quantifiable phenomenon common to nearly all Ponzi-like enterprises that eventually collapse is a progressively increasing ratio of the monthly volume of funds transacted to the average monthly balance in an account. This ratio, known as the velocity of funds, describes the number of times per month the funds in an account turn over.

For example, if an account saw $2 million pass through it in a month, but the average balance in the account was $1 million, the ratio would be 2:1 (which could be expressed as just 2). If the same account a few months later saw $10 million pass through it in a single month, but the

average balance in the account remained $1 million, the ratio would be 10. When the ratio is 2, the money in the account is effectively replaced twice per month, whereas when it is 10, the money in the account is effectively replaced ten times per month—requiring a much higher rate of transactions and faster flows of money.

In Ponzi-like schemes, this ratio usually increases dramatically until the scheme collapses under its own weight. In other words, if the ratio is ever-increasing, there is a high likelihood that the scheme is getting closer to collapse.

***Beasley Law Group Wells Fargo IOLTA (a/e 5598)***

Here is the chart of the monthly turnover ratio for the Beasley Law Group Wells Fargo IOLTA (a/e 5598):




The Beasley Law Group Wells Fargo IOLTA (a/e 5598) had an average monthly turnover ratio of 2.2 in 2017, 2.5 in 2018, 5.8 in 2019 (a 132% increase), 6.2 in 2020, and then, starting in March 2021, we see Beasley turn over his IOLTA ten times in one month, then eleven times in June 2021, three months of twelve times turnover in August to October 2021, and then in November 2021, with an average daily balance of $2.3 million, Matt Beasley would turnover his IOLTA 22.5 times that month with over $50 million in transaction volume.

***J&J Consulting US Bank (a/e 2073)***

The following chart shows the monthly turnover ratio for the J&J Consulting US Bank (a/e 2073):




J&J Consulting US Bank (a/e 2073) had an average monthly turnover ratio of 18.4 in 2016, 21.5 in 2017, 9.9 in 2018, 11.0 in 2019, and, then in October 2020, with an average daily balance of $63,360, Jeff Judd would turnover the account 119.1 times with over $7.5 million in transaction volume. The 2021 monthly turnover ratio averaged 31.6, with peaks in June and August of 2021 of 52.4 and 57.8.

***J&J Consulting Wells Fargo (a/e 0153)***

Next is the chart of the monthly turnover ratio for the J&J Consulting Wells Fargo (a/e 0153):



J&J Consulting Well Fargo (a/e 0153) had an average monthly turnover ratio of 39.4 in 2018, 117.9 in 2019, 80.4 in 2020 and, then in November 2021, with an average daily balance of $198k, Jeff Judd would turnover his account 122.2 times that month with over $24.2 million in transaction volume.

There were large peaks in April 2019 and May of 2019. April 2019 showed a turnover of 375.0 with an average balance of $12,845 and $4.8 million in transaction volume. May 2019 showed a turnover of 255.4 times with an average balance of $17,624 and $4.5 million.

***Stirling Consulting Wells Fargo Bank (a/e 6558)***

Below is the chart of the monthly turnover ratio for Stirling Consulting Wells Fargo (a/e 6558):




Stirling Consulting  (a/e 6558) had an average monthly turnover ratio of 5.7 in 2018, 6.9 in 2019, then, starting in September 2020, we see Shane Jager turn over the account ten times in one month,  six months of a range of 19.1 – 27.2 turnover in October 2021 to March 2021, and then in April 2021, with an average daily balance of $182k, Shane Jager would turnover his account 54.5 times that month with over $9.9 million in transaction volume.

***Nevada Pro Pest Control Wells Fargo Bank (a/e 6540)***

Below is the chart of the monthly turnover ratio for the Nevada Pro Pest Control Wells Fargo (a/e 6540):




Nevada Pro Pest Control Wells Fargo (a/e 6540) had an average monthly turnover ratio of 0.6 from November 2018 through February 2020, on a total volume of funds of $158k. From March 2020 through December 2020, the average turnover ratio would increase to 123.4 on a total volume of funds of $50.7 million. The 2021 monthly turnover ratio averaged 309.7, with peaks in August and October of 2021 of 663.7 and 462.5.

***Velocity of Funds Summary***

In summary, Beasley Law Group Wells Fargo account ending 5598 had an average monthly turnover ratio of 5.87 from January 2017 to June 2022, with a total volume of funds of $164.4 million.

J&J Consulting US Bank account ending 2073 had an average monthly turnover ratio of 21.4 from December 2016 to April 2022, with a total volume of funds of $164.4 million.

J&J Consulting Wells Fargo account ending 0153 had an average monthly turnover ratio of 81.6 from December 2018 to March 2022, with a total volume of funds of $599.1 million.

Sterling Consulting Wells Fargo account ending 6558 had an average monthly turnover ratio of 10.5 from August 2018 to June 2022, with a total volume of funds of $294.6 million.

Nevada Pro Pest Control Wells Fargo account ending 6540 had an average monthly turnover ratio of 0.6 from November 2018 through February 2020 with a total volume of funds of $158k. From March 2020 through June of 2022, the average monthly turnover ratio was 178.6, with a total volume of funds of $172.6 million. These results are clearly indicative of the fact that Nevada Pro Pest Control's role in this enterprise was to launder money between J&J Consulting and Stirling Consulting.

## PURPORTED V. ACTUAL TERMINAL BALANCE SHEET AND NECESSARY RESTRUCTURING ADJUSTMENTS

The J&J Ponzi Scheme lacked any form of reconciled and audited financial records. However, based on the active contracts when operations ceased, the expected v. actual financial information on the income statement and balance sheet would have been presented as shown below.

***The Implied Balance Sheet Had Accounts Receivables of $419.5 Million***

**J&J Ponzi Scheme Balance Sheet**

| | **Purported** | **Actual** |
|---|---|---|
| **Assets** | | |
| Cash | - | - |
| Accounts Receivable | 419,541,147 | - |
| **Toal Assets** | 419,541,147 | - |
| **Liabilities** | | |
| Interest Due to Investors | 40,298,929 | (58,004,481) |
| Due to Operators | 56,555,317 | (188,423,955) |
| Principle Due To Investors | 322,686,902 | - |
| **Total Liabilities** | 419,541,147 | (246,428,436) |
| **Equity** | | |
| Investor Capital In | - | 519,920,355 |
| Investor Capital Out | - | (273,491,918) |
| Net Investor Capital | - | 246,428,436 |
| Net Income | - | - |
| **Total Equity** | - | 246,428,436 |
| **Total Liabilities and Equity** | 419,541,147 | - |

The purported balance sheet represents the financial activity that would have taken place in the 90 days following business cessation. There was nearly $420 million expected to be received from the 3,404 active contracts. $40.3 million of this was interest due to investors, $56.6 million due to the operators of the J&J Ponzi Scheme, and $322.7 million due in principle to the investors. However, there were no actual contracts and instead the investors were, for practical purposes, treated as the unsecured equity holders of the J&J Ponzi Scheme.

The actual balance sheet is restated to show no past or future receivables as there was never any revenue. The only identifiable assets would be the large contra liabilities from the operators and unjustly enriched third parties, which equal the net capital loss of the investors of $246.2 million. Since there was never any revenue, all so-called "interest" payments made in the preceding years were not interest at all, in fact $58.0 million was distributed in the form of recoverable amounts to certain third parties that need to be returned to the losing investors. The operators, far from being owed the $56.5 million in commissions and fees, need to return over $188.4 million to make the investors whole.

Investor funds were treated as revenue by the operators of the J&J Ponzi Scheme, creating a façade of profitability when in a legitimate operation it would have been treated as equity. From the start, investor funds were used to repay new investors as the J&J Ponzi Scheme grew. Proper financial statements and operations of an investment company would have a clear distinction between funds raised on investments and revenue earned during operations, the two were blurred and combined during these operations of this enterprise.

***Engaged Capital Forecast Based on Existing Contracts and Estimated New Capital Needed in the Next 90 Days to Cover Liabilities***

For the sake of argument, for the J&J Ponzi Scheme to continue to operate as though it was a profitable enterprise, the operators would need to raise, in 90 days: 1) $40.2 million to pay investors their timely interest payments; 2) assuming they could convince 90% of investors to "roll over into a new contract", they would need at least $32.2 million to pay the 10% who wanted to cash out; and 3) the salespeople were due $56.5 million. So, for the J&J Ponzi Scheme to not collapse under its own financial mass, the operators would need to raise at least $72.4 million in 90 days and preferably $128.9 million to correctly compensate themselves. Otherwise, the enterprise would find itself insolvent from its own unsustainable financial demands.

The J&J Ponzi Scheme's financial practices clearly exhibit characteristics of fraudulent investment operations. Investor funds were solely treated as revenue or profits, creating the appearance of successful operations. There was no actual revenue earned, and subsequent investor funds were being used to pay off earlier investors, a classic indication of a Ponzi-like enterprise.

## ON THE ECONOMIC DAMAGES OF MULTI-OPERATOR PONZI-LIKE ENTERPRISES AND THE ASSIGNMENT OF SUCH DAMAGES TO OPERATORS USING THE FRAUD PROXIMITY RATIO

In Ponzi-like enterprises such as the J&J Ponzi Scheme, where very little investor capital was put to productive use, the total amount of claims approved by a court are generally the sum of all the individual net cash losses of those investor victims having suffered such losses. These are the total damages *(D)*, which can be expressed with the following mathematical expression:

*Total Damages (D) =*
*Operator's Investor Victims' Aggregate Net Cash Loss (I)*

Ponzi-like enterprises differ from normal enterprises in several ways, but the ultimate difference is Ponzi-like operators primarily do not sell things or provide services to make their money; the source of their money is investor capital. This difference is apparent when you analyze an operator's deposits. Specifically, mature Ponzi-like enterprises lack deposits from revenue-

generating activities sufficient to produce profits or even cover their investment capital[6], appearing more like a pre-profit start-up or a failing business than a mature, profitable business.

In the J&J Ponzi Scheme there was $1.9 billion in total deposits. 64.5% of inflows were transfers of no economic value, 26.8% were deposits of invested capital, and 8.7% was everything else. Ignoring the economically neutral transfers, 75.5% of the deposits were investment capital and 24.5% were all other sources. So, the invested capital may be said to have returned no more than 32.4% of its value in the form of revenue as of June 2022. Under no circumstances may businesses whose revenues do not exceed 100% of their invested capital be considered profitable; and accordingly, such businesses have no profits to distribute to their operators, agents, or investors.

The operational goal of a Ponzi-like enterprise is the redistribution of the investment capital from the investors to the enterprise operators, their agents, and their investor non-victims, so total damages may also be expressed with the following equality:

*Total Damages (D) =*
*Amount of Operator's Personal Enrichment[7] (O) -*
*Amount of Operator's Recoverable Distributions[8] (P)*

Therefore, in the accounting of a fully reconstructed and reconciled Ponzi-like enterprise, where sources of funds equal uses of funds, the following equation is true:

*Operator's Investor Victims' Aggregate Net Cash Loss (I)=*
*Amount of Operator's Personal Enrichment (O) -*
*Amount of Operator's Recoverable Distributions (P)*

In the J&J Ponzi Scheme, investor victims lost a net $246.4 million *(I)*, which is equal to the net $188.4 million of defendant personal enrichments *(O)*, plus the $58.0 million that operators distributed that is potentially recoverable *(P)*.

In single-operator Ponzi-like enterprises, the ratio (*I)* to *[(O) - (P)]* is always 1:1. But this is not the case for individual unique operators $(O_u)$ in multi-operator Ponzi-like enterprises like the J&J Ponzi Scheme. Indeed, the operational goal of the J&J Ponzi Scheme was, apparently, to fabricate a certain flow of funds to ensure the contracts investors purchased performed correctly. Certain defendants like Anthony Alberto did not acquire investors at all, Matt Beasley had no investors and his primary role was depositing investor funds and forwarding them to Jeff Judd, who had some investors and was primarily responsible for handling investor funds transferred to him from Beasley, and then there are defendants like Jason Jongeward, whose investors suffered

---

[6] Investment capital is the money that is used, or should be used, to generate revenue for the company and produce some profits for its investors.

[7] Amount of Operator's Direct Enrichment is the same figure that the Securities and Exchange Commission currently generally uses to determine its restitution amount with the defendants in cases with multiple defendants. It is the sum of the net inter-defendant cash transfers and the defendant's aggregate net cash flows with its investors and agents in their personal accounts.

[8] Receivers in federal cases involving securities fraud generally have causes against third parties that received false profits or other recoverable appropriations of victim's capital.

an immense loss compared to the funds Jason Jongeward personally handled. So, for multi-operator Ponzi-like enterprises, the *Total Damages ($D_u$)* equality is updated to reflect:

$$\sum \textit{All Unique Operator's } (I_u) \textit{ Investor Victims' Aggregate Net Cash Loss} =$$
$$\sum \textit{Amount of All Unique Operator's } (O_u) \textit{ Personal Enrichment} -$$
$$\sum \textit{Amount of All Unique Operator's Recoverable Distributions } (P_u)$$

Suppose each unique operator's investors' loss is represented by $(I_u)$, each unique operator's personal enrichment is represented by $(O_u)$, and the amount each unique operator's recoverable distributions (a negative number) is represented by $(P_u)$. The ratio of $(I_u)$ to $[(O_u - P_u)]$ accurately measures the degree to which the individual operator profited relative to how his personal investors were damaged. This is the *Fraud Proximity Ratio* ("FPR") and is expressed as:

$$\textbf{\textit{Fraud Proximity Ratio}} = I_u / (O_u - P_u)$$

…where the lower the result, the "closer" the operator is to personally be directing the underlying monetary appropriation and the higher the results, the "further" the operator is from directing the underlying appropriation. The resulting ratio is interpreted as follows:

| *Fraud Proximity Ratio* of an Individual Operator in Multi-Operator Enterprise | Interpretation of *Fraud Proximity Ratio* |
|---|---|
| 0.00 | Operator has no damaged investors/is extorting money |
| 0.01 to 0.99 | Operator was enriched more than his investors were damaged |
| 0.20 | Operator was enriched five times more than his investors were damaged |
| 0.50 | Operator was enriched double what his investors were damaged |
| 1.0 | Operator was enriched as much as his investors were damaged |
| 1.01 and higher | Operator's investors were damaged more than operator was enriched |
| 2.0 | Operator's investors were damaged twice as much as operator was enriched |
| 10.0 | Operator's investors were damaged tenfold the operator was enriched |

The *Fraud Proximity Ratios* we observe in the J&J Ponzi Scheme are:

| *Operator* | *Fraud Proximity Ratio (FPR): Iu / (Ou - Pu)* |
|---|---|
| Anthony Alberto | 0.00 |
| Matt Beasley | 0.02 |
| Jason Jenne | 0.07 |
| Jeff Judd | 0.40 |
| Warren Rosegreen | 0.42 |
| Chris Madsen | 0.67 |
| Mark Murphy | 0.88 |
| Shane Jager | 1.13 |
| Richard Madsen | 2.72 |
| Chris Humphries | 3.13 |
| Roland Tanner | 4.41 |
| Larry Jeffery | 5.19 |
| Denny Seybert | 10.20 |
| Cameron Rohner | 10.69 |
| Seth Johnson | 48.80 |
| Jason Jongeward | 57.99 |

Anthony Alberto was possibly unaware of the J&J Ponzi Scheme entirely as he brought in no investors and stopped participating at the beginning of January 2020, when Matt Beasley had repaid his gambling debts. Truly, the $10.6 million Anthony Alberto derived from Matt Beasley appears to have been the *raison d'être* for contriving the J&J Ponzi Scheme in the first place, representing the "fraud behind the fraud" that is reflected in his FPR of 0.00.

Matt Beasley has a slightly higher FRP of 0.02, and this is only due to his legitimate balance due to borrowing from Libertas Funding. Jason Jenne's FPR is a very low 0.07 because he benefited from the enterprise 14 times more than his personally-procured investors suffered a loss; Jenne's investors invested large sums early in the enterprise and let it ride, with Jenne directly benefiting every 90-days when his investors rolled their old contracts into new ones and not cashing out. Jeff Judd's FPR of 0.40 indicated that Judd benefitted 2.5 times more than his 169 investors lost of their $103.3 million invested ($102.1 million compared to $40.7 million). One of the earliest defendants to bring investors into the enterprise, Warren Rosegreen, had a similarly low FPR of 0.42. Chris Madsen's FPR of 0.67 indicates that the $13.5 million he appropriated was 67% higher than the $9.0 million his investors lost. Mark Murphy's FPR of 0.88 shows that the $8.2 million his investors lost was only modestly less than the $9.3 million he made.

The remaining nine defendants, whose FPR's are over 1, all had investors who were damaged to a greater extent than the operator benefited. Shane Jager appropriated a staggering $43.1 million, but this was less than the estimated $48.8 million his investors lost. For Richard Madsen (FPR 2.72), Chris Humphries (FPR 3.13), Roland Tanner (FPR 4.41) and Larry Jeffery (FPR 5.19), these defendants' investors lost two-, three-, four-, and five-times as much as these defendants benefited themselves. Denny Seybert (FPR 10.20) and Cameron Rohner (FPR 10.69) each benefited less than 10% of the amount that their investors were injured. Seth Johnson's (FPR

48.80) identifiable enrichments of $37,850 are 48.8 times less than the $1.8 million his investors lost, and Jason Jongeward (FPR 57.99), who brought in 141 investors who lost $43.4 million seems to have only directly benefitted about $749k, which is 1.7% of his investors' aggregate loss.

The *Fraud Proximity Ratio* reconciles three disparate variables that exist in all multiple operator Ponzi-like enterprises: the aggregate losses of the investors, each of whom was induced to invest in the enterprise by one or more unique operators; the aggregate net amount that each operator received from each other operator plus the aggregate net amount that each operator directly received from their unique investors; and the aggregate net investor capital each operator appropriated and sent to third parties that is subject to recovery. This reconciliation allows an observer to compare the direct enrichment of the operator *($O_u$)* with the direct losses of the operator's investors *($D_u$)*.

The usefulness of calculating the *Fraud Proximity Ratio* in multi-operator issues of misappropriation is that the FPR quantifies the relationship between the funds an operator brought in and the funds an operator appropriated.

Imagine an enterprise where all operators have an FPR of 1.0. This is an egalitarian enterprise where each operator raised the same *proportion* of investor funds relative to the amount of money they appropriated. In such an enterprise, a neutral observer would confidently say that each operator is responsible for the amount they appropriated, which is conveniently the same amount that their investor's lost. But what would the same neutral observer say if some operators took large sums while raising none themselves? What if others raised tremendous sums and took only small sums, while still others profited exponentially compared to how much they raised? The *Fraud Proximity Ratio* is a calculation that describes operators from most proximate to most distant from the underlying appropriation and yields the following formula for calculating damages in a multi-operator Ponzi-like enterprise:

*FPR Damages ($D_u$) = Operator's Investors' Loss ($I_u$) / Fraud Proximity Ratio (FPR)*

In the J&J Ponzi Scheme, the $246.4 million in capital losses suffered by the 948 net losing investors are attributed to the operator that brought in the individual investors as follows:

| Operator | Operator's Investor Victims' Net Loss: (Iu) | % |
|---|---|---|
| Shane Jager | 48,817,116 | 19.8% |
| Jason Jongeward | 43,436,154 | 17.6% |
| Chris Humphries | 41,192,061 | 16.7% |
| Jeff Judd | 40,791,866 | 16.6% |
| Roland Tanner | 15,155,885 | 6.2% |
| Richard Madsen | 11,289,142 | 4.6% |
| Chris Madsen | 9,036,962 | 3.7% |
| Larry Jeffery | 8,449,428 | 3.4% |
| Mark Murphy | 8,234,348 | 3.3% |
| Cameron Rohner | 6,248,867 | 2.5% |
| Denny Seybert | 5,899,582 | 2.4% |
| Warren Rosegreen | 5,086,460 | 2.1% |
| Seth Johnson | 1,847,067 | 0.7% |
| Matt Beasley | 490,000 | 0.2% |
| Jason Jenne | 453,500 | 0.2% |
| Anthony Alberto | 0 | 0.0% |

In other words, investors Shane Jager brought in suffered 19.8% of the total loss, investors Seth Johnson brought in suffered 0.7% of the total loss, and Anthony Alberto had no investors. But when we look at the amount the operator personally appropriated as well as the recoverable amounts they distributed, the list ascends quite differently:

| Operator | Operator's Personal Enrichment: (Ou) | % | Operator's Recoverable Distributions: (Pu) | % |
|---|---|---|---|---|
| Jeff Judd | 79,985,662 | 42.4% | -22,139,765 | 38.2% |
| Shane Jager | 36,182,119 | 19.2% | -6,932,743 | 12.0% |
| Matt Beasley | 22,810,846 | 12.1% | -2,285,826 | 3.9% |
| Chris Madsen | 9,734,343 | 5.2% | -3,822,557 | 6.6% |
| Chris Humphries | 10,558,448 | 5.6% | -2,609,385 | 4.5% |
| Warren Rosegreen | 5,841,577 | 3.1% | -6,204,324 | 10.7% |
| Anthony Alberto | 6,151,909 | 3.3% | -4,560,140 | 7.9% |
| Mark Murphy | 5,240,861 | 2.8% | -4,154,223 | 7.2% |
| Jason Jenne | 5,428,125 | 2.9% | -620,000 | 1.1% |
| Richard Madsen | 1,570,368 | 0.8% | -2,575,494 | 4.4% |
| Roland Tanner | 2,569,850 | 1.4% | -870,548 | 1.5% |
| Larry Jeffery | 1,297,697 | 0.7% | -331,731 | 0.6% |
| Jason Jongeward | 199,805 | 0.1% | -549,233 | 0.9% |
| Cameron Rohner | 508,950 | 0.3% | -75,750 | 0.1% |
| Denny Seybert | 355,544 | 0.2% | -222,763 | 0.4% |
| Seth Johnson | -12,150 | 0.0% | -50,000 | 0.1% |

In comparison of the preceding two charts, Jeff Judd's investors had 16.6% of the loss but Jeff Judd had 42.4% of the operator enrichment and distributed 38.2% of the distributed third-party recovery amounts. Conversely, Jason Jongeward's investors had 17.6% of the loss but Jason Jongeward had 0.1% of the overall operator enrichment and 0.9% of the distributed recovery amounts. Consider that Jason Jenne's investors suffered only 0.2% of the aggregate loss, but Jason Jenne got 2.9% of thew total operator enrichment and distributed 1.1% of the recovery amounts. Now look at Mark Murphy, who received 2.8% of the operator enrichment, brought in 3.3% of the losing investors, and distributed 7.2% of the recoverable distributions. Finally look at Warren Rosegreen, who is responsible for obtaining 2.1% of the investors' loss, yet he got 3.1% of the operator enrichment and distributed 10.7% of the distributed third-party recovery amounts. The five preceding operators all have dramatically different outcomes from the J&J Ponzi Scheme, but the *Fraud Proximity Ratio* standardizes and reconciles these issues.

In summary, by calculating the *Fraud Proximity Ratio* for the defendants in the J&J Ponzi Scheme, we can associate the overall loss the investors experienced with each individual operator who directly and indirectly caused these losses as follows:

| *Operator* | *Operator's Investor Victims' Net Loss: (Iu)* | *%* | *Fraud Proximity Ratio (FPR): Iu / (Ou - Pu)* | *FPR Damages: Iu / FPR* | *%* |
|---|---|---|---|---|---|
| Jeff Judd | 40,791,866 | 16.6% | 0.40 | 102,125,427 | 41.4% |
| Shane Jager | 48,817,116 | 19.8% | 1.13 | 43,114,862 | 17.5% |
| Matt Beasley | 490,000 | 0.2% | 0.02 | 25,096,672 | 10.2% |
| Chris Madsen | 9,036,962 | 3.7% | 0.67 | 13,556,901 | 5.5% |
| Chris Humphries | 41,192,061 | 16.7% | 3.13 | 13,167,833 | 5.3% |
| Warren Rosegreen | 5,086,460 | 2.1% | 0.42 | 12,045,901 | 4.9% |
| Anthony Alberto | 0 | 0.0% | 0.00 | 10,712,049 | 4.3% |
| Mark Murphy | 8,234,348 | 3.3% | 0.88 | 9,395,084 | 3.8% |
| Jason Jenne | 453,500 | 0.2% | 0.07 | 6,048,125 | 2.5% |
| Richard Madsen | 11,289,142 | 4.6% | 2.72 | 4,145,861 | 1.7% |
| Roland Tanner | 15,155,885 | 6.2% | 4.41 | 3,440,398 | 1.4% |
| Larry Jeffery | 8,449,428 | 3.4% | 5.19 | 1,629,428 | 0.7% |
| Jason Jongeward | 43,436,154 | 17.6% | 57.99 | 749,038 | 0.3% |
| Cameron Rohner | 6,248,867 | 2.5% | 10.69 | 584,700 | 0.2% |
| Denny Seybert | 5,899,582 | 2.4% | 10.20 | 578,307 | 0.2% |
| Seth Johnson | 1,847,067 | 0.7% | 48.80 | 37,850 | 0.0% |
| TOTAL: | 246,428,436 | | 1.00 | 246,428,436 | |

**CONCLUSION**

Sixteen defendant individuals, through seventy-five legal entities, operated the J&J Ponzi Scheme. They raised $519.9 million from 1,213 investors who purchased 11,342 contracts from salespeople, promising settlement claims of over $1.3 billion in revenue. All these contracts were false, and Enterprise never deposited any such revenue.

948 investors with $405.6 million have net cash losses of $246.4 million; 253 investors with investments of $113.0 million have $47.9 million in false profits to recover; and another 83 non-investors have $10.0 million in unjust enrichments to recover.

The sixteen defendant individuals had a direct enrichment of $188.4 million as of June 2022 and have returned $82.4 million to the receiver to-date. In summary, the defendants were responsible for gross investor losses and further enrichment as of June 3, 2022 as follows:

| *Operator* | *Operator's Investor Victims' Net Loss: (Iu)* | *%* | *Operator's Personal Enrichment: (Ou)* | *%* | *Fraud Proximity Ratio (FPR): Iu / (Ou - Pu)* | *FPR Damages: Iu / FPR* | *%* |
|---|---|---|---|---|---|---|---|
| Jeff Judd | 40,791,866 | 16.6% | 79,985,662 | 42.4% | 0.40 | 102,125,427 | 41.4% |
| Shane Jager | 48,817,116 | 19.8% | 36,182,119 | 19.2% | 1.13 | 43,114,862 | 17.5% |
| Matt Beasley | 490,000 | 0.2% | 22,810,846 | 12.1% | 0.02 | 25,096,672 | 10.2% |
| Warren Rosegreen | 5,086,460 | 2.1% | 5,841,577 | 3.1% | 0.42 | 12,045,901 | 4.9% |
| Chris Madsen | 9,036,962 | 3.7% | 9,734,343 | 5.2% | 0.67 | 13,556,901 | 5.5% |
| Anthony Alberto | 0 | 0.0% | 6,151,909 | 3.3% | 0.00 | 10,712,049 | 4.3% |
| Mark Murphy | 8,234,348 | 3.3% | 5,240,861 | 2.8% | 0.88 | 9,395,084 | 3.8% |
| Chris Humphries | 41,192,061 | 16.7% | 10,558,448 | 5.6% | 3.13 | 13,167,833 | 5.3% |
| Jason Jenne | 453,500 | 0.2% | 5,428,125 | 2.9% | 0.07 | 6,048,125 | 2.5% |
| Richard Madsen | 11,289,142 | 4.6% | 1,570,368 | 0.8% | 2.72 | 4,145,861 | 1.7% |
| Roland Tanner | 15,155,885 | 6.2% | 2,569,850 | 1.4% | 4.41 | 3,440,398 | 1.4% |
| Larry Jeffery | 8,449,428 | 3.4% | 1,297,697 | 0.7% | 5.19 | 1,629,428 | 0.7% |
| Cameron Rohner | 6,248,867 | 2.5% | 508,950 | 0.3% | 10.69 | 584,700 | 0.2% |
| Jason Jongeward | 43,436,154 | 17.6% | 199,805 | 0.1% | 57.99 | 749,038 | 0.3% |
| Denny Seybert | 5,899,582 | 2.4% | 355,544 | 0.2% | 10.20 | 578,307 | 0.2% |
| Seth Johnson | 1,847,067 | 0.7% | -12,150 | 0.0% | 48.80 | 37,850 | 0.0% |
| TOTAL: | 246,428,436 | | 188,423,955 | | 1 | 246,428,436 | |

As of March 31, 2025, receiver Geoff Winkler has $163.6 million in misappropriated investor capital to further recover:

| *Operator* | *FPR Damages Less Recoveries-To-* | *%* | *Balance to Recover From Operator* | *%* | *Balance to Recover from Third Parties* | *%* |
|---|---|---|---|---|---|---|
| Jeff Judd | 64,800,090 | 39.6% | 42,660,325 | 40.4% | 22,139,765 | 38.2% |
| Shane Jager | 17,541,266 | 10.7% | 10,608,523 | 10.0% | 6,932,743 | 12.0% |
| Matt Beasley | 16,973,828 | 10.4% | 14,688,002 | 13.9% | 2,285,826 | 3.9% |
| Warren Rosegreen | 11,858,129 | 7.2% | 5,653,806 | 5.3% | 6,204,324 | 10.7% |
| Chris Madsen | 11,104,918 | 6.8% | 7,282,361 | 6.9% | 3,822,557 | 6.6% |
| Anthony Alberto | 10,712,049 | 6.5% | 6,151,909 | 5.8% | 4,560,140 | 7.9% |
| Mark Murphy | 9,068,516 | 5.5% | 4,914,293 | 4.7% | 4,154,223 | 7.2% |
| Chris Humphries | 8,425,444 | 5.1% | 5,816,059 | 5.5% | 2,609,385 | 4.5% |
| Jason Jenne | 5,673,098 | 3.5% | 5,053,098 | 4.8% | 620,000 | 1.1% |
| Richard Madsen | 3,860,988 | 2.4% | 1,285,494 | 1.2% | 2,575,494 | 4.4% |
| Roland Tanner | 2,280,388 | 1.4% | 1,409,841 | 1.3% | 870,548 | 1.5% |
| Larry Jeffery | 869,472 | 0.5% | 537,741 | 0.5% | 331,731 | 0.6% |
| Cameron Rohner | 573,094 | 0.4% | 497,344 | 0.5% | 75,750 | 0.1% |
| Jason Jongeward | 252,729 | 0.2% | -296,504 | -0.3% | 549,233 | 0.9% |
| Denny Seybert | 18,075 | 0.0% | -204,688 | -0.2% | 222,763 | 0.4% |
| Seth Johnson | -326,143 | -0.2% | -376,143 | -0.4% | 50,000 | 0.1% |
| TOTAL: | 163,685,943 | | 105,681,461 | | 58,004,481 | |

The forensic accounting analysis contained in this Report was prepared by John B. Hall and American Fiduciary Services, LLC based on primary and secondary source documents mostly obtained from financial institutions and other third parties. Neither the receiver, John B. Hall nor American Fiduciary Services, LLC guarantees or warrants the accuracy or completeness of the analysis. While commercially reasonable efforts have been made to provide an accurate and complete report, inadvertent errors or omissions may exist, and the analysis is based on the information available to American Fiduciary Services, LLC at the time of the preparation of the report.

American Fiduciary Services, LLC reserves the right to update, modify, or revise the information provided in this Report if additional relevant information is made available that materially affects the findings, conclusions or recommendations presented herein.

Respectfully Submitted this 31st Day of March 2025,

John B. Hall, Accountant

I have reviewed the information contained herein and hereby adopt it in its entirety.

Geoff Winkler, Receiver

# EXHIBIT A

# Entity Level Net Cash Results

| Associated Defendant | Legal Entity Name | Starting Balance | Net Cash From NON BLG/JJC Business Operations | Net Investor + Recoverable Flows | Net Named Party Flows | Net Transfers (To)/From Personal Accounts | Ending Balance |
|---|---|---|---|---|---|---|---|
| Jeff Judd | J & J Consulting Services, Inc | 41,066 | (24,741,006) | (56,455,910) | 130,490,911 | (49,157,324) | (177,737) |
| Jeff Judd | Judd Nevada Trust | | 1,721,079 | (750,000) | (1,250,000) | 664,608 | (385,687) |
| Jeff Judd | The Judd Irrevocable Trust | | (2,400,000) | | 1,400,000 | 1,050,000 | (50,000) |
| Jeff Judd | PAJ Consulting, Inc. | | (664,256) | | 859,500 | (195,244) | |
| Jeff Judd | PRJ Consulting, Inc. | | (782,708) | | 700,000 | 109,491 | (26,782) |
| Jeff Judd | KAJ Holdings, LLC | | (686,122) | (31,378) | | 717,500 | |
| Jeff Judd | The Judd Family Foundation | | (4,237,096) | | | 7,536,108 | (3,299,012) |
| Jeff Judd | Target Marketing Insurance Services, Inc. | | 1,822 | | | (1,822) | |
| Jeff Judd | J and J Purchasing, LLC | | (110) | | | 10,100 | (9,990) |
| Shane Jager | Stirling Consulting LLC | | (3,800,521) | (53,196,548) | 87,762,817 | (30,763,445) | (2,304) |
| Shane Jager | Jager Family Trust | 32,323 | (29,561,072) | 852,232 | (742,230) | 29,799,881 | (381,134) |
| Shane Jager | The D-Wayne Foundation | | (1,160,245) | | | 1,160,245 | |
| Shane Jager | The Arjen Jager and Kelli Jager Living Trust | | 244,750 | (193,259) | (40,000) | (1,671) | (9,821) |
| Shane Jager | Fajardo Properties LLC | 622 | 194,400 | (150,645) | 17,900 | 17,554 | (79,831) |
| Shane Jager | Elite Pest Control, LLC | 1,563 | 247,118 | (9,581) | | (239,100) | |
| Shane Jager | Pride Pest Control, LLC | | 206,237 | (189,546) | | | (16,692) |
| Shane Jager | Infused LLC | | 24,649 | | (10,445) | (8,700) | (5,504) |
| Chris Humphries | CJ Investments LLC | | (1,561,799) | (29,387,587) | 36,613,500 | (4,483,184) | (1,180,930) |
| Chris Humphries | Bug Raiders Pest Control, LLC | 12,646 | 28,029 | 25,000 | (329,568) | 315,234 | (51,342) |
| Chris Humphries | JCH Consulting, LLC | | 43,990 | 57,332 | 433,000 | (525,865) | (8,457) |
| Chris Humphries | Anderson Dairy Creamery | | (19,578) | 13,030 | | 6,550 | (2) |
| Chris Humphries | CJ Humphries Foundation | | (103,296) | | | 450,000 | (346,704) |
| Jason Jongeward | Jongeward Construction & Development LLC | 110,173 | (70,173) | | (40,000) | | |
| Jason Jongeward | JL2 Investments LLC | | (151,403) | (11,570,750) | 12,236,791 | (489,466) | (25,173) |
| Jason Jongeward | Jason Jongeward/Eco Battery | | 349,805 | (350,000) | | 500 | (305) |
| Matt Beasley | Beasley Law Group, PC | 3,958 | (13,903,423) | 367,278,668 | (344,093,913) | (5,446,307) | (3,838,984) |
| Matt Beasley | Expert Litigation Services Inc. | | (1,327,341) | (16,000) | (493,700) | 1,837,041 | |
| Chris Madsen | All American Builders, Inc. | 137,774 | 167,731 | (743,350) | 1,291,073 | (656,291) | (196,936) |
| Chris Madsen | ACAC, LLC | 22,292 | (7,178,241) | 1,092,004 | 5,485,281 | 594,451 | (15,788) |
| Chris Madsen | Business Center LLC | 5,824 | (56,525) | 78,278 | | (17,500) | (10,077) |
| Chris Madsen | HGD Brothers, LLC | 6,660 | (197,728) | 118,500 | | 151,423 | (78,855) |
| Chris Madsen | Business Investment, LLC | 9,121 | (401,628) | 176,680 | | 236,226 | (20,399) |
| Chris Madsen | US Team Industries LLC | 2,477 | 12,959 | | | (10,750) | (4,686) |
| Chris Madsen | Precision Sanitation, LLC | 7,293 | (1,774) | | | (375) | (5,144) |
| Chris Madsen | Promenade Partners, LLC | 24,196 | (19,649) | | | (4,547) | |
| Roland Tanner | Anthem Assets, LLC | | (9,800) | (17,929,620) | 23,415,500 | (5,472,000) | (4,080) |
| Roland Tanner | Tanner Capital Group, LLC | 250,341 | (1,349,933) | (240,057) | 950,000 | 1,268,313 | (878,664) |
| Roland Tanner | Nevada Housing Solutions, LLC | | 1,556,638 | (560,010) | (800,000) | 379,621 | (576,250) |
| Roland Tanner | ZZYZX Capital, LLC | 95,107 | 187,028 | (76,121) | (730,250) | 524,652 | (417) |
| Roland Tanner | Tanner Legacy, LLC | | 1,470,918 | | (2,100,000) | 700,000 | (70,918) |
| Roland Tanner | Tanner Family Trust | 38,050 | (1,164,829) | | | 1,145,118 | (18,339) |
| Mark Murphy | American Colocation Services LLC | 3,235 | (1,688,963) | (588,054) | 3,809,476 | (1,530,823) | (4,872) |
| Mark Murphy | Mark A Murphy LTD DBA Steel Dust | 8,704 | (442,083) | 2,363,988 | (649,535) | (1,276,599) | (4,474) |
| Mark Murphy | AAA Las Vegas Event Planner Inc | | 129,174 | 180 | (175,000) | 45,710 | (64) |
| Mark Murphy | American Investment Company LLC | 1,731 | (1,786,269) | (47,901) | | 1,838,584 | (6,145) |
| Mark Murphy | Chopin Investments Inc | 141 | 43,518 | 30,000 | 159,835 | (233,480) | (13) |
| Mark Murphy | Hope Ranch Inc. | 203 | (122,918) | (15,111) | | 137,833 | (7) |
| Mark Murphy | Desert Elevator Inc. | 395 | 37,666 | 124,490 | 19,300 | (181,600) | (250) |
| Mark Murphy | North Texas Properties LLC | | 68 | | | | (68) |
| Mark Murphy | Mark Murphy Foundation | | (104,646) | (553,315) | | 657,993 | (32) |
| Mark Murphy | Triangle Consultants LLC | | 149,855 | 145 | (125,000) | (25,000) | |
| Warren Rosegreen | Triple Threat Basketball LLC | 14,185 | (3,961,003) | (23,196,689) | 28,191,333 | (868,000) | (179,827) |
| Richard Madsen | Battle Born Funding, LLC | | (30,127) | (640,373) | 900,000 | (229,500) | |
| Richard Madsen | Ruger Investments | | (73,940) | 3,398,367 | (4,254,620) | 932,765 | (2,572) |
| Richard Madsen | Red Hills Investments, Inc. | | (653,459) | 2,280,444 | (585,080) | (1,041,280) | (625) |
| Richard Madsen | RRM Consulting, LLC | 37,420 | (1,639,811) | (127,983) | 1,729,667 | 1,011 | (304) |
| Anthony Alberto | Monty Crew LLC | | (2,550,594) | (187,800) | 2,806,705 | (68,311) | |
| Larry Jeffery | Capital Core Financial, Inc. | 18,465 | 1,316,975 | (646,971) | 110,000 | (790,500) | (7,969) |
| Larry Jeffery | FD Consulting Corp. | | (1,218,823) | (3,150,590) | 5,026,000 | (648,800) | (7,787) |
| Larry Jeffery | Pearl Squirrel Fund LLC | | 99,975 | | | (99,500) | (475) |
| Cameron Rohner | CR6 LLC | | (155,986) | (223,700) | 758,750 | (379,102) | 37 |
| Cameron Rohner | Cameron Rohner LLC | 4,768 | (200,309) | (45,000) | (50,000) | 305,507 | (14,966) |
| Jason Jenne | J&D Consulting Firm, Inc. | | (5,637,351) | (1,503,500) | 6,954,125 | 228,855 | (42,129) |
| Denny Seybert | Rocking Horse Properties LLC | 3,436 | (2,297,054) | 2,806,816 | (1,062,000) | 557,709 | (8,908) |

EXHIBIT A

## Entity Level Net Cash Results

| Associated Defendant | Legal Entity Name | Starting Balance | Net Cash From NON BLG/JJC Business Operations | Net Investor + Recoverable Flows | Net Named Party Flows | Net Transfers (To)/From Personal Accounts | Ending Balance |
|---|---|---|---|---|---|---|---|
| Denny Seybert | LV Capital LLC | | (15,905) | (574,900) | | 593,175 | (2,370) |
| Denny Seybert | Hobbyhorse Associates, LLC | 90,245 | 770,982 | (29,425) | (30,000) | (687,796) | (114,007) |
| Denny Seybert | C&C Group Holding LLC | 64,476 | 628,007 | (10,000) | (350,000) | (331,834) | (650) |
| Denny Seybert | Twenty17 Bayou City LLC | 3,069 | 104,185 | 9,500 | | (116,754) | |
| Seth Johnson | S.A. Johnson LLC | 109,554 | 2,183,338 | | 63,000 | (2,056,308) | (299,584) |
| Matt Beasley, Jeff Judd | BJ Holdings, LLC (Beasley/Judd) | | (180,074) | | 180,100 | | (26) |
| Shane Jager, Chris Madsen | GDBH, LLC (Chris Madsen/Jager) | 100 | (2,207,326) | | 2,428,927 | | (221,701) |
| Shane Jager, Jeff Judd | Nevada Pro Pest Control Inc. (Jager/Judd) | | 218,846 | | (150,825) | | (68,021) |
| Shane Jager, Jeff Judd | ORC Holdings LLC (Jager/Judd) | | (1,290,829) | | 1,294,600 | | (3,771) |
| Seth Johnson, Cameron Rohner | Prestige Consulting LLC (Johnson/Rohner) | | (10,550) | 3,079,400 | (3,039,800) | | (29,051) |
| | **Total** | **1,161,613** | **(109,678,530)** | **180,393,382** | **(5,013,873)** | **(54,065,018)** | **(12,797,574)** |